No. 25-4124

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UTAH POLITICAL WATCH, INC.; BRYAN SCHOTT,

*Plaintiffs-Appellants*,

v.

ALEXA MUSSELMAN, Utah House of Representatives Communications Director and Media Liaison Designee; ANDREA PETERSON, Utah Senate Deputy Chief of Staff and Media Liaison Designee; ABBY OSBORNE, Utah House of Representatives Chief of Staff; MARK THOMAS, Utah Senate Chief of Staff, in their official and individual capacities,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Utah, No. 2:25-CV-00050 (Shelby, J.)

### RESPONSE BRIEF OF APPELLEES

Victoria Ashby
Christine R. Gilbert
Alan R. Houston
OFFICE OF LEGISLATIVE
  RESEARCH & GENERAL COUNSEL
W210 State Capitol Complex
Salt Lake City, UT 84114
(801) 538-1032
vashby@le.utah.gov
cgilbert@le.utah.gov
ahouston@le.utah.gov

Dated: December 18, 2025

\* *Supervised by principals of the firm admitted to practice in VA*

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Daniel M. Vitagliano\*
Julius Kairey
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
dvitagliano@consovoymccarthy.com
julius@consovoymccarthy.com

*Counsel for Defendants-Appellees Alexa Musselman,
Aundrea Peterson, Abby Osborne, and Mark Thomas*

**ORAL ARGUMENT NOT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................ii

STATEMENT OF RELATED CASES ...........................................................ix

INTRODUCTION .............................................................................................1

STATEMENT OF THE ISSUES......................................................................2

STATEMENT OF THE CASE .........................................................................2

  A. Factual background ...................................................................................2

  B. Procedural history ....................................................................................6

SUMMARY OF ARGUMENT...................................................................... 13

STANDARD OF REVIEW ........................................................................... 14

ARGUMENT ................................................................................................. 15

  I. The district court correctly dismissed the amended complaint for failure to state a claim.................................................................................... 15

    A. Plaintiffs fail to state a First Amendment violation under forum doctrine (Counts I-II)................................................................... 15

      1. Denying Schott a credential does not infringe any newsgathering protected by the First Amendment.................................................. 15

      2. The credentialing policy is reasonable considering the forum's purpose and viewpoint neutral. ........................................................ 24

      3. Standards of content discrimination and strict scrutiny do not apply (Count II)................................................................................ 34

    B. Plaintiffs fail to plausibly plead First Amendment retaliation (Count III)...... 36

    C. Plaintiffs' prior-restraint claim fails (Count IV)..................................... 39

    D. Plaintiffs' void-for-vagueness claim fails (Count V)........................... 42

  II. The district court did not abuse its discretion in denying Plaintiffs' preliminary injunction motion. ...................................................................... 45

    A. Dismissal mooted Plaintiffs' motion. ................................................... 45

    B. The evidence confirms Plaintiffs are not entitled to preliminary relief.......... 46

CONCLUSION ............................................................................................. 52

STATEMENT WITH RESPECT TO ORAL ARGUMENT.................................... 53

CERTIFICATE OF COMPLIANCE.............................................................. 54

CERTIFICATE OF DIGITAL SUBMISSION............................................... 54

CERTIFICATE OF SERVICE....................................................................... 54

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. Mote*,
423 F.3d 438 (4th Cir. 2005) ............................ 41

*AP v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6)......................... 35

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)............................... 48

*Ateba v. Jean-Pierre*,
706 F. Supp. 3d 63 (D.D.C. 2023)............................... 32, 39

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) .................... 24, 25, 27, 28, 29, 32, 35, 42, 43

*Att'y Gen. of Okla. v. Tyson Foods*,
565 F.3d 769 (10th Cir. 2009) ........................ 47

*Balt. Sun v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ...........................22, 35, 38

*Beckles v. United States*,
580 U.S. 256 (2017)........................... 42

*Benisek v. Lamone*,
585 U.S. 155 (2018)........................... 51

*Boutilier v. INS*,
387 U.S. 118 (1967)........................... 43

*Bralley v. Albuquerque Pub. Schs. Bd. of Educ.*,
2015 WL 13666482 (D.N.M. Feb. 25)........................ 40

*Branzburg v. Hayes*,
408 U.S. 665 (1972)...........................16, 21

*Brokers' Choice of Am. v. NBC Universal*,
861 F.3d 1081 (10th Cir. 2017) ........................ 34

*Bronson v. Swensen*,
500 F.3d 1099 (10th Cir. 2007) ........................ 46

*Brown v. Palmer*,
915 F.2d 1435 (10th Cir. 1990) ........................ 34

*Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*,
660 F. App'x 600 (10th Cir. 2016).......................... 34

*Chegup v. Ute Indian Tribe of Uintah & Ouray Rsrv.*,
28 F.4th 1051 (10th Cir. 2022) ........................................ 46

*City of Lakewood v. Plain Dealer Publ'g*,
486 U.S. 750 (1988) .................................................. 41, 42

*CLS v. Martinez*,
561 U.S. 661 (2010) ....................................................... 26

*Clyma v. Sunoco, Inc.*,
594 F.3d 777 (10th Cir. 2010) .......................................... 21

*Cook v. Baca*,
12 F. App'x 640 (10th Cir. 2001) ....................................... 40

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985) ................................ 15, 23, 24, 25, 27, 29, 32

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) ........................................... 16

*Cressman v. Thompson*,
719 F.3d 1139 (10th Cir. 2013) ......................................... 46

*Danielson v. Huether*,
355 F. Supp. 3d 849 (D.S.D. 2018) ..................................... 19

*Epona v. County of Ventura*,
876 F.3d 1214 (9th Cir. 2017) .......................................... 46

*Friends of Animals v. Bernhardt*,
15 F.4th 1254 (10th Cir. 2021) ......................................... 18

*Golicov v. Lynch*,
837 F.3d 1065 (10th Cir. 2016) ......................................... 42

*Gonzalez v. Bendt*,
971 F.3d 742 (8th Cir. 2020) ........................................... 38

*Green Room LLC v. Wyoming*,
157 F.4th 1196 (10th Cir. 2025) ..................................... 14, 43

*GTE Corp. v. Williams*,
731 F.2d 676 (10th Cir. 1984) .......................................... 51

*Harmon v. City of Norman*,
981 F.3d 1141 (10th Cir. 2020) ......................................... 18

*Hawkins v. City & County of Denver*,
170 F.3d 1281 (10th Cir. 1999) ....................................................29, 34

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ........................................................ 51

*Hooks v. Yandell*,
2021 WL 3557190 (10th Cir. Aug. 12) ............................................. 46

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) .......................................................................16, 17

*Int'l Soc'y for Krishna Consciousness v. Lee*,
505 U.S. 672 (1992) .......................................................................... 27

*John K. MacIver Inst. for Pub. Pol'y v. Evers*,
994 F.3d 602 (7th Cir. 2021) .............................................15, 21, 22, 24, 26,
                                                  28, 31, 35, 36, 43, 51

*Lyn M. v. Premera Blue Cross*,
966 F.3d 1061 (10th Cir. 2020) ........................................................ 46

*Maehr v. United States*,
822 F. App'x 780 (10th Cir. 2020) .................................................... 45

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) .....................................................14, 30

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) .......................................................... 18

*New Hope Fam. Servs. v. Poole*,
966 F.3d 145 (2d Cir. 2020) .............................................................. 46

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......................................................................... 38

*Okla. Hosp. Ass'n v. Okla. Publ'g Co.*,
748 F.2d 1421 (10th Cir. 1984) ........................................................ 17

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) ........................................................ 29

*Pell v. Procunier*,
417 U.S. 817 (1974) ......................................................................16, 17

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) ............................................................26, 29, 30, 32

*Perry v. McDonald*,
  280 F.3d 159 (2d Cir. 2001) ................................................................ 40

*Potts v. Ctr. for Excellence in Higher Educ.*,
  908 F.3d 610 (10th Cir. 2018) ............................................................ 44

*Pryor v. Coats*,
  203 F.3d 836, 2000 WL 147388 (10th Cir. 2000) ............................ 27

*Reed v. Bernard*,
  976 F.3d 302 (3d Cir. 2020) ............................................................... 35

*Richison v. Ernest Grp., Inc.*,
  634 F.3d 1123 (10th Cir. 2011) .......................................................... 24

*Sac & Fox Nation of Okla. v. Cuomo*,
  193 F.3d 1162 (10th Cir. 1999) .......................................................... 46

*Saxbe v. Wash. Post*,
  417 U.S. 843 (1974) ...................................................................... 16, 18

*SCFC ILC, Inc. v. Visa USA*,
  936 F.2d 1096 (10th Cir. 1991) .......................................................... 47

*Schrier v. Univ. of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ..................................................... 14, 47

*Shero v. City of Grove*,
  510 F.3d 1196 (10th Cir. 2007) .................................................... 36, 37

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977) ............................................................ 35

*Smith v. Medina*,
  2024 WL 4471425 (10th Cir. Oct. 11) ............................................... 45

*Smith v. Plati*,
  258 F.3d 1167 (10th Cir. 2001) ....................................... 12, 17, 23, 37, 38

*Snyder v. Ringgold*,
  133 F.3d 917, 1998 WL 13528 (4th Cir. 1998) ............................. 21, 22

*Summum v. Callaghan*,
  130 F.3d 906 (10th Cir. 1997) ............................................................ 34

*Taylor v. Roswell Indep. Sch. Dist.*,
  713 F.3d 25 (10th Cir. 2013) .............................................................. 39

*Thomas v. Chi. Park Dist.*,
    534 U.S. 316 (2002) ................................................................ 41

*Trant v. Oklahoma*,
    754 F.3d 1158 (10th Cir. 2014) ............................................30, 36, 38

*Tyler v. City of Kingston*,
    74 F.4th 57 (2d Cir. 2023) ...................................................... 27

*United States v. Kokinda*,
    497 U.S. 720 (1990) ............................................................24, 25

*VDARE Found. v. City of Colorado Springs*,
    11 F.4th 1151 (10th Cir. 2021) .................................................. 38

*Vidal v. Elster*,
    602 U.S. 286 (2024) ............................................................28, 29

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .............................................................. 43

*Warner v. Gross*,
    776 F.3d 721 (10th Cir. 2015) ................................................... 45

*Wells v. City & County of Denver*,
    257 F.3d 1132 (10th Cir. 2001) ............................................15, 34, 41

*Wyo. Gun Owners v. Gray*,
    83 F.4th 1224 (10th Cir. 2023) ..............................................42, 43

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ................................................................ 16

**Other Authorities**

@johnforutah, X (Nov. 7, 2023, 10:17 PM),
    https://perma.cc/HD9F-GKYQ .................................................... 39

@schotthappens, Instagram (Dec. 17, 2024),
    https://bit.ly/4gkJpkv .......................................................... 45

@schotthappens, Instagram (Mar. 20, 2025),
    https://bit.ly/3XKptRM .......................................................... 18

@schotthappens, Instagram (Mar. 3, 2025),
    https://bit.ly/3FXUonO .......................................................... 20

@schotthappens.com, Bluesky (Dec. 16, 2024, at 6:40 PM),
    https://perma.cc/SV5K-XTWW ..................................................... 45

@VoteTrevorLee, X (July 17, 2023, 10:21 PM),
   https://perma.cc/HS66-ZEVK ....................................................... 39

@VoteTrevorLee, X (Oct. 19, 2023, 2:32 PM),
   https://archive.ph/QXFwK ............................................................ 39

*Archive*, Utah Senate,
   https://bit.ly/4iW6n3R .................................................................. 19

*Blog,* Merriam-Webster,
   https://archive.ph/LJqM0 ............................................................. 43

Editorial Board, *Tribune editorial: Utah Legislature declares phony*
   *'emergency' in drive to rob the people of what little power they have,*
   Salt Lake Trib. (Aug. 25, 2024),
   https://perma.cc/6TC3-XX7B ......................................................... 31

*Editorial policies and ethics,* Salt Lake Trib.,
   https://perma.cc/M8GN-VGDR ..................................................... 44

*Freelancer,* Merriam-Webster,
   https://archive.ph/s2trX ................................................................ 44

*Governor's Monthly News Conference,* PBS Utah,
   https://bit.ly/4aDOh3h ................................................................. 18

*House - 2025 General Session - Day 1,* Utah State Legis.,
   https://bit.ly/3EsB9BK .................................................................. 19

*Independent media,* Oxford Reference,
   https://perma.cc/339E-6P8J ........................................................... 33

*Independent,* Oxford English Dictionary,
   https://perma.cc/PP46-779P ........................................................... 33

Olohan, *White House Receives Over 7,400 New Media Requests Within*
   *24 Hours,* Daily Wire (Jan. 29, 2025),
   https://perma.cc/HL5A-FTT7 ......................................................... 22

*Recent Posts,* Utah House,
   https://bit.ly/4jDWlnZ .................................................................. 19

Schott, *'The whole thing's dumb.' Utah Gov. Cox blasts Pride flag battle*
   *with Salt Lake City,* Utah Pol. Watch (June 10, 2025),
   https://archive.ph/lYscl ................................................................. 18

Schott, *Political payback? Utah teachers' union locked out of discussions on bill to limit their power*, Utah Pol. Watch (Jan. 9, 2025), https://perma.cc/5ZNP-4D6E ...................................................................... 20

*Senate - 2025 General Session - Day 1*, Utah State Legis., https://bit.ly/4aDcqqo ...................................................................... 19

Special Session with Bryan Schott, *Podcast: Week one comin' in hot!*, Apple Podcasts (Jan. 24, 2025), https://bit.ly/4oBjOrN ...................................................................... 20

Stokols, *Trump briefing begins with pledge to boost outside media*, Politico (Jan. 28, 2025), https://archive.ph/cjltA ...................................................................... 22

Utah House Reps, *House Majority Media Availability – Feb. 21, 2025*, YouTube (Feb. 21, 2025), https://bit.ly/4i9mziy ...................................................................... 20

Utah House Reps, *Utah House Majority releases 2025 priorities*, YouTube (Jan. 30, 2025), https://bit.ly/3E8WNLB ...................................................................... 18

Utah Senate, *Utah Senate Media Availability – Day 1 – 2025 General Session*, Facebook (Jan. 21, 2025), https://bit.ly/4gmkE7w ...................................................................... 20

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## INTRODUCTION

The Utah Legislature has long limited media credentials to "professional member[s] of the media" who are "part of an established reputable news organization or publication." So when the *Salt Lake Tribue* fired Bryan Schott in 2024, legislative staff revoked his Utah Capitol media credential. And Schott did not become eligible again upon forming Utah Political Watch, his independent, self-run news blog. Under the Legislature's media credentialing policy, "[b]logs, independent media or other freelance media do not qualify for a credential." As Schott himself anticipated, legislative staff denied his application for a credential for the 2025 legislative session for these reasons.

Schott has no viable claim against the credentialing policy or the denial of his application. Denying Schott a credential did not infringe any First Amendment activity; he enjoys the same access to government information disseminated at the Capitol as credentialed media. Even if it did, the policy and the decision to deny Schott's application were reasonable and viewpoint neutral. No well-pleaded allegations support Schott's claims that the Legislature revised its policy or denied his application in retaliation for his reporting. There is no prior restraint, and the policy is not vague. Other circuits have correctly rejected Schott's theories, which would call into question the legality of longstanding policies regulating press access to government property across the country. The district court did not err in dismissing Plaintiffs' claims. This Court should affirm.

## STATEMENT OF THE ISSUES

I.    Whether the district court correctly dismissed the amended complaint for failing to state a claim upon which relief can be granted.

II.   Whether the district court abused its discretion in denying Plaintiffs' preliminary injunction motion as moot after dismissing the amended complaint.

## STATEMENT OF THE CASE

### A.  Factual background

The following facts are taken from the amended complaint and exhibits attached thereto.

**1.** "The Utah Legislature is dedicated to maintaining a transparent government, and the [Utah] Capitol is open to all." App.Vol.I at 77. "Committee meetings, legislative floor debates, agenda items and materials are readily accessible on the legislative website, and everyone is welcome to attend committee meetings and floor time." *Id.* at 77-78. "[N]othing prevents individuals from reporting on the proceedings of the Utah Legislature, regardless of whether they hold a media credential." *Id.* at 77.

Credentialed media, however, receive some benefits at the Capitol. They receive access to the Capitol press room, designated areas in the Senate and House chambers, a limited number of designated media workspaces in the Senate and House galleries, and a limited number of designated media parking spaces. *Id.* at 69. They also may be permitted access to media availabilities and other press events with elected officials. *Id.*

The Legislature adopted a written media credentialing policy in 2018. *Id.* at 17. The 2018 policy set forth "[d]efining characteristics" of eligible reporters: they "represent institution[s] that hire and fire, can be held responsible for actions, sued for libel"; "have editors, to whom they are responsible," "aren't the final arbiter and executioners of their own stories," and "don't just represent their own stream of consciousness"; "adhere to a defined professional code of ethics"; and "represent institutions with a track record," *i.e.*, "have been in the business for a period of time and have established they are not lobbyist organizations, political parties, or flash-in-the-pan charlatans with blog sites." *Id.* at 45. Characteristics of ineligible reporters included "[b]log site owners" where "[t]he writing is essentially their own stream of consciousness, with little or no editorial oversight" and "[o]rganizations with no history or track record," "[l]ittle or no institutional framework," and "not bound by a journalistic code of ethics." *Id.* The 2018 policy recognized that "these defining characteristics can be debated," but "[f]or practical purposes, we need to create a clear definition, so this is the starting point. These characteristics will likely change as the characteristics of the media industry evolve." *Id.* at 45-46.

As anticipated, the Legislature made incremental changes over the years. The 2019 policy maintained the same criteria. *Id.* at 49. The 2020 policy provided that an applicant must "[b]e a professional journalist" and "[r]epresent news organizations or publications that have a track record," among other things. *Id.* at 52. The 2021 policy required that an applicant "[b]e a professional journalist" and "[r]epresent an

established, reputable news organization or publication," among other things. *Id.* at 54. The 2022, 2023, and 2024 policies maintained these requirements. *See id.* at 57, 60, 64.

As to bloggers and independent media, the 2019 policy added a note suggesting that "a blog site owner or organization not bound by a code of ethics" could receive a credential by agreeing to abide by one. *Id.* at 49. The 2021 and 2022 policies provided: "Bloggers representing a legitimate independent news organization may become credentialed under some circumstances." *Id.* at 55, 58. The 2023 and 2024 policies narrowed that availability: "Bloggers representing a legitimate independent news organization may become credentialed under *limited, rare circumstances.*" *Id.* at 62, 66 (emphasis added).

In November 2024, the Legislature issued its 2025 credentialing policy. Like immediately preceding policies, the 2025 policy required applicants to "[c]omplete the online <u>application</u>"; "[b]e a professional member of the media … who regularly covers the Legislature and Capitol in person and is part of an established reputable news organization or publication"; "provide an annual background check"; "[a]dhere to a professional code of ethics"; and "[c]omplete the yearly harassment prevention training." *Id.* at 68. Directionally consistent with prior revisions, the 2025 policy revised the standard for bloggers: "Blogs, independent media or other freelance media do not qualify for a credential." *Id.* The revision comported with the Legislature's position since 2018 that qualifying characteristics "will likely change as the characteristics of the media industry evolve." *Id.* at 45-46.

4

**2.** Bryan Schott worked as a political correspondent at the *Salt Lake Tribune* from 2020 to 2024. App.Vol.I at 15-16. In October 2024, two months after departing the *Tribune*, he started Utah Political Watch. *Id.* at 16. Schott is UPW's "owner," "publisher," "sole reporter," and "Editor-in-Chief." *Id.* at 14, 16. UPW purportedly "employs" as an editor Malissa Morrell. *Id.* at 16. Morrell has served as Schott's "copyeditor in an unofficial capacity at various times since at least 2015," assisting with "story selection, improving his stories (grammar, clarity, brevity) and headline writing." *Id.*

Schott alleges that his reporting in 2024 "drew the ire of legislative leaders," citing three incidents. *Id.* at 21. First, Schott wrote an article accusing House Speaker Mike Schultz of "dodg[ing] questions" at a press conference. *Id.* Schultz texted Schott in response, "accusing Schott of bias." *Id.* Second, in response to a Schott post on X mocking staffers struggling to assemble a backdrop, House Chief of Staff Abby Osborne criticized Schott and defended the staffers. *Id.* at 22.[1] Third, in December 2024, Schott, now writing for UPW, reported that a complaint alleged Senate President Stuart Adams "violated campaign disclosure laws." *Id.* Adams publicly criticized Schott's reporting. *Id.* Senate Deputy Chief of Staff Aundrea Peterson also criticized Schott "[i]n an iMessage exchange" for his "disregard for accurate reporting and ethical standards." *Id.* at 22-23. Attempting to set the stage for this lawsuit, Schott wrote, "It certainly sounds

---

[1] Schott's X post, which he deleted and omitted from the amended complaint, can be found in App.Vol.II at 162. The district court characterized Schott's post as "an unflattering and critical comment of staffers." Suppl.App.80.

like you're going to use your criticism of this story you don't like to deny me a press credential next week." *Id.* at 73. Peterson assured Schott of neutral application of the credentialing policy: "We will follow our policy when reviewing media credential applications." *Id.*

Soon after that, Schott applied for a press credential for the 2025 legislative session. *Id.* at 23. House Communications Director Alexa Musselman denied the application because "media credentials are currently not issued to blogs, independent, or other freelance journalists." *Id.* at 24. As Musselman later explained, "Schott is not responsible to an editor and is the final arbiter and executioner of his stories, and thus represents his own stream of consciousness." *Id.* at 26. In addition, UPW "did not have any institutional framework or a sufficiently established track record." *Id.* Schott appealed that denial, and Osborne and Senate Chief of Staff Mark Thomas denied his appeal, explaining that Schott was not "a professional member of the media associated with an established, reputable news organization or publication" and that "[b]logs, independent media outlets or freelance media do not qualify for credentials." *Id.* at 24, 77.

## B. Procedural history

**1.** On January 22, 2025, one day after the general legislative session began, UPW and Schott sued Musselman, Peterson, Osborne, and Thomas and moved for a TRO and preliminary injunction ordering them to give Schott a credential. App.Vol.I at 1, 28. After full briefing and a hearing, the district court orally denied the motion, holding Plaintiffs failed to show a likelihood of success on the merits of the four claims

asserted—each of which Plaintiffs reasserted in their later-dismissed amended complaint, the basis of this appeal.

*First*, the district court rejected Plaintiffs' "assertion of an unequivocal … 'right to gather news.'" Suppl.App.87. It explained that "the First Amendment does not invalidate every incident burdening of the press that may result from the enforcement of government policies of general applicability." *Id.* at 88. The court held that Defendants did not "violate the First Amendment by establishing certain criteria to regulate the distribution of media credentials, because the plaintiffs do not have an unfettered constitutional right of access" and are not prohibited "from entering the legislature" to gather information. *Id.* at 89.

*Second*, the district court held that the credentialing policy is "reasonable and viewpoint neutral," the standard for restricting access to limited public fora. *Id.* at 90-91. The court explained that the policy "draws no distinctions based upon the viewpoint of the speaker, and there is no reason to think that in application it would tend to favor some viewpoints or ideas at the expense of others." *Id.* at 91. Rather, "the policy … is designed to give professional journalists and media representatives from reputable organizations access to cover the legislature." *Id.* at 92. Those criteria do not "assume or prescribe any particular viewpoint" or "govern what can be published"—only "how information is disseminated." *Id.* Plaintiffs also failed to show "that the credentialing criteria were modified to discriminate against plaintiffs' content or viewpoint." *Id.*

7

*Third*, the district court rejected Plaintiffs' vagueness challenge. *Id.* Assuming void-for-vagueness doctrine applied to the policy, the court held that the credentialing criteria "provide fair notice" of what the policy requires and are not susceptible to arbitrary administration. *Id.* at 94. The court explained that the policy includes terms "commonly understood in the English language" and "incorporated" "additional defining characteristics" from earlier iterations of the policy. *Id.* The court added that the latest revisions "removed some of the discretion that was previously permitted" and thus "reduced the potential for … arbitrary application." *Id.* at 95.

*Fourth*, the district court held that the policy is not a prior restraint. It does not "prevent the plaintiffs from reporting or publishing," as they "are able to attend and view the legislators' actions" and they "have not been restricted from speaking or publishing any commentary on the 2025 legislative session." *Id.* at 96-97.

The district court also held that Plaintiffs faced no irreparable harm because "Schott's lack of a media credential imposes little, if any, restrictions on the plaintiffs' ability to cover and report on the legislative session." *Id.* at 99. Schott can "attend the proceedings on the Senate and House floors from a position immediately adjacent to the press boxes," and all official legislative actions, legislative leadership's in-office briefings, and gubernatorial news conferences are live-streamed and archived online. *Id.* at 99-100.

**2.** Three weeks later, Plaintiffs filed an amended complaint and an amended preliminary injunction motion.

The amended complaint asserted four claims. First, Plaintiffs alleged the credentialing policy and its application deprives them of their right to gather news, is unreasonable, and discriminates based on content and viewpoint (Counts I-II).[2] App.Vol.I at 30-37. Second, they alleged Defendants denied Schott a press pass in retaliation for his critical reporting (Count III). *Id.* at 37-38. Third, they alleged the credentialing policy operates as a prior restraint (Count IV). *Id.* at 38-39. Finally, they alleged the policy is unconstitutionally vague (Count V). *Id.* at 39-41. Defendants moved to dismiss.

The parties took depositions on Plaintiffs' amended preliminary injunction motion. Schott confirmed, after failing to disclose in his declaration, that his purported editor, Morrell, is his wife. App.Vol.III at 27. Morrell is no professional editor. As she testified, she is a "licensed marriage and family therapist" and "doctoral student." Suppl.App.117. She has no training or professional experience in media, journalism, or editing (separate from UPW). *Id.* at 119-20, 184-85. Morrell is not a UPW "employee" in any sense: She "work[s]" approximately five hours per week; has no employment contract; and does not receive a paycheck, other compensation, or benefits from UPW. *Id.* at 131-32; App.Vol.III at 37-38.

Morrell's "work" includes discussing story ideas, sources, and when to publish stories and reviewing articles for "wording," "flow," and "grammar." Suppl.App.124-

---

[2] Plaintiffs pleaded these claims separately, but they present the same issue—whether the policy is lawful under the standards applicable to the forum—and therefore are duplicative. *Infra* I.A.3.

26, 133-34; App.Vol.III at 48. Morrell "does not review every piece" that UPW publishes, specifically UPW's "morning newsletter" and "breaking news" stories "that nee[d] to be published quickly." App.Vol.III at 42, 44, 53-54; *see* Suppl.App.141. She does not "do any sort of fact checking or verifying the accuracy of matters that are reported on." Suppl.App.138. She does not review "every document that is cited in every article" or "review footage" of legislative proceedings. *Id.* at 139. Nor does she "verify the identity of unnamed sources." *Id.* at 141.

Morrell's role as "editor" is at most advisory. When Schott worked at the *Tribune*, his editors had "the final say over what gets published." App.Vol.III at 56-57. At UPW, however, Schott maintains "the final say over what gets published," Morrell notwithstanding. *Id.* at 55-56; *see* Suppl.App.133 (Schott has "the final say"). Schott "can freely publish" anything despite Morrell's "disagreement." Suppl.App.143. And Schott "[f]or sure" has "rejected … Morrell's suggested edits." App.Vol.III at 55. As Schott explained, when he and Morrell disagree, "if I think that my way is better, I will probably stick to the way that I want to do it." *Id.* at 54-55.

Schott's amended complaint claimed that "Defendants do not uniformly apply" the credentialing policy, pointing to the "list of media credentials issued for the 2025 session." App.Vol.I at 25, 27. But Schott testified that he is unaware of those other media organizations' publication or editorial processes, organizational structure, affiliation with large media groups, or other characteristics relevant to credentialing. *See* App.Vol.III at 72-81.

Despite claiming that a press credential is "the primary way" that he reports on Utah politics, App.Vol.I at 156, Schott continued to cover the Legislature without a credential during the 2025 general session, App.Vol.III at 81. He maintained access to the House and Senate chamber galleries to observe floor debates and other proceedings in person. *Id.* at 83-84. He reported on floor debates, committee meetings, and bills that were introduced, passed, or failed. *Id.* at 82, 89; *see* Suppl.App.186-203. His reporting included video and audio of proceedings. App.Vol.III at 103-106. Schott also reported on gubernatorial press conferences with video footage. *Id.* at 101-03. He communicated with legislators and their staff by telephone, text message, and in person for his stories. *Id.* at 89-92. And he included in his articles statements from legislators, which he received directly from legislators or through staff. *Id.* at 93-101; *see* Suppl.App.204-221.

**3.** The district court canceled the scheduled hearing on the parties' motions and issued a decision granting Defendants' motion to dismiss and denying as moot Plaintiffs' amended preliminary injunction motion. App.Vol.I at 10.

The district court held that "Plaintiffs failed to plausibly allege a First Amendment violation" for their claim of unreasonable content and viewpoint discrimination. App.Vol.II at 258. Applying the "three-step framework for analyzing First Amendment activity on government property," the court concluded that Plaintiffs' claim fails at step one because "Plaintiffs have not alleged an infringement of an activity protected by the First Amendment." *Id.* at 255-56. The court reasoned that "Plaintiffs do not contend they lack access to all government information available to the public." *Id.* at 258. The

court explained that "the First Amendment does not encompass a right to resources routinely given to other media, and Plaintiffs do not … point to any Supreme Court or Tenth Circuit precedent establishing the right of access they seek." *Id.* (cleaned up) (citing *Smith v. Plati*, 258 F.3d 1167, 1177-78 (10th Cir. 2001)).

As to the retaliation claim, the district court held that "Plaintiffs' allegations are insufficient to infer a denial of a media credential would 'chill a person of ordinary firmness from continuing' unfavorable reporting." *Id.* at 259. The alleged chill was "speculative," and the alleged injuries were "trivial or de minimis," since Schott maintains access to all legislative proceedings, whether in person or online, and remains able to speak with legislators and their staff in public or via private channels. *Id.* at 260-61.

The district court also rejected Plaintiffs' prior restraint claim, explaining that the credentialing policy "does not regulate who may speak or what a reporter may or may not publish." *Id.* at 262. Plaintiffs did not allege that the policy "restricts the content of their speech" or would "censor their speech in the future." *Id.* And Plaintiffs' claim that Defendants "may potentially wield" the policy "in a discriminatory way" was "speculative." *Id.* at 262-63.

Finally, the district court rejected Plaintiffs' void-for-vagueness claim, explaining that the credentialing policy "uses commonly-understood terms." *Id.* at 264. Confirming the policy's "fair notice," "Plaintiffs themselves anticipated they would be denied a media credential." *Id.*

12

## SUMMARY OF ARGUMENT

**I. A.** Plaintiffs' First Amendment claim fails at step one of forum analysis because the denial of Schott's application has not burdened any activity protected by the First Amendment. Schott maintains access to all government information that is available to the public, and there is no right of "equal access" as a member of the press. Even if Schott cleared step one, the credentialing criteria are reasonable and viewpoint neutral. They reasonably ensure that professional journalists from reputable organizations maintain sufficient access to the limited spaces available, supporting informed reporting while preserving the Capitol's integrity. On their face, the criteria turn on the credential holders' status, not their views. And no well-pleaded facts suggest that, in applying the criteria, Defendants discriminated against Schott because of his views.

**B.** Schott has not plausibly alleged retaliation. Denying a media credential would not chill a person of ordinary firmness from continuing to report critically on the Legislature. A credential provides no greater access to government information, and anyone can freely cover the Legislature without one. Schott's continued reporting confirms the point. Plaintiffs also allege no facts plausibly establishing that Schott's reporting caused Defendants to revise the credentialing policy or deny Schott's application.

**C.** The credentialing policy is not a prior restraint because it does not restrict what may be published or what information may be gathered for reporting. Even if the policy were viewed as a prior restraint, the same standards of reasonableness and

13

viewpoint neutrality would apply, which the policy satisfies. And the policy does not give Defendants unbridled discretion in processing applications.

**D.** Grounded in due process, void-for-vagueness doctrine does not apply to the credentialing policy, which is not a law and does not deprive Plaintiffs of life, liberty, or property. Even if it applies, the policy's terms, read in context, have clear meanings.

**II.** The district court did not abuse its discretion in denying Plaintiffs' preliminary injunction motion. Dismissal of the complaint mooted that motion. Even if Plaintiffs stated a claim, the proper course is to remand for the district court to consider the motion in the first instance. Even if this Court were to consider it first, the record confirms Plaintiffs' claims are meritless.

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of a complaint for failure to state a claim. *Green Room LLC v. Wyoming*, 157 F.4th 1196, 1205 (10th Cir. 2025). To withstand a Rule 12(b)(6) motion to dismiss, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023). While the Court "accept[s] the well-pleaded facts alleged as true," it "need not accept threadbare recitals of the elements of a cause of action that are supported by mere conclusory statements" devoid of "any factual enhancement." *Id.* (cleaned up).

This Court reviews the denial of a preliminary injunction motion for abuse of discretion. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

# ARGUMENT

## I. The district court correctly dismissed the amended complaint for failure to state a claim.

### A. Plaintiffs fail to state a First Amendment violation under forum doctrine (Counts I-II).

Plaintiffs' challenge to the denial of a media credential concerns alleged First Amendment activity "on government property," triggering the well-established "three-step analytical framework" under forum doctrine. *Wells v. City & County of Denver*, 257 F.3d 1132, 1144 (10th Cir. 2001); *see, e.g.*, *John K. MacIver Inst. for Pub. Pol'y v. Evers*, 994 F.3d 602, 611-12 (7th Cir. 2021) (explaining forum doctrine "addresses who has the right of access to government property to engage in various expressive pursuits," including "gathering information for news dissemination"). First, Plaintiffs must show that their activities are "protected by the First Amendment." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Second, the court "must identify the nature of the forum," which dictates "the extent to which the Government may limit access." *Id.* Third, the court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

### 1. Denying Schott a credential does not infringe any newsgathering protected by the First Amendment.

Counts I and II fail at step one of the forum analysis because Plaintiffs do not allege an infringement of activity "protected by the First Amendment." *Cornelius*, 473 U.S. at 797. "It is helpful first to identify the nature of the right allegedly infringed" because "the asserted right is more narrowly defined" than Plaintiffs (and amici) claim.

*Courthouse News Serv. v. Smith*, 126 F.4th 899, 907 (4th Cir. 2025). Defendants do not dispute that Schott engages in protected First Amendment activity when he gathers news information for dissemination. But denying Schott a media credential does not limit that activity because Schott maintains complete "access to sources of information available to members of the general public" even without a credential. *Pell v. Procunier*, 417 U.S. 817, 835 (1974); *Saxbe v. Wash. Post*, 417 U.S. 843, 850 (1974). And the First Amendment does not guarantee "equal access" to every journalist. Accordingly, Plaintiffs have not shown an infringement of activity protected by the First Amendment, as the district court correctly concluded. App.Vol.II at 255-58.

**a.** Plaintiffs allege a sweeping "First Amendment right to gather news." App.Vol.I at 30. But as the district court recognized, "[t]here is no constitutional right to have access to particular government information." App.Vol.II at 255 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978) (plurality op.)).

The First Amendment does not bestow an "unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Nor does it "guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (collecting cases). The Supreme Court has long rejected the notion that "the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally." *Pell*, 417 U.S. at 834. Thus, "there is no general First Amendment right of access to all sources of information within governmental control."

16

*Smith*, 258 F.3d at 1178. This limitation "applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public." *Id.* (collecting cases). So "whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." *Okla. Hosp. Ass'n v. Okla. Publ'g Co.*, 748 F.2d 1421, 1425 (10th Cir. 1984).

Here, denying Schott a media credential has not deprived Plaintiffs of any publicly accessible government information. Plaintiffs' claims boil down to where and how—not whether—they access information. Plaintiffs complain about their inability "to view and report … *from the designated media areas* throughout the Capitol." App.Vol.I at 29 (emphasis added). But "the media have no special right of access … different from or greater than that accorded the public generally." *Houchins*, 438 U.S. at 16 (plurality op.). The complaint nowhere alleges that legislative proceedings cannot be viewed in person or online by anyone, press credential or not. Nor could it, as those proceedings "are readily accessible on the legislative website, and everyone is welcome to attend" them in person. App.Vol.I at 77-78.

The complaint alleges that Plaintiffs' lack of a credential has hampered Schott's ability to gather news in several ways. But Schott has not been denied "access to sources of information available to members of the general public." *Pell*, 417 U.S. at 835; *Saxbe*,

17

417 U.S. at 850. Schott can freely gather without a credential the same news on the Legislature for his reporting that he could with a credential.[3]

*First*, Plaintiffs allege that Schott cannot attend legislative and gubernatorial press conferences "in person." App.Vol.I at 28. But the complaint does not allege that such press conferences are otherwise unavailable for Schott to view. Nor could it, as press conferences are available online. *E.g.*, Utah House Reps, *Utah House Majority releases 2025 priorities*, YouTube (Jan. 30, 2025), https://bit.ly/3E8WNLB; *Governor's Monthly News Conference*, PBS Utah, https://bit.ly/4aDOh3h.[4] In fact, Schott has reported on several of the Governor's "semiregular televised press conference[s]"—with video footage. @schotthappens, Instagram (Mar. 20, 2025), https://bit.ly/3XKptRM; *e.g.*, Schott, *'The whole thing's dumb.' Utah Gov. Cox blasts Pride flag battle with Salt Lake City*, Utah Pol. Watch (June 10, 2025), https://archive.ph/lYscl.

---

[3] Amici claim that denial of a media credential generally "implicate[s] the First Amendment," FIRE-Br.6-8, because "news gathering is an activity given protection by the First Amendment," ACLU-Br.14-15. But amici (and Plaintiffs) do not consider the specific activity at issue here, including the public availability of the government information Schott seeks. *See Harmon v. City of Norman*, 981 F.3d 1141, 1147 (10th Cir. 2020) (confirming plaintiffs' "initial burden of showing that the First Amendment applies to their conduct").

[4] The Court may take "judicial notice of the existence and online availability" of the Internet materials cited herein, the sole purpose for which Defendants cite them. *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 719 n.48 (10th Cir. 2009) ("press release"); *see Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1263 & n.5 (10th Cir. 2021) ("online newspaper articles and social media posts").

*Second*, Plaintiffs allege that Schott could not "cover the opening addresses by the Senate President and Speaker of the House." App.Vol.I at 28. But Schott could have covered them in person or online, making this allegation implausible. The complaint does not explain why Schott could not have viewed these public addresses in person from the chamber gallery—the same place where designated media workspaces are located. *Id.* at 20. Nor does the complaint say why Schott could not have viewed these addresses online, both of which were livestreamed. *Senate - 2025 General Session - Day 1*, Utah State Legis., https://bit.ly/4aDcqqo; *House - 2025 General Session - Day 1*, Utah State Legis., https://bit.ly/3EsB9BK.

*Third*, Plaintiffs allege that Schott "missed multiple legislative press releases." App.Vol.I at 28. While the complaint says Schott is not on the "press release list," it does not allege that the releases are not otherwise accessible. *Id.* at 21. Nor could it, as press releases are available online. *E.g.*, *Archive*, Utah Senate, https://bit.ly/4iW6n3R; *Recent Posts*, Utah House, https://bit.ly/4jDWlnZ; *see Danielson v. Huether*, 355 F. Supp. 3d 849, 867-68 (D.S.D. 2018) (rejecting First Amendment claim to "receive notifications of press releases … normally sent to the media" where plaintiff blogger could "learn of [them] from other sources").

*Fourth*, Plaintiffs allege that "Schott is being denied entry" to "House or Senate rules committee meetings." App.Vol.I at 29. But such meetings are "open to all" to attend in person. *Id.* at 77-78.

*Fifth*, Plaintiffs allege that Schott cannot attend "meetings with Senate leadership in the Senate President's office" or "media availabilities with the Speaker of the House in his office." *Id.* at 29. But the complaint nowhere alleges that these meetings and media availabilities are not accessible online. Nor could it—because they are. *E.g.*, Utah Senate, *Utah Senate Media Availability – Day 1 – 2025 General Session*, Facebook (Jan. 21, 2025), https://bit.ly/4gmkE7w; Utah House Reps, *House Majority Media Availability – Feb. 21, 2025*, YouTube (Feb. 21, 2025), https://bit.ly/4i9mziy.

*Sixth*, Plaintiffs allege that Schott cannot "speak to legislators and their staff" or "ask questions" at gubernatorial press conferences. App.Vol.I at 28-29. But the complaint does not allege that Schott cannot do so in public spaces or through private channels, as he has done. *See id.* at 22, 24 (Schott texting Musselman and Peterson). And Schott has published several articles with statements of legislators that he obtained through direct communications. *E.g.*, Schott, *Political payback? Utah teachers' union locked out of discussions on bill to limit their power*, Utah Pol. Watch (Jan. 9, 2025), https://perma.cc/5ZNP-4D6E.

*Seventh*, Plaintiffs allege Schott is in a less advantageous "position to obtain videos, photographs, and audio recordings." App.Vol.I at 29. But the complaint nowhere alleges that Schott cannot obtain such materials. Indeed, Schott has reported on legislative actions with such materials. *E.g.*, @schotthappens, Instagram (Mar. 3, 2025), https://bit.ly/3FXUonO; Special Session with Bryan Schott, *Podcast: Week one comin' in hot!*, at 19:51-21:26, Apple Podcasts (Jan. 24, 2025), https://bit.ly/4oBjOrN.

**b.** Plaintiffs also allege a First Amendment right of "equal access" as a member of the press. App.Vol.I at 31; *see* Br.28 (seeking "equal access as other media"). But the First Amendment confers no such right, so the complaint fails to show an infringement of protected activity under this theory too.

Plaintiffs' asserted "right of 'equal access' … cannot be limited to members of the media without conferring a privileged First Amendment status on the press, and the Supreme Court has affirmed that the press does not enjoy special First Amendment rights that exceed those of ordinary citizens." *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998) (citing *Branzburg*, 408 U.S. at 684-85); *see Clyma v. Sunoco, Inc.*, 594 F.3d 777, 780 (10th Cir. 2010) ("the media does not have a special right of access to information unavailable to the public"). Plaintiffs' "asserted right would require that, in each and every circumstance where the government made news available, it would have to give access to that information to *everyone* on equal terms." *Snyder*, 1998 WL 13528, at *4. The Fourth Circuit has long rejected such a "broad rule" of "equal access" as "untenable." *Id.* And the Seventh Circuit recently rejected it too. In *Evers*, the plaintiff challenged its exclusion from the Wisconsin governor's "limited-access" press events, asserting an "equal access" theory. 994 F.3d at 610, 614. The court held that the First Amendment does not require government officials to "grant every media outlet access to every press conference," emphasizing "the chaos that might ensue if every gubernatorial press event had to be open to any 'qualified' journalist." *Id.* at 614. The

same concerns apply here: the Legislature cannot continue to hold in-office briefings with leadership or other private media events if everyone must receive "equal access."

Plaintiffs' theory also is unworkable and "flies in the face of so much well settled practice." *Snyder*, 1998 WL 13528, at *4. "Public officials routinely select among reporters when … providing access to nonpublic information." *Balt. Sun v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006). Plaintiffs' view of unbridled "equal access" would categorically "preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impractical to open up the conference to all media organizations." *Snyder*, 1998 WL 13528, at *4. Accepting Plaintiffs' theory "would 'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press." *Balt. Sun*, 437 F.3d at 418.

Case in point. Earlier this year the president's press secretary announced that the administration would extend White House access beyond "legacy media" to "less traditional outlets and even independent bloggers." Stokols, *Trump briefing begins with pledge to boost outside media*, Politico (Jan. 28, 2025), https://archive.ph/cjltA. Within 24 hours, the White House received over 7,400 requests for access to the briefing room. Olohan, *White House Receives Over 7,400 New Media Requests Within 24 Hours*, Daily Wire (Jan. 29, 2025), https://perma.cc/HL5A-FTT7. Surely the First Amendment does not mandate that all 7,400 applicants receive credentials. This Court should follow the Fourth and Seventh Circuits and reject Plaintiffs' equal-access theory and the "havoc" that would ensue. *Evers*, 994 F.3d at 612.

**c.** Plaintiffs argue the district court erred in applying *Smith v. Plati*. Br.25-28. *Smith* involved a website owner's First Amendment claim against a university for denying him "resources … routinely given to other media and to other fans of the University" and denying him "treatment as 'media' or 'press.'" 258 F.3d at 1172. This Court held that the university did not violate the plaintiff's asserted First Amendment "right to news-gathering" by "declining to provide him certain information about its varsity athletic programs." *Id.* at 1177. The Court explained that the press "do not have a special right of access to government information not available to the public." *Id.* at 1178 (collecting cases). And "alternative avenues to information remained open" to the plaintiff, even if the university "made it more difficult to obtain some information." *Id.* at 1177.

Plaintiffs claim *Smith* "isn't applicable" because it did not involve "a written cre-dentialling policy." Br.27. But *Smith*'s holding controls step one of the forum analysis. Plaintiffs assert the same First Amendment "right of access" for "newsgathering" ad-dressed in *Smith*, and *Smith* held that there is no First Amendment "right of access to government information not available to the public." 258 F.3d at 1177-78. As in *Smith*, Schott maintains access to all the information he seeks. Nor do Plaintiffs' conclusory assertions of viewpoint discrimination distinguish *Smith*, *contra* Br.27-30, because courts only consider viewpoint discrimination if the plaintiff shows a burden on protected activity. *Cornelius*, 473 U.S. at 797.

\*

Because Plaintiffs fail to plead a constitutionally cognizable restriction on their ability to gather news, Counts I and II fail at step one and the analysis "need go no further," as the district court held. App.Vol.II at 256 n.84 (quoting *Cornelius*, 473 U.S. at 797).

## 2. The credentialing policy is reasonable considering the forum's purpose and viewpoint neutral.

Even if Plaintiffs' well-pleaded factual allegations had established that the denial of a media credential infringes activity protected by the First Amendment, Plaintiffs still fail to state a claim. The district court (correctly) ended its analysis at step one, but this Court "may affirm on any basis supported by the record," including "arguments not reached by the district court." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

Defendants' "justifications" for denying Schott a credential and his "exclusion from the relevant forum satisfy the requisite standard." *Cornelius*, 473 U.S. at 797. The spaces to which Plaintiffs seek access are either limited public or nonpublic fora. *See* App.Vol.I at 31 (alleging limited public forum); *Evers*, 994 F.3d at 610 (classifying governor's "limited-access press conference" as nonpublic forum); *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025) (classifying White House press area and U.S. Capitol as nonpublic fora), *cert. denied*, 2025 WL 3260204. Either way, the standard is the same. *United States v. Kokinda*, 497 U.S. 720, 730 (1990) (plurality op.). Government control

over access to limited or nonpublic fora "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. Here, the credentialing policy is reasonable and viewpoint neutral.

a. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. Reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809. "Reasonableness may be established by evidence in the record or even by a commonsense inference." *Ateba*, 133 F.4th at 123 (cleaned up); *accord Kokinda*, 497 U.S. at 734-35 (plurality op.).

The credentialing criteria reasonably serve the policy's goal of facilitating news coverage of the Legislature and events at the Capitol by professional journalists and representatives from reputable media organizations. The requirements that an applicant be "a professional member of the media" and "[a]dhere to a professional code of ethics," App.Vol.I at 68, aim to support informed reporting while maintaining the integrity of the Capitol. For similar aims, the policy requires applicants to be "part of an established reputable news organization or publication" and excludes "[b]logs, independent media or other freelance media." *Id.* Denying credentials to bloggers and other independent media reasonably ensures professional journalists and established media maintain sufficient access to the few restricted spaces.

*Evers* is similar. The policy there required an applicant to be "a bona fide correspondent of repute in their profession" and "employed by or affiliated with an organization whose principal business is news dissemination." 994 F.3d at 606. The policy further required news organizations to have "published news continuously for at least 18 months" and have "a periodical publication component or an established television or radio presence." *Id.* The Seventh Circuit held these were "reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories." *Id.* at 610. So too here.

The reasonableness of the credentialing policy "is also supported by the substantial alternative channels that remain open" for news gathering. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 53 (1983). When considering forum "access barriers," the Supreme Court has "counted it significant that other available avenues for the [plaintiff] to exercise its First Amendment rights lessen the burden created by those barriers." *CLS v. Martinez*, 561 U.S. 661, 690 (2010). Shown above, other avenues to obtain the information Schott seeks remain available without a credential. *Supra* I.A.1.a. In other words, Plaintiffs are "assured of equal access to all modes of communication." *Perry*, 460 U.S. at 53. Their "ability" to gather news is not "seriously impinged by the restricted access," *id.*, as the district court first recognized, *see* Suppl.App.99-100. Even if those other channels are not Plaintiffs' preferred means to gather news, "[t]he First

Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means" to engage in First Amendment activity. *Cornelius*, 473 U.S. at 809.

The "surrounding circumstances" confirm the reasonableness of the latest policy revision. *Id.* That revision eliminated discretion in credentialing decisions to improve consistency and predictability. The policy now "provide[s] concrete guidelines that cabin" Defendants' "discretion when" applying the policy. *Ateba*, 133 F.4th at 126. Confirming the point, Defendants have seen "an uptick in nontraditional, independent media" inquiring about credentials. App.Vol.I at 19. Limiting credentials to established news organizations reasonably helps the press corps maintain its legitimacy amid the rise in nontraditional media. *Cf. Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 685 (1992) (finding concerns over "incremental effects" reasonable).

Plaintiffs' arguments challenging the policy's reasonableness fall flat. Plaintiffs assert, without citation, that "'[r]easonableness' is typically a mixed question of fact and law inappropriate for disposition by a 12(b) motion." Br.31. But courts routinely grant Rule 12(b)(6) motions where the complaint fails to show that an access restriction is unreasonable. *See, e.g.*, *Pryor v. Coats*, 203 F.3d 836, 2000 WL 147388, at *6 (10th Cir. 2000) (affirming dismissal and holding "policy governing access to law school bulletin boards is a reasonable, viewpoint-neutral exercise of its right to limit such access"); *Tyler v. City of Kingston*, 74 F.4th 57, 66 (2d Cir. 2023) (affirming dismissal where "the

27

Complaint itself and common sense offer a satisfactory rationale … , which undermines Plaintiffs' assertions of unreasonableness").

Plaintiffs' allegation that "Defendants do not have space or security concerns that justify denying independent journalists or bloggers credentials," Br.31; App.Vol.I at 32, is conclusory and unsupported by factual allegations. It is also implausible, since the designated spaces for credentialed media are limited in number. *See* App.Vol.I at 69 (2025 policy noting "limited space" for "designated media parking"); *id.* at 54 (2021 policy explaining "[s]pace is limited" in "media workspaces in the Senate and House galleries"). Nor is the policy "full of discretionary decisions," *contra id.* at 32; Br.32-34, because the terms "blog," "independent," "reputable," and "established" have clear meanings, *infra* I.C-D; *see Ateba*, 133 F.4th at 125-26 (rejecting argument that "'of repute' standard injects unbridled discretion into the credentialing process"). Finally, Plaintiffs argue that bloggers' ineligibility for credentials based on the lack of an editor or use of "'stream of consciousness' reporting" is unreasonable because "style and editing choices … do not affect security or space within the forum." App.Vol.I at 32. But those requirements serve the goals of journalistic quality and integrity in reporting. *See Evers*, 994 F.3d at 606-07, 610-11 (holding "bona fide correspondent of repute in their profession" was a reasonable criterion). The credentialing policy is reasonable.

**b.** Viewpoint discrimination occurs when the government targets "particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024). Government discriminates based on viewpoint "when it denies access to a speaker solely to

28

suppress the point of view he espouses." *Cornelius*, 473 U.S. at 806. Here, the credentialing policy is viewpoint neutral, both on its face and as applied.

On its face, the policy "draws no distinctions based upon the … viewpoint of the speaker, and there is no reason to think that, in application, it would tend to 'favor some viewpoints or ideas at the expense of others.'" *Pahls v. Thomas*, 718 F.3d 1210, 1234 (10th Cir. 2013). It "does not reference viewpoints in any way." *Ateba*, 133 F.4th at 124. None of the credentialing criteria is "based on the specific motivating ideology or the opinion or perspective of the speaker." *Vidal*, 602 U.S. at 294. As the district court first recognized, "[t]he term 'reputable organizations' does not itself assume or prescribe any particular viewpoint." Suppl.App.92. And in assessing applications, Defendants consider whether the organization has a "track record" and whether the reporter is "responsible to an editor." App.Vol.I at 26. These criteria are "based on the *status* of the respective" credential holder "rather than their views." *Perry*, 460 U.S. at 49. The policy excludes these reporters "[n]o matter the message [they] wan[t] to convey." *Vidal*, 602 U.S. at 293-94.

Beyond that, Defendants "did not apply the policy in this case to the plaintiffs on the basis of their viewpoint." *Hawkins v. City & County of Denver*, 170 F.3d 1281, 1288 (10th Cir. 1999). Defendants denied Schott's application because Plaintiffs, as a blog or independent media, did not meet the policy's requisite criteria. App.Vol.I at 24. Application of those objective criteria did not turn on Plaintiffs' viewpoint.

Plaintiffs' contrary assertions are based only on Schott's allegations that his reporting angered Defendants. Br.34-36. But as discussed regarding Plaintiffs' retaliation claim, *infra* I.B, "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014). No allegations provide any "indication" that Defendants "intended to discourage one viewpoint and advance another." *Perry*, 460 U.S. at 49.

Plaintiffs claim the Legislature altered its policy to exclude Schott given his unfavorable reporting on the Legislature. App.Vol.I at 35. But no well-pleaded factual allegations permit such an inference, rendering Plaintiffs' claim a "threadbare recita[l] … supported by mere conclusory statements," which this Court "need not accept." *Matney*, 80 F.4th at 1144 (cleaned up). The latest policy revision to exclude blogs and independent media was, as the district court first concluded, "a continuation of prior limitations," Suppl.App.97—narrowing the policy from "under some circumstances" in 2021 and 2022 to "under limited, rare circumstances" in 2023 and 2024, *supra* p.4.

Plaintiffs' exchanges with Defendants and legislative leadership do not suggest otherwise. Plaintiffs cite Speaker Schultz's text and Osborne's X post from January 2024—both nearly a year before the policy revision and denial of Schott's application. App.Vol.I at 21-22. Schott alleges no viewpoints expressed in the Schultz article, only that "Schultz dodged questions." *Id.* at 21. And Osborne's post related to Schott

mocking "media staffers who had difficulty setting up a backdrop," not any viewpoints expressed in his reporting. *Id.* at 22. As to the alleged spat with President Adams and Peterson, *id.* at 22-23; Br.36, staff modified the policy *before* that incident, so it could not have motivated the policy revision, as the district court observed, Suppl.App.92. And Defendants denied Schott's application because he did not meet the policy's objective criteria. App.Vol.I at 24. Plaintiffs' cited exchanges do not plausibly establish that Schott's viewpoints played any role in revising the policy or denying his application.

The Legislature's credentialing history and the current list of credentialed journalists confirm the absence of viewpoint discrimination. The Legislature has repeatedly credentialed journalists notwithstanding their personal (or their organizations') past coverage critical of the Legislature—including Schott when he wrote for the *Tribune. See id.* at 94-97 (listing publications with credentialed journalists); Editorial Board, *Tribune editorial: Utah Legislature declares phony 'emergency' in drive to rob the people of what little power they have*, Salt Lake Trib. (Aug. 25, 2024), https://perma.cc/6TC3-XX7B. Plaintiffs do not plead that all other credentialed organizations have not criticized the Legislature or have viewpoints of which Defendants approve, and any such allegations would be implausible. "[T]he inclusion of a broad range of media outlets on both sides of the political spectrum certainly diminishes any claim that the list is based on political ideology." *Evers*, 994 F.3d at 611.

Plaintiffs allege that credentialing decisions under the policy are "full of discretionary decisions." App.Vol.I at 32. But the revision to exclude blogs and independent

media *eliminated discretion*. Prior versions of the policy could result in some nontraditional media receiving credentials and others not, depending on the "circumstances." *See id.* at 18. Now, rather than Defendants exercising discretion in assessing eligibility based on an applicant's "circumstances," the credentialing policy "provide[s] concrete guidelines that cabin" Defendants' "discretion." *Ateba*, 133 F.4th at 126. That revision ultimately "reduces the risk" that officials "might allocate" credentials "based on the views of certain … reporters." *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 84 (D.D.C. 2023), *aff'd sub nom.*, *Ateba v. Leavitt*, 133 F.4th 114.

Plaintiffs also claim the policy's focus on the nature of the publication, including "'stream-of-consciousness' reporting," editorial oversight, "independent media," and "blogs," indicates viewpoint discrimination. App.Vol.I at 26, 34; *see* Br.35, 54-55. It does not. As the district court observed, such considerations concern merely "how information is disseminated," "not … what can be published." Suppl.App.92. "It is a process of review as an indicia of the reliability of the news organization. Whether that is in favor of school vouchers or against school vouchers, the same editorial review would take place in that instance." *Id.* at 61. The applicant's viewpoint has no bearing on that assessment. Furthermore, governments may limit access to nonpublic forums "based on … speaker identity." *Cornelius*, 473 U.S. at 806. Indeed, such "distinctions … are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Perry*, 460 U.S. at 49.

Finally, no well-pleaded allegations establish "inconsistent application" of the credentialing policy to support Plaintiffs' claim of viewpoint discrimination. *Contra* Br.36-37. Plaintiffs allege that "credentials have been issued to reporters from multiple organizations that call themselves independent." App.Vol.I at 25. But Plaintiffs misunderstand the term "independent media" in the policy. It is used in the series "[b]logs, independent media or other freelance media." App.Vol.I at 68. In context, it refers to media that is not dependent on or connected to the existence or authority of a larger power structure or organization. *E.g.*, *Independent*, Oxford English Dictionary, https://perma.cc/PP46-779P; *see Independent media*, Oxford Reference, https://perma.cc/339E-6P8J ("1. Small media production, marketing, or distribution companies not affiliated with a 'major' commercial company."). Utah News Dispatch, for example, necessarily uses the term differently since it is "an affiliate of States Newsroom." App.Vol.I at 28. The fact that credentialed publications consider themselves "independent" in some other sense does not mean they have not satisfied the policy's criteria by having editorial oversight and by being an established, reputable news organization. UPW, conversely, is a self-run blog or independent media without those characteristics.

No well-pleaded facts support Plaintiffs' allegation that "journalists with a similar editorial structure to UPW" have received credentials. App.Vol.I at 34; *see* Br.36-37. The complaint speculates that credential holders from Davis Journal and Utah Policy are "self-edited" but provides no supporting factual allegations concerning those entities'

editorial structure, oversight, or practices. App.Vol.I at 27. Plaintiffs' allegations are also contradicted by the list of 2025 applications, which shows every other official application denial concerned a self-supervised applicant like Schott. *Id.* at 92; *see Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1105 (10th Cir. 2017) (explaining exhibit to complaint controls over conflicting allegation). Plaintiffs have not plausibly alleged viewpoint discrimination.

### 3. Standards of content discrimination and strict scrutiny do not apply (Count II).

Plaintiffs also challenge the credentialing policy as discriminating based on content and subject to strict scrutiny. App.Vol.I at 34-37; Br.37-38. That challenge fails because it employs the wrong standard. Plaintiffs concede that the policy regulates access to limited public (if not nonpublic) fora. App.Vol.I at 31; Br.31. Standards of content discrimination and strict scrutiny only apply to "traditional" or "designated" public fora. *Wells*, 257 F.3d at 1144-45; *see, e.g., Hawkins*, 170 F.3d at 1288 (holding court "need not address whether [challenged] speech policy … is content-based" for "a nonpublic forum"). In limited public or nonpublic fora, "the government may regulate on the basis of the content of speech, as long as its regulations are reasonable and viewpoint neutral." *Brown v. Palmer*, 915 F.2d 1435, 1440 (10th Cir. 1990); *see Summum v. Callaghan*, 130 F.3d 906, 917 (10th Cir. 1997) ("content-based discrimination is permissible in a limited or nonpublic forum"). Strict scrutiny simply does not apply here. *See, e.g., Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 F. App'x 600, 606 (10th Cir. 2016)

(finding strict scrutiny arguments inapplicable in limited public forum); *accord Evers*, 994 F.3d at 612-13.

Plaintiffs say they pleaded Count II "in the alternative" because some "courts consider the denial of reporters from government-created spaces without ever engaging in forum analysis." Br.37. But the cases Plaintiffs cite are unavailing. *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), "predated modern forum analysis," which the D.C. Circuit now applies, *see Ateba*, 133 F.4th at 122-23. In *AP v. Budowich*, the D.C. Circuit found forum analysis inapplicable when the White House "[o]pen[s] restricted White House and presidential spaces to small groups of journalists" to "be present for observational newsgathering," permitting the president to "take into account their viewpoint." 2025 WL 1649265, at *6, *10 (D.C. Cir. June 6) (Rao, J., concurring). *Baltimore Sun* rejected a retaliation claim to which forum analysis does not apply. 437 F.3d at 418. And *Reed v. Bernard* involved access to bail hearings, and Plaintiffs quote the *dissenting* opinion (without saying so), not the majority opinion. 976 F.3d 302 (3d Cir. 2020), *vacated*, 2021 WL 1897359.

Nor does *Evers* support Plaintiffs' push for strict scrutiny. *Contra* Br.53. *Evers* explained why strict scrutiny *does not apply* in the context of press credentialing in a nonpublic forum. 994 F.3d at 612-13. The discussion in *Evers* on which Plaintiffs rely distinguished cases about taxes that "singled out the press over other industries for differential treatment" from the press credentialing policy, which was "a rule of general application." *Id.* at 613. *Evers* rejected the plaintiff's disagreement "with the use of forum

analysis at all," *id.* at 611—no different from Plaintiffs' alternative argument of content discrimination and strict scrutiny here. This Court should reject it too.

### B. Plaintiffs fail to plausibly plead First Amendment retaliation (Count III).

Plaintiffs contend that Defendants revised the credentialing policy and denied Schott's application "in retaliation for his prior reporting." App.Vol.I at 37-38. To state a retaliation claim, Plaintiffs must establish three elements: (1) they "engaged in constitutionally protected activity"; (2) Defendants' actions caused them "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Defendants' actions were "substantially motivated as a response to" their constitutionally protected activity. *Trant*, 754 F.3d at 1169-70. Plaintiffs' claim fails on the second and third elements.

The "standard for evaluating th[e] chilling effect on speech is objective," and a "trivial or de minimis injury" will not suffice. *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). *Shero* held that denying an outspoken citizen's request for "council packets" prepared for city councilmembers "would not, as a matter of law, chill a person of ordinary firmness from continuing to speak out" because his "discourse" was not "inhibited in any way" and he "remained free to express his views publicly and to criticize the city council." *Id.* at 1204 (cleaned up). And *Smith v. Plati* held that denying a website owner resources "routinely given to other media" and "requir[ing] him formally to request and pay for" them were insufficient because it "did nothing to affect an

ordinary person's ability to actually maintain a website" and "alternative avenues to information remained open." 258 F.3d at 1177.

The district court correctly applied these precedents in holding that "Plaintiffs' allegations are insufficient to infer a denial of a media credential would 'chill a person of ordinary firmness from continuing' unfavorable reporting." App.Vol.II at 259. Schott's work has not been "impeded." *Contra* Br.38. Schott maintains access to all the government information he seeks. *Supra* I.A.1.a; *see Smith*, 258 F.3d at 1177. Denying him a credential did not stop him from continuing to freely express his views and criticize the Legislature through UPW, as is his right. *See Shero*, 510 F.3d at 1204; *Smith*, 258 F.3d at 1177. Accordingly, the actual consequences of being denied a credential "are trivial or de minimis injuries and inadequate to support a retaliation claim," as the district court held. App.Vol.II at 261.

The district court did not apply the wrong standard on this element. *Contra* FIRE-Br.14-23. Amici criticize the district court's invoking the term "vigorous," a standard that they say applies only to "retaliation claims arising out of criticism or censure by government officials," not "retaliatory government *action*." FIRE-Br.15-17. The district court applied *Shero* and *Smith*, App.Vol.II at 259-60, both of which involved "government *action*"—denying council packets in *Shero*, 510 F.3d at 1204, and denying media resources in *Smith*, 258 F.3d at 1177. Amici's claim that "no amount of Mr. Schott's own speech could cure the denial of his press credential," FIRE-Br.17-18, ignores that Schott maintains access to all the government information he seeks and covered the

Legislature extensively without a credential. *Supra* I.A.1.a. And while amici contest the district court's reliance on Schott's "*subjective* response" to the allegedly retaliatory conduct, FIRE-Br.19, *Smith* squarely held that the plaintiff's "persistence in maintaining his website offers some evidence that [the defendant's] actions did not prevent such private speech." 258 F.3d at 1177. Other circuits also recognize that while the government action is measured "against an objectively reasonable plaintiff," "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." *Balt. Sun*, 437 F.3d at 419 (continued reporting disproved chilling element); *see also Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020) ("We consider [plaintiff's] actions in response to [defendant's] alleged retaliation as evidence of what a person of ordinary firmness would have done.").

Plaintiffs' retaliation claim also fails on the third element. Plaintiffs must allege facts establishing "but-for" causation. *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). They do not. It is well-established that "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant*, 754 F.3d at 1170. But that is the entire basis of Plaintiffs' claim: Schott's reporting in 2024 allegedly "drew the ire" of Defendants. App.Vol.I at 21-23; *see VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1174 (10th Cir. 2021) (holding "lone allegation" of "temporal proximity" did not establish causation). Plaintiffs' own allegations demonstrate the implausibility of that narrative and undermine any suggested causal link. Schott's departure from the *Tribune* most affected his

eligibility for a press pass. *See* App.Vol.I at 15-16; Suppl.App.97. The complaint no-where alleges that Schott did not report critically of the Legislature or draw the ire of legislators or staff when he worked at the *Tribune*. In fact, he did, and he still received credentials.[5] The evolution of the credentialing policy—narrowing the eligibility of bloggers and independent media from "some circumstances" in 2021 and 2022 to "lim-ited, rare circumstances" in 2023 and 2024 to ineligible in 2025, *supra* p.4—undermines Schott's conclusory claim that his reporting prompted the latest revision. And upon leaving the *Tribune*, Schott would not have been eligible for a credential even under the *former* policy. *See* Suppl.App.97. Plaintiffs have not plausibly pleaded a retaliation claim.

### C. Plaintiffs' prior-restraint claim fails (Count IV).

Plaintiffs allege that the credentialing policy is an unlawful prior restraint. App.Vol.I at 38-39; Br.39. It is not, as the district court held. App.Vol.II at 262-63. "[A] 'prior restraint' restricts speech in advance on the basis of content … ." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013). "[P]ress gallery regulations" do not impose "a prior restraint on the publication of news articles." *Ateba*, 706 F. Supp. 3d at 85; *see Bralley v. Albuquerque Pub. Schs. Bd. of Educ.*, 2015 WL 13666482, at *4 (D.N.M.

---

[5] *See* @VoteTrevorLee, X (July 17, 2023, 10:21 PM), https://perma.cc/HS66-ZEVK ("Schotty still crying about this. … [H]e's not a journalist. He's a left wing ac-tivist."); @VoteTrevorLee, X (Oct. 19, 2023, 2:32 PM), https://archive.ph/QXFwK (posting a photo of Schott wearing a CCCP shirt and commenting: "Everyone knows you love socialism schotty. Which of your hero[e]s do you idolize the most? Stalin, Mao, Lenin, Castro, Chavez?"); @johnforutah, X (Nov. 7, 2023, 10:17 PM), https://perma.cc/HD9F-GKYQ ("This Salt Lake Tribune @sltrib 'Journalist' is prov-ing to the world the one sided narrative of his paper. Sad news for Utah.").

Feb. 25) (rejecting claim that "denial of [plaintiff's] press pass constituted a prior restraint … as a member of the press" as supported by "no authority—much less Supreme Court or Tenth Circuit authority").

Here, Plaintiffs have not been restricted in speaking or publishing about the Legislature. As the district court recognized, the credentialing policy "does not regulate who may speak or what a reporter may or may not publish. Any reporter has access to the legislative session and is not restricted in the content of any potential publication." App.Vol.II at 262. Indeed, as Defendants explained to Schott, "nothing prevents individuals from reporting on the proceedings of the Utah Legislature, regardless of whether they hold a media credential." App.Vol.I at 77. And this is not the rare case where "*news gathering* (as opposed to speech)" has been "unreasonably restricted in advance," because Plaintiffs maintain access to all the information they seek. *See Bralley*, 2015 WL 13666482, at *3-4 (finding no prior restraint from denial of press pass where government did not "thwar[t] any other attempt to attend the debate").

Even if the credentialing policy constituted a prior restraint, Plaintiffs' claim still fails. "[A] restriction on expression which would otherwise be deemed a prior restraint if it had been applied in a public forum is valid in a *nonpublic* forum as long as it is reasonable and viewpoint-neutral." *Perry v. McDonald*, 280 F.3d 159, 171 (2d Cir. 2001). The credentialing policy survives any prior-restraint analysis for the same reasons it survives forum analysis—it is reasonable and viewpoint neutral, *supra* I.A.2. *See, e.g.*, *Cook v. Baca*, 12 F. App'x 640, 641 (10th Cir. 2001) (holding any "prior restraint was

constitutional because the forum was non-public and the restraint was reasonable"); *ACLU v. Mote*, 423 F.3d 438, 446 (4th Cir. 2005) ("Having already determined that the University's policy is viewpoint neutral and reasonable, it is also not an impermissible prior restraint.").

The credentialing policy does not place "unbridled discretion" in legislative staff. *Contra* Br.40. The unbridled-discretion doctrine protects against the "risk" that licensing officials "will favor or disfavor speech based on its content." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002). Limits on official discretion must be "made explicit by textual incorporation." *Wells*, 257 F.3d at 1151. Here, the credentialing criteria explicitly limit discretion by requiring that applicants "[b]e a professional member of the media" who represents "an established reputable news organizations" and not be a blog or independent media, among other things. App.Vol.I at 68. These criteria "are reasonably specific and objective, and do not leave the decision to the whim of the administrator. They provide narrowly drawn, reasonable and definite standards to guide [staff's] determination." *Thomas*, 534 U.S. at 323 (cleaned up).

*City of Lakewood v. Plain Dealer Publishing*, 486 U.S. 750 (1988), which concerned a permitting scheme to place newsracks on public property, is inapt. *Contra* Br.40-41. The ordinance there failed to guard "against censorship" because it "contain[ed] no explicit limits on the mayor's discretion" other than a "minimal requirement" of assessing the "public interest." 486 U.S. at 769-71. And the ordinance authorized the mayor to "condition the permit on any additional terms he deems 'necessary and reasonable.'" *Id.* at

772. Unlike that ordinance, the credentialing policy here imposes "concrete standards to guide the decision-maker's discretion." *Id.* at 771; *see Ateba*, 133 F.4th at 125-26 (rejecting reliance on *Lakewood* in challenge to White House press policy limiting credentials to "bona fide correspondents of repute").

### D. Plaintiffs' void-for-vagueness claim fails (Count V).

Plaintiffs allege that the credentialing policy is unconstitutionally vague. App.Vol.I at 39-41; Br.41-43. This claim fails because void-for-vagueness doctrine does not apply to the credentialing policy and, in any event, the policy is not unduly vague.

Void-for-vagueness doctrine is grounded in the Due Process Clause. *Beckles v. United States*, 580 U.S. 256, 262 (2017). "[T]he Government violates [due process] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Golicov v. Lynch*, 837 F.3d 1065, 1068 (10th Cir. 2016). The credentialing policy, however, is not a law and does not take away Plaintiffs' life, liberty, or property. Plaintiffs still "have not provided any authority establishing that [vagueness] doctrine necessarily applies to credentialing policies like those at issue here." Suppl.App.93. Void-for-vagueness doctrine does not apply here.

Even if void-for-vagueness doctrine applies, Plaintiffs' claim still fails. "The void-for-vagueness doctrine requires that statutory commands provide fair notice to the public." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). Yet "perfect clarity and precise guidance have never been required even of regulations that restrict

expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). In the civil context, a statute or regulation must be "so vague and indefinite as really to be no rule or standard at all." *Boutilier v. INS*, 387 U.S. 118, 123 (1967).

Plaintiffs challenge the policy's terms "established," "reputable," "blog," "independent," and "freelance" as unduly vague. App.Vol.I at 39. But each term generally has a "common understanding." *Green Room*, 157 F.4th at 1214. And when "[r]ead in context" amid "the surrounding words and phrases," the terms have clear, specific meanings. *Gray*, 83 F.4th at 1234. Thus, courts have had no difficulty understanding and upholding similar credentialing policies. *See Ateba*, 133 F.4th at 124-26 (rejecting argument that "bona fide correspondents of repute" in White House policy was "standardless"); *Evers*, 994 F.3d at 610-11 (upholding same criterion).

Plaintiffs claim "blog" is vague because "it is unclear what qualifies as a 'blog' and whether it is only journalists who report exclusively on a 'blog,' as opposed to in conjunction with other media formats." App.Vol.I at 40. But "blog" has a well-known, ordinary meaning. *See Blog*, Merriam-Webster, https://archive.ph/LJqM0 ("a website that contains online personal reflections, comments, and often hyperlinks, videos, and photographs provided by the writer"). Read in context, a reasonable person can easily distinguish a blogger from a "professional member of the media" who "is part of an established reputable news organization or publication." App.Vol.I at 68. And no reasonable person would think a "professional member of the media" becomes ineligible because he also operates a blog. *Contra id.* at 40. The same is true for freelancers—a

journalist who is "regularly employed" by a qualifying publication is plainly eligible for a credential *on behalf of that publication* even if he separately does freelance work for "another publication." *Contra id.*

Plaintiffs also challenge the terms "independent media or other freelance media." *Id.* at 39. These terms "are associated in a context suggesting that the words have something in common" and so "they should be assigned a permissible meaning that makes them similar." *Potts v. Ctr. for Excellence in Higher Educ.*, 908 F.3d 610, 614 (10th Cir. 2018). The term "freelancer" already bears a meaning similar to "independent." *See Freelancer*, Merriam-Webster, https://archive.ph/s2trX ("a person who acts independently without being affiliated with or authorized by an organization"). And the policy's use of "other" before "freelance" confirms they should be read similarly. *See Potts*, 908 F.3d at 615.

Plaintiffs also misunderstand the criterion that applicants "[a]dhere to a professional code of ethics." App.Vol.I at 39. The policy does not require adherence to any specific professional journalist code. Schott must know what it means for a journalist to "[a]dhere to a professional code of ethics," having previously worked at an outlet that professes to do so. *See Editorial policies and ethics*, Salt Lake Trib., https://perma.cc/M8GN-VGDR.

Finally, Plaintiffs cannot seriously claim vagueness when Schott knew all along that he did not satisfy the credentialing criteria. The day before he applied, Schott expressed on social media concerns that he would not qualify, trying to plant the seeds

44

for his (false) narrative that the policy has been "weaponized against" him to "shut [him] out." *See* @schotthappens.com, Bluesky (Dec. 16, 2024, at 6:40 PM), https://perma.cc/SV5K-XTWW. He then posted a video documenting his application experience, which begins, "Come with me while I get denied a press credential for the first time ever." @schotthappens, Instagram (Dec. 17, 2024), https://bit.ly/4gkJpkv. As the district court explained, these actions "demonstrat[e] that Schott likely understood the criteria." Suppl.App.94-95; *see* App.Vol.II at 264. The policy is not unduly vague.

## II.   The district court did not abuse its discretion in denying Plaintiffs' preliminary injunction motion.

Under this "deferential" standard, this Court "will find an abuse of discretion if the district court denied the preliminary injunction on the basis of a clearly erroneous factual finding or an error of law." *Warner v. Gross*, 776 F.3d 721, 727-28 (10th Cir. 2015). The district court did neither here.

### A.  Dismissal mooted Plaintiffs' motion.

The district court did not abuse its discretion by denying Plaintiffs' preliminary injunction motion as moot after dismissing Plaintiffs' claims. *Maehr v. United States*, 822 F. App'x 780, 783-84 (10th Cir. 2020); *see, e.g.*, *Smith v. Medina*, 2024 WL 4471425, at *4 (10th Cir. Oct. 11) (holding district court "correctly concluded that the motion for a preliminary injunction was moot" after it dismissed all claims). This Court "need not address the merits" of Plaintiffs' motion "because the district court dismissed [the]

action and entered a final judgment, which moots [the] appeal of the district court's orde[r] denying a preliminary injunction." *Hooks v. Yandell*, 2021 WL 3557190, at *4 (10th Cir. Aug. 12) (collecting cases). Accordingly, the Court should dismiss as moot Plaintiffs' appeal of the denial of the preliminary injunction motion. *Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1168 (10th Cir. 1999).

Even if the district court erred in dismissing Counts I or II,[6] the proper course would be to remand for the district court to consider Plaintiffs' motion. This Court is "a court of review, not first view." *Chegup v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 28 F.4th 1051, 1070 (10th Cir. 2022). This Court "typically permit[s]" the district court to address issues "in the first instance," particularly where an inquiry would be "fact-intensive." *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1070 (10th Cir. 2020). Thus, the normal course after reversing a Rule 12(b)(6) dismissal is to remand for the district court to consider a preliminary injunction motion denied as moot. *See Cressman v. Thompson*, 719 F.3d 1139, 1158 (10th Cir. 2013); *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 184 (2d Cir. 2020); *Epona v. County of Ventura*, 876 F.3d 1214, 1227 (9th Cir. 2017).

**B. The evidence confirms Plaintiffs are not entitled to preliminary relief.**

Were this Court to consider Plaintiffs' motion in the first instance, Plaintiffs failed to carry their burden for a preliminary injunction. Plaintiffs must make a

---

[6] Plaintiffs address only Counts I and II with respect to the preliminary injunction denial in their opening brief. Br.44-58. They accordingly have forfeited any arguments for Counts IV and V. *E.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104-05 (10th Cir. 2007). They did not move on Count III. *See* App.Vol.I at 98-140.

"heightened showing" because their desired injunction is "mandatory" and would "alter the status quo." *Att'y Gen. of Okla. v. Tyson Foods*, 565 F.3d 769, 776 (10th Cir. 2009). It is mandatory because it "would affirmatively require the defendants … to issue a media credential to the plaintiffs." Suppl.App.85; *accord Schrier*, 427 F.3d at 1260-61. That relief would alter the status quo. The "last uncontested status between the parties which preceded the controversy" is Schott without a credential and ineligible for one. *SCFC ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1099-100 & n.8 (10th Cir. 1991). Legislative staff revoked Schott's credential after he was fired from the *Tribune* because he no longer qualified for one, App.Vol.II at 18-19—months *before* the November 2024 policy revision and the December 2024 application denial that he challenges here.

**1.** Plaintiffs are not substantially likely to succeed on their First Amendment claims for the same reasons they fail to state a claim. The preliminary injunction record only confirms it.

As to no infringement of protected activity (*supra* I.A.1), Peterson's declaration explains the public availability of all information Schott seeks. *See* App.Vol.II at 4-8. And Schott conceded in his deposition that—even without a credential—he covered legislative proceedings and actions and gubernatorial press conferences, even speaking with legislators and staff and using video and audio recordings. App.Vol.III at 81-82, 88-106.

Evidence confirms the policy's reasonableness (*supra* I.A.2.a). As to space limitations, there are 15 media parking spaces, 20 desks in the press room, eight workspaces

in the House chamber gallery, and six workspaces in the Senate chamber gallery. App.Vol.II at 6-7. While Schott claims only 20 organizations have credentialed staff, Br.49, more than 140 credential holders share those limited spaces, App.Vol.II at 15. And beyond the "uptick in nontraditional, independent media" generally, legislative staff specifically have received "increased inquiries from nontraditional media." *Id.* at 12. Each year, bloggers and independent media inquired about credentials, all of whom were turned down. *Id.* at 16. Indeed, "[n]o blogger or independent media had ever received a credential under the carveouts in the earlier policies." *Id.* at 12. In revising the policy to exclude them, legislative staff reasonably sought "to establish objective, black-and-white criteria and eliminate any discretion." *Id.*

Evidence also confirms the absence of viewpoint discrimination (*supra* I.A.2.b). Under sworn testimony, "Schott's viewpoints played absolutely no role in the denial of his credentialing application. Legislative staff denied his application without regard to the content of his prior publications or the viewpoints expressed therein." App.Vol.II at 139; *see id.* at 27, 30 (same); App.Vol.IV at 143 (same). Staff denied Schott's application "for the sole reason of failing to satisfy the credentialing criteria." App.Vol.II at 30, 139. And staff revised the policy "without any consideration of Mr. Schott—neither his forming Utah Political Watch nor his past reporting." *Id.* at 13 (cleaned up); *see* App.Vol.IV at 27; *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998) (rejecting plaintiffs' claim of viewpoint discrimination where official "testified [plaintiff's]

48

views had 'absolutely' no role in the decision to exclude him" and proffered viewpoint-neutral reasons).

As to Schott's exchanges with legislative leadership and staff, neither Speaker Schultz nor President Adams played any role in revising the credentialing policy or in the denial of Schott's application. App.Vol.IV at 15, 37-38, 105-06. Furthermore, none of the incidents was unusual. "[L]egislators often publicly criticize journalists or media organizations for their reporting," and "[s]uch criticisms play no role in assessing eligibility for future media credentials." App.Vol.II at 25. Likewise, "[l]egislative staff routinely reach out to reporters or media organizations with issues or concerns—primarily inaccuracies—over stories they publish," and such exchanges "play no role in assessing eligibility for future media credentials." *Id.* at 24, 140. Confirming the point, when Schott worked at the *Tribune*, legislators criticized him and his reporting, and legislative staff raised issues with his stories, yet he still received credentials. *Id.* at 26-30.

The record refutes Plaintiffs' claim that "Defendants made no efforts to determine whether the reasons they proffered in their declarations were applicable before denying Schott's application." Br.50. Legislative staff conducted an "independent inquiry of whether [Schott] and Utah Political Watch met the requisite criteria," including a "review of Utah Political Watch's website," App.Vol.II at 136, consistent with staff's normal review process, *see id.* at 14-15 ("With each application, legislative staff evaluates the website, editorial and supervisory structure, affiliations, and other relevant factors before determining eligibility."). Plaintiffs also claim that Defendants' "failure to inquire

or validate" the "reasons" for "denying Schott's application indicates … pretext." Br.50-51. It does not. Plaintiffs cite no authority that government officials are obligated to do so. "[I]t is the applicant's responsibility to provide context and address any potential concerns based on the Legislature's policies and guidelines." App.Vol.II at 15; *see* App.Vol.IV at 125. Many organizations have done so during the application process. App.Vol.II at 15. Schott did not. His claim that he did not know to list his so-called editor on his application, Br.36, 50, is belied by the fact that he listed his *Tribune* editor in the "Supervisor" field on past applications, *see* App.Vol.II at 20.

No evidence supports Plaintiffs' claim of disparate treatment compared to other entities. Br.52-53. Schott has no personal knowledge of those entities' publication or editorial processes, organizational structure, affiliation with larger media groups, or other characteristics relevant to credentialing. *See* App.Vol.III at 72-81. Sworn testimony explains how each of those entities satisfies the credentialing criteria with the requisite organizational structure and editorial oversight. *See* App.Vol.II at 20-24; App.Vol.IV at 28-29, 58-63, 94-96, 136-137. None is a "blog" or "self-edited." *Conta* Br.11, 52-53. But each official denial of a credential was a self-supervised blog, independent media, or freelance journalist who publishes without editorial oversight—just like Plaintiffs. App.Vol.I at 92. And many other applicants have been denied credentials unofficially for the same reasons. App.Vol.II at 16. The record reflects only evenhanded application of the policy's neutral, objective criteria.

**2.** Even if Plaintiffs were substantially likely to succeed on the merits, they have not shown irreparable harm given the alternative channels for newsgathering and their months-long delay in seeking preliminary relief. Considering "the specific character of the First Amendment claim" here, Plaintiffs maintain "'ample' alternative means" to gather information and cover the Legislature, so there is no "great" or "substantial" harm. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003); *accord* Suppl.App.98-100. And Plaintiffs did not "show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). After the Legislature published the 2025 policy in early November 2024, Plaintiffs waited 11 weeks to seek relief—then took another three weeks to file an amended motion after the district court denied their TRO. *See GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) (holding "delay is an important consideration" in assessing irreparable harm).

**3.** On the equities, granting Plaintiffs a preliminary injunction would harm the Legislature and the public. Accepting Plaintiffs' equal-access theory and requiring the Legislature to issue a press credential to Schott would open the pressroom doors to anyone who sought access. The Legislature would be left powerless to turn away any future blogger, freelance journalist, or social media "influencer" who sought equal access. This is precisely the "havoc" and "chaos" the Seventh Circuit foresaw. *Evers*, 994 F.3d at 612, 614. An influx of credential holders would make it impossible for the Senate President and House Speaker to continue to hold their in-office briefings, resulting in less access for the press and ultimately less newsworthy information for Utahns.

51

## CONCLUSION

This Court should affirm the judgment dismissing Plaintiffs' amended complaint and dismiss as moot Plaintiffs' appeal of the denial of their preliminary injunction motion.

Respectfully submitted,

Dated: December 18, 2025

 /s/ Tyler R. Green

Victoria Ashby
Christine R. Gilbert
Alan R. Houston
OFFICE OF LEGISLATIVE
  RESEARCH & GENERAL COUNSEL
W210 State Capitol Complex
Salt Lake City, UT 84114
(801) 538-1032
vashby@le.utah.gov
cgilbert@le.utah.gov
ahouston@le.utah.gov

*\* Supervised by principals of the firm
admitted to practice in VA*

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Daniel M. Vitagliano\*
Julius Kairey
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
dvitagliano@consovoymccarthy.com
julius@consovoymccarthy.com

*Counsel for Defendants-Appellees Alexa Musselman,
Aundrea Peterson, Abby Osborne, and Mark Thomas*

**STATEMENT WITH RESPECT TO ORAL ARGUMENT**

Oral argument is unnecessary. The only relevant part of the record for the appeal of the Rule 12(b)(6) dismissal is Plaintiffs' amended complaint. The district court applied straightforward First Amendment doctrine and Circuit precedent in holding that Plaintiffs failed to state a claim. If the Court schedules oral argument, however, Defendants of course will participate to aid the Court's adjudication of this matter.

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 12,997 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: December 18, 2025          */s/ Tyler R. Green*

## CERTIFICATE OF DIGITAL SUBMISSION

With respect to this brief, all required privacy redactions have been made; the hard copies submitted to the clerk are exact copies of the ECF submission; the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Word, and according to the program is free of viruses.

Dated: December 18, 2025          */s/ Tyler R. Green*

## CERTIFICATE OF SERVICE

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: December 18, 2025          */s/ Tyler R. Green*