No. 25-4124

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

UTAH POLITICAL WATCH, INC.; BRYAN SCHOTT,

*Plaintiffs-Appellants*,

v.

ALEXA MUSSELMAN, Utah House of Representatives Communications Director and Media Liaison Designee; ANDREA PETERSON, Utah Senate Deputy Chief of Staff and Media Liaison Designee; ABBY OSBORNE, Utah House of Representatives Chief of Staff; MARK THOMAS, Utah Senate Chief of Staff, in their official and individual capacities,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Utah, No. 2:25-CV-00050 (Shelby, J.)

## SUPPLEMENTAL APPENDIX

Victoria Ashby
Christine R. Gilbert
Alan R. Houston
OFFICE OF LEGISLATIVE
  RESEARCH & GENERAL COUNSEL
W210 State Capitol Complex
Salt Lake City, UT 84114
(801) 538-1032
vashby@le.utah.gov
cgilbert@le.utah.gov
ahouston@le.utah.gov

Dated: December 18, 2025

* Supervised by principals of the firm
admitted to practice in VA

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Daniel M. Vitagliano*
Julius Kairey
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
dvitagliano@consovoymccarthy.com
julius@consovoymccarthy.com

*Counsel for Defendants-Appellees Alexa Musselman,
Aundrea Peterson, Abby Osborne, and Mark Thomas*

# INDEX

District Court Docket Entries ............................................................................ Suppl. App. 1

Transcript of Motion Hearing (Feb. 5, 2025) (Dkt. 32) ............................ Suppl. App. 14

Transcript of Deposition of Malissa Morrell (Dkt. 57-16) ..................... Suppl. App. 111

Exhibit 1 to the Deposition of Malissa Morell (Dkt. 57-17) .................. Suppl. App. 183

Exhibit 7 to the Deposition of Bryan Schott (Dkt. 57-5) ....................... Suppl. App. 186

Exhibit 8 to the Deposition of Bryan Schott (Dkt. 57-6) ....................... Suppl. App. 191

Exhibit 9 to the Deposition of Bryan Schott (Dkt. 57-7) ....................... Suppl. App. 195

Exhibit 10 to the Deposition of Bryan Schott (Dkt. 57-8) ..................... Suppl. App. 199

Exhibit 11 to the Deposition of Bryan Schott (Dkt. 57-9) ..................... Suppl. App. 204

Exhibit 12 to the Deposition of Bryan Schott (Dkt. 57-10) ................... Suppl. App. 209

Exhibit 13 to the Deposition of Bryan Schott (Dkt. 57-11) ................... Suppl. App. 215

Exhibit 14 to the Deposition of Bryan Schott (Dkt. 57-12) ................... Suppl. App. 216

APPEAL,CLOSED

## US District Court Electronic Case Filing System
### District of Utah (Central)
### CIVIL DOCKET FOR CASE #: 2:25-cv-00050-RJS

Utah Political Watch et al v. Musselman et al
Assigned to: Judge Robert J. Shelby
Case in other court:  Tenth Circuit, 25-04124
Cause: 42:1983 Civil Rights Act

Date Filed: 01/22/2025
Date Terminated: 09/29/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

### Plaintiff

**Utah Political Watch**
*Inc*

represented by **Robert P. Harrington**
KUNZLER BEAN & ADAMSON
50 W BROADWAY STE 1000
SALT LAKE CITY, UT 84101
(801)994-4646
Email: rharrington@kba.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles M Miller**
INSTITUTE FOR FREE SPEECH
1150 CONNECTICUT AVE NW STE 801
WASHINGTON, DC 20036
202-301-9800
Email: cmiller@ifs.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Courtney Corbello**
CENTER FOR AMERICAN LIBERTY
PO BOX 200942
PITTSBURGH, PA 15251
703-636-9959
Email: ccorbello@libertycenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Bryan Schott**

represented by **Robert P. Harrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles M Miller**
(See above for address)
*PRO HAC VICE*

**Suppl. App. 1**

*ATTORNEY TO BE NOTICED*

**Courtney Corbello**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Alexa Musselman**                      represented by   **Christine R. Gilbert**
*Utah House of Representatives*                          OFFICE OF LEGISLATIVE RESEARCH
*Communications Director and Media*                     & GENERAL COUNSEL
*Liaison Designee*                                      W210 STATE CAPITOL COMPLEX
                                                        SALT LAKE CITY, UT 84114
                                                        801-538-1032
                                                        Email: cgilbert@le.utah.gov
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Tyler R. Green**
                                                        CONSOVOY MCCARTHY PLLC
                                                        222 S MAIN ST STE 5TH FL
                                                        SALT LAKE CITY, UT 84111
                                                        703-243-9423
                                                        Email: tyler@consovoymccarthy.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Alan R. Houston**
                                                        OFFICE OF LEGISLATIVE RESEARCH
                                                        & GENERAL COUNSEL
                                                        STATE CAPITOL BUILDING 436
                                                        SALT LAKE CITY, UT 84114
                                                        385-258-7086
                                                        Email: ahouston@le.utah.gov
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Daniel M. Vitagliano**
                                                        CONSOVOY MCCARTHY PLLC
                                                        1600 WILSON BLVD STE 700
                                                        ARLINGTON, VA 22209
                                                        703-243-9423
                                                        Email: dvitagliano@consovoymccarthy.com
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Julius Kairey**
                                                        CONSOVOY MCCARTHY PLLC
                                                        1600 WILSON BLVD
                                                        STE 700
                                                        ARLINGTON, VA 22209
                                                        703-243-9423
                                                        Email: julius@consovoymccarthy.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Ashby**
436 STATE CAPITOL W STE 210
SALT LAKE CITY, UT 84103
801-538-1032
Email: vashby@le.utah.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Aundrea Peterson**                    represented by    **Christine R. Gilbert**
*Utah Senate Deputy Chief of Staff and*                   (See above for address)
*Media Liaison Designee*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Tyler R. Green**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Alan R. Houston**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Daniel M. Vitagliano**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Julius Kairey**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Victoria Ashby**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Abby Osborne**                        represented by    **Christine R. Gilbert**
*Utah House of Representatives Chief of Staff*            (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Tyler R. Green**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Alan R. Houston**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Suppl. App. 3**

**Daniel M. Vitagliano**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julius Kairey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Ashby**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark Thomas**                           represented by **Christine R. Gilbert**
*Utah Senate Chief of Staff in their official*                (See above for address)
*and individial capacities*                                    *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Tyler R. Green**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Alan R. Houston**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Daniel M. Vitagliano**
                                                               (See above for address)
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Julius Kairey**
                                                               (See above for address)
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Victoria Ashby**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/22/2025 | 1 | Case has been indexed and assigned to District Judge Ann Marie McIff Allen. Plaintiffs Bryan Schott, Utah Political Watch is directed to E-File the Complaint and cover sheet (found under Complaints and Other Initiating Documents) and pay the filing fee of $ 405.00 by the end of the business day. NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system. Civil Summons may be issued electronically. Prepare the summons using the courts PDF |

**Suppl. App. 4**

| | | |
|---|---|---|
| | | version and email it to utdecf_clerk@utd.uscourts.gov for issuance. (sg) (Entered: 01/22/2025) |
| 01/22/2025 | 2 | COMPLAINT *FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF* (Motion for Temporary Restraining Order to be filed separately) against All Defendants (Filing fee $ 405, receipt number AUTDC-5306874) filed by Utah Political Watch, Bryan Schott. (Attachments: # 1 Exhibit A - Media Access Credentialing Policy 2025, # 2 Exhibit B - Media Access Credentialing Policy 2024, # 3 Exhibit C - Text Exchange, # 4 Exhibit D - Appeal Denial Letter, # 5 Civil Cover Sheet) (Harrington, Robert) (Entered: 01/22/2025) |
| 01/22/2025 | 3 | Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Exhibit A - Media Access Credentialing Policy 2025, # 2 Exhibit B - Media Access Credentialing Policy 2024, # 3 Exhibit C - Text Exchange, # 4 Exhibit D - Appeal Denial Letter, # 5 Exhibit - Declaration of Bryan Schott, # 6 Text of Proposed Order)(Harrington, Robert) (Entered: 01/22/2025) |
| 01/22/2025 | 4 | NOTICE OF REQUIREMENTS for appearance Pro Hac Vice emailed to attorney Charles Miller and Courtney Corbello for Bryan Schott, Utah Political Watch. (sg) (Entered: 01/22/2025) |
| 01/22/2025 | 5 | MOTION for Admission Pro Hac Vice of Charles Miller , Registration fee $ 50, receipt number AUTDC-5307084,<br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.<br><br>filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Exhibit A - PHV App re C. Miller, # 2 Text of Proposed Order)(Harrington, Robert) (Entered: 01/22/2025) |
| 01/22/2025 | 6 | MOTION for Admission Pro Hac Vice of Courtney Corbello , Registration fee $ 50, receipt number AUTDC-5307089,<br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.<br><br>filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Exhibit A - PHV App re C. Corbello, # 2 Text of Proposed Order)(Harrington, Robert) (Entered: 01/22/2025) |
| 01/24/2025 | 7 | DOCKET TEXT ORDER granting 5 Motion for Admission Pro Hac Vice of Attorney Charles Miller for Bryan Schott,Charles Miller for Utah Political Watch.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.** |

**Suppl. App. 5**

| | | |
|---|---|---|
| | | *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>Signed by District Judge Ann Marie McIff Allen on 1/24/2025. No attached document. (mh) (Entered: 01/24/2025) |
| 01/24/2025 | 8 | DOCKET TEXT ORDER REFERRING CASE to Magistrate Judge Cecilia M. Romero under 28:636 (b)(1)(A), Magistrate Judge to hear and determine all nondispositive pretrial matters. No attached document.<br><br>Signed by District Judge Ann Marie McIff Allen on 1/24/2025. (pjd) (Entered: 01/24/2025) |
| 01/24/2025 | 9 | DOCKET TEXT ORDER granting 6 Motion for Admission Pro Hac Vice of Attorney Courtney Corbello for Bryan Schott,Courtney Corbello for Utah Political Watch.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.**<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>Signed by District Judge Ann Marie McIff Allen on 1/24/2025. No attached document. (mh) (Entered: 01/24/2025) |
| 01/24/2025 | 10 | ORDER denying without prejudice Plaintiffs' 3 Motion for TRO. Though the court's schedule may present some challenges, Plaintiffs may request a scheduling conference after providing notice to Defendants. Signed by Judge Robert J. Shelby on 1/24/2025. (mh) (Entered: 01/24/2025) |
| 01/24/2025 | 11 | ORDER OF RECUSAL District Judge Ann Marie McIff Allen recused. Case reassigned to Judge Robert J. Shelby for all further proceedings. Signed by District Judge Ann Marie McIff Allen on 1/24/2025. (mh) (Entered: 01/24/2025) |
| 01/24/2025 | 12 | CERTIFICATE OF SERVICE by Bryan Schott, Utah Political Watch re 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support , 2 Complaint,, (Harrington, Robert) (Entered: 01/24/2025) |
| 01/24/2025 | 13 | REQUEST for Renewal of Motion for Temporary Restraining Order re 10 Order on Motion for TRO, filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Exhibit A - Miller Email Jan 22, # 2 Exhibit B - Notice to Court, # 3 Exhibit C - Defendants' Waiving Service, # 4 Exhibit D - Notice to Court of Waiver)(Harrington, Robert) (Entered: 01/24/2025) |
| 01/24/2025 | 14 | **NOTICE OF HEARING**: (Notice generated by Mary Jane McNamee) In Person Status Report and Scheduling Conference set for 1/27/2025 at 11:30 AM in Rm 3.100 before Judge Robert J. Shelby. (mjm) (Entered: 01/24/2025) |
| 01/24/2025 | 15 | WAIVER OF SERVICE Returned Executed filed by Utah Political Watch, Bryan Schott. Waiver received from All Defendants on January 23, 2025. (Miller, Charles) (Entered: 01/24/2025) |
| 01/27/2025 | 16 | Minute Entry for proceedings held before Judge Robert J. Shelby: Status Conference held on 1/27/2025. The court sets the following dates/deadlines: Response to docket entry 3 Plaintiff's MOTION for Temporary Restraining Order filed by Plaintiffs Bryan Schott, Utah |

| | | |
|---|---|---|
| | | Political Watch due by 1/31/2025. Plaintiff's Reply Memo due by 2/3/2025. In Person Motion Hearing set for 2/5/2025 at 01:30 PM in Rm 3.100 before Judge Robert J. Shelby. In advance of hearing, counsel should submit direct testimony via witness affidavits and meet and confer about what witnesses should be available for cross and redirect examination. Attorney for Plaintiff: Charles Miller, Robert Harrington; Attorney for Defendant: Victoria Ashny, Christine Gilbert. Court Reporter: Ed Young. Recording: Electronic.(Time Start: 11:31, Time End: 11:50, Room 3.100.) (mjm) (Entered: 01/27/2025) |
| 01/27/2025 | 17 | Supplemental AFFIDAVIT/DECLARATION of Bryan Schott in Support re 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Exhibit E - House & Senate Media Credential GRAMMA Request, # 2 Exhibit F - Press Credential List) (Harrington, Robert) (Entered: 01/27/2025) |
| 01/27/2025 | 18 | NOTICE of Appearance by Tyler R. Green on behalf of Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas (Green, Tyler) (Entered: 01/27/2025) |
| 01/28/2025 | 19 | MOTION for Admission Pro Hac Vice of Daniel M. Vitagliano , Registration fee $ 50, receipt number AUTDC-5313396, <br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.<br><br>filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Green, Tyler) (Entered: 01/28/2025) |
| 01/28/2025 | 20 | MOTION for Admission Pro Hac Vice of Julius Kairey , Registration fee $ 50, receipt number AUTDC-5313545, <br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.<br><br>filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Green, Tyler) (Entered: 01/28/2025) |
| 01/28/2025 | 21 | **NOTICE OF HEARING ON MOTION** re: 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support : (Notice generated by Mary Jane McNamee). In Person Motion Hearing set for 2/5/2025 at 01:30 PM in Rm 3.100 before Judge Robert J. Shelby. (mjm) (Entered: 01/28/2025) |
| 01/28/2025 | 22 | MOTIONS REFERRED - 20 MOTION for Admission Pro Hac Vice of Julius Kairey , Registration fee $ 50, receipt number AUTDC-5313545, <br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case ac, 19 MOTION for Admission Pro Hac Vice of |

| | | |
|---|---|---|
| | | Daniel M. Vitagliano , Registration fee $ 50, receipt number AUTDC-5315396, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of Motions referred to Cecilia M. Romero.(mjm) (Entered: 01/28/2025) |
| 01/28/2025 | 23 | NOTICE AFFIRMING PRIOR ORDER OF REFERENCE re 8 Order Referring Case to Magistrate Judge. Orders of the prior judge are affirmed including the order of reference to Magistrate Judge Cecilia M. Romero under 28:636 (b)(1)(A). (mh) (Entered: 01/28/2025) |
| 01/28/2025 | 24 | ORDER granting 19 Motion for Admission Pro Hac Vice of Attorney Daniel M. Vitagliano for Alexa Musselman,Daniel M. Vitagliano for Abby Osborne,Daniel M. Vitagliano for Aundrea Peterson,Daniel M. Vitagliano for Mark Thomas. <br><br> *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.** <br><br> *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.* <br><br> Signed by Magistrate Judge Cecilia M. Romero on 1/28/2025. (mh) (Entered: 01/28/2025) |
| 01/28/2025 | 25 | ORDER granting 20 Motion for Admission Pro Hac Vice of Attorney Julius Kairey for Alexa Musselman,Julius Kairey for Abby Osborne,Julius Kairey for Aundrea Peterson,Julius Kairey for Mark Thomas. <br><br> *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.** <br><br> *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.* <br><br> Signed by Magistrate Judge Cecilia M. Romero on 1/28/2025. (mh) (Entered: 01/28/2025) |
| 01/31/2025 | 26 | MEMORANDUM in Opposition re 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Green, Tyler) (Entered: 01/31/2025) |
| 01/31/2025 | 27 | AFFIDAVIT/DECLARATION of Aundrea Peterson in Opposition re 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit 2025 Utah Capitol Media Access and Credentialing Policy, # 2 Exhibit Press room, # 3 Exhibit Senate gallery, # 4 Exhibit House gallery, # 5 Exhibit 2018 Utah Capitol Media Credentialing Policy, # 6 Exhibit 2019 Utah Capitol Media Credentialing Policy, # 7 Exhibit 2020 Utah Capitol Media Credentialing Policy, # 8 Exhibit 2021 Utah Capitol Credentialing Policy, # 9 Exhibit 2022 Utah Capitol Media Access and Credentialing Policy, # 10 Exhibit 2023 Utah Capitol Media Access and Credentialing Policy, # 11 Exhibit 2024 Utah Capitol Media Access and Credentialing Policy, # 12 Exhibit 2025 Utah Capitol Media Access and Credentialing Policy - Nov. 5, 2024, # 13 Exhibit E-mail re 2025 media credential process, # 14 Exhibit Credentialing |

**Suppl. App. 8**

| | | |
|---|---|---|
| | | application process, # 15 Exhibit Salt Lake Tribune e-mail, # 16 Exhibit Schott credential status change, # 17 Exhibit E-mail re press release distribution, # 18 Exhibit E-mail re background check)(Green, Tyler) (Entered: 01/31/2025) |
| 01/31/2025 | 28 | AFFIDAVIT/DECLARATION of Alexa Musselman in Opposition re 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit Text messages, # 2 Exhibit Text messages, # 3 Exhibit E-mail denial, # 4 Exhibit Schott appeal, # 5 Exhibit Appeal denial, # 6 Exhibit Osborne Tweet, # 7 Exhibit Schott deleted tweet)(Green, Tyler) (Entered: 01/31/2025) |
| 02/03/2025 | 29 | REPLY to Response to Motion re 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Miller, Charles) (Entered: 02/03/2025) |
| 02/05/2025 | 31 | Minute Order. Proceedings held before Judge Robert J. Shelby: Motion Hearing held on 2/5/2025 re: docket entry 3 Plaintiff's MOTION for Temporary Restraining Order and Memorandum in Support filed by Utah Political Watch, Bryan Schott. Oral argument heard. For the reasons stated on the record the court DENIED WITHOUT PREJUDICE docket entry 3 Plaintiff's MOTION for Temporary Restraining Order. The court grants Plaintiff leave to file an amended complaint. Counsel will meet and confer to discuss how the case will proceed. Written Order to follow oral order: No. Attorney for Plaintiff: Charles Miller, Robert Harrington; Attorney for Defendant Tyler Green, Daniel Vitagliano; Victoria Ashby, Christine Gilbert. Court Reporter: Ed Young. (Time Start: 1:40, Time End: 4:40, Room 3.100.) (mjm) (Entered: 02/06/2025) |
| 02/06/2025 | 30 | AO 435 TRANSCRIPT REQUEST ORDER FORM by Bryan Schott, Utah Political Watch for proceedings held on February 5, 2025 before Judge Robert J. Shelby.. (Harrington, Robert) (Entered: 02/06/2025) |
| 02/10/2025 | 32 | **~~RESTRICTED DOCUMENT~~** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on February 5, 2025 before Judge Robert J. Shelby. Court Reporter/Transcriber Ed Young, Telephone number 801-328-3202.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this notice. Within 42 days after receiving this notice, a party must file a Redaction Request identifying the information that must be redacted. Please review DUCivR 5.2-1 for additional information about redacting personal identifiers or protected information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.**<br><br>**Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 3/3/2025. Redaction Request due 3/24/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 5/12/2025. (jrj) Modified by removing restricted text on 5/12/2025 (kec). (Entered: 02/10/2025)** |
| 02/10/2025 | 33 | Transcript Purchased by: Robert Harrington, Charles Miller, Tyler Green and Daniel Vitagliano re 32 transcript(s) of 2/5/25. (jrj) (Additional attachment(s) added on 3/3/2025: # 1 Searchable OCR Copy) (jwt). (Entered: 02/10/2025) |

| 02/12/2025 | 34 | Joint MOTION for Leave to File Overlength Memoranda and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. Motions referred to Cecilia M. Romero.(Miller, Charles) (Entered: 02/12/2025) |
|---|---|---|
| 02/13/2025 | 35 | ORDER granting 34 Motion for Leave to File Overlength Memoranda. The court hereby GRANTS the Motion and Orders that an overlength Motion for Preliminary Injunction and Response thereto of no more than 40-pages or 12,400-words in length may be filed, and a Reply of no more than 20-pages or 6,200-words may also be filed. Signed by Magistrate Judge Cecilia M. Romero on 2/13/2025. (mh) (Entered: 02/13/2025) |
| 02/26/2025 | 36 | AMENDED COMPLAINT against All Defendants. filed by Utah Political Watch, Bryan Schott. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13) (Corbello, Courtney) (Entered: 02/26/2025) |
| 02/26/2025 | 37 | Amended MOTION for Preliminary Injunction and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Affidavit of Bryan Schott, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13)(Corbello, Courtney) (Entered: 02/26/2025) |
| 03/05/2025 | 38 | Defendant's MOTION for Short Form Discovery re: Protective Order Providing Relief from Depositions *of Alexa Musselman and Aundrea Peterson*, MOTION to Expedite and Memorandum in Support filed by Defendants Alexa Musselman, Aundrea Peterson. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Protective Order) Motions referred to Cecilia M. Romero.(Green, Tyler) (Entered: 03/05/2025) |
| 03/07/2025 | 39 | RESPONSE to Motion re 38 Defendant's MOTION for Short Form Discovery re: Protective Order Providing Relief from Depositions *of Alexa Musselman and Aundrea Peterson* MOTION to Expedite and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Text of Proposed Order)(Corbello, Courtney) (Entered: 03/07/2025) |
| 03/10/2025 | 40 | Joint MOTION for Scheduling Order *Suspending Parties' Briefing Deadlines on Plaintiffs' Preliminary Injunction Motion*, Joint MOTION for Extension of Time Suspending Parties' Briefing Deadlines *Pending Resolution of Short Form Discovery Motion* filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Text of Proposed Order Proposed Order Suspending Briefing Schedule) Motions referred to Cecilia M. Romero.(Green, Tyler) (Entered: 03/10/2025) |
| 03/11/2025 | 41 | ORDER granting 38 Motion for Short Form Discovery and denying as moot 40 Motion for Scheduling Order. The court reminds the parties of the requirements of Local Rule DUCivR 37-1 in the event either contemplates filing additional short form discovery motions. Signed by Judge Robert J. Shelby on 3/11/2025. (mh) (Entered: 03/11/2025) |
| 03/11/2025 | 42 | Consent MOTION for Extension of Time *Defendants' Response Deadline on Plaintiffs' Amended Preliminary Injunction Motion* filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Green, Tyler) (Entered: 03/11/2025) |
| 03/12/2025 | 43 | ORDER granting 42 Motion for Extension of Time. The remaining briefing deadlines related to Plaintiffs' Amended Motion for Preliminary Injunction are stayed pending entry of the scheduling order contemplated by the court's order granting Defendants' 41 short form discovery motion. Signed by Magistrate Judge Cecilia M. Romero on 3/12/2025. (mh) (Entered: 03/12/2025) |
| 03/18/2025 | 44 | Joint MOTION for Scheduling Order filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Text of Proposed Order) |

| | | Motions referred to Cecilia M. Romero.(Green, Tyler) (Entered: 03/18/2025) |
|---|---|---|
| 03/20/2025 | 45 | SCHEDULING ORDER granting 44 Motion for Scheduling Order. See order for details. Signed by Magistrate Judge Cecilia M. Romero on 3/20/2025. (mh) (Entered: 03/20/2025) |
| 03/20/2025 | 46 | NOTICE of Appearance by Alan R. Houston on behalf of Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas (Houston, Alan) (Entered: 03/20/2025) |
| 03/20/2025 | 47 | NOTICE of Appearance by Victoria Ashby on behalf of Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas (Ashby, Victoria) (Entered: 03/20/2025) |
| 03/24/2025 | 48 | MOTION for Leave to File Supplemental Exhibit to Plaintiffs' Amended Motion for Preliminary Injunction (Dkt. 37) and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Proposed Exhibit 14, # 2 Text of Proposed Order Proposed Order on Motion for Leave) Motions referred to Cecilia M. Romero. (Corbello, Courtney) (Entered: 03/24/2025) |
| 03/25/2025 | 49 | ORDER granting 48 Motion for Leave to File Supplemental Exhibit. Plaintiffs are to separately file the proposed Exhibit 14 in accordance with the local rules related to exhibits that cannot be electronically filed. Signed by Magistrate Judge Cecilia M. Romero on 3/25/2025. (mh) (Entered: 03/25/2025) |
| 03/25/2025 | 50 | NOTICE OF NONELECTRONIC FILING of Exhibit 14 to Plaintiffs' Amended Motion for Preliminary Injunction (Dkt. 37) filed by Plaintiffs Bryan Schott, Utah Political Watch re 37 Amended MOTION for Preliminary Injunction and Memorandum in Support (Corbello, Courtney) (Entered: 03/25/2025) |
| 03/25/2025 | 51 | EXHIBIT #14 to 37 Amended MOTION for Preliminary Injunction, filed by Bryan Schott, Utah Political Watch, consisting of a one MP4 audio file on a single USB flash drive.

The file is not uploaded to the docket due to non-PDF file type and the drive will be retained in a case file folder in the Clerk's Office while the case is active, and according to the retention schedule set forth by the Judicial Conference thereafter. (alt) (Entered: 03/26/2025) |
| 03/26/2025 | 52 | DECLARATION of Bryan Schott re 51 Exhibits, *14 to Plaintiffs' Amended Motion for Preliminary Injunction* filed by Bryan Schott, Utah Political Watch. (Corbello, Courtney) (Entered: 03/26/2025) |
| 04/08/2025 | 53 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Green, Tyler) (Entered: 04/08/2025) |
| 04/25/2025 | 54 | MEMORANDUM in Opposition re 37 Amended MOTION for Preliminary Injunction filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Green, Tyler) (Entered: 04/25/2025) |
| 04/25/2025 | 55 | AFFIDAVIT/DECLARATION of Aundrea Peterson in Opposition re 37 Amended MOTION for Preliminary Injunction filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit 2025 Utah Capitol Media Access and Credentialing Policy, # 2 Exhibit Press room, # 3 Exhibit Senate gallery, # 4 Exhibit House gallery, # 5 Exhibit 2018 Utah Capitol Media Credentialing Policy, # 6 Exhibit 2019 Utah Capitol Media Credentialing Policy, # 7 Exhibit 2020 Utah Capitol Media Credentialing Policy, # 8 Exhibit 2021 Utah Capitol Credentialing Policy, # 9 Exhibit 2022 Utah Capitol Media Access and Credentialing Policy, # 10 Exhibit 2023 Utah Capitol Media Access and Credentialing Policy, # 11 Exhibit 2024 Utah Capitol Media Access and Credentialing Policy, # 12 Exhibit 2025 Utah Capitol Media Access and Credentialing Policy - Nov. 5, 2024, # 13 Exhibit E-mail re 2025 media credential process, |

| | | |
|---|---|---|
| | | # 14 Exhibit Credentialing application process, # 15 Exhibit Salt Lake Tribune e-mail, # 16 Exhibit Schott credential status change, # 17 Exhibit E-mail re press release distribution, # 18 Exhibit E-mail re background check, # 19 Exhibit 2025 application, # 20 Exhibit Schott 2025 credential application, # 21 Exhibit Text messages, # 22 Exhibit Senate statement re KSL, # 23 Exhibit Rep. Lee post, # 24 Exhibit Speaker Schultz post, # 25 Exhibit Rep. Lee post, # 26 Exhibit Tribune title changes, # 27 Exhibit Rep. Lee post, # 28 Exhibit Sen Johnson post, # 29 Exhibit Rep. Lee post, # 30 Exhibit Sen. McCay post, # 31 Exhibit Rep. Lee post, # 32 Exhibit Sen Johnson post)(Green, Tyler) (Entered: 04/25/2025) |
| 04/25/2025 | 56 | AFFIDAVIT/DECLARATION of Alexa Musselman in Opposition re 37 Amended MOTION for Preliminary Injunction filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit Text messages, # 2 Exhibit Schott 2025 credentialing application, # 3 Exhibit UPW website, # 4 Exhibit Text messages, # 5 Exhibit Application denial email, # 6 Exhibit Schott appeal, # 7 Exhibit Appeal denial, # 8 Exhibit Osborne post, # 9 Exhibit Schott deleted post, # 10 Exhibit Text messages, # 11 Exhibit Text messages, # 12 Exhibit Text messages)(Green, Tyler) (Entered: 04/25/2025) |
| 04/25/2025 | 57 | AFFIDAVIT/DECLARATION of Daniel M. Vitagliano in Opposition re 37 Amended MOTION for Preliminary Injunction filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Attachments: # 1 Exhibit Schott deposition transcript, # 2 Exhibit Schott deposition exhibit 5, # 3 Exhibit Schott deposition exhibit 6, # 4 Exhibit Schott deposition exhibit 7, # 5 Exhibit Schott deposition exhibit 8, # 6 Exhibit Schott deposition exhibit 9, # 7 Exhibit Schott deposition exhibit 10, # 8 Exhibit Schott deposition exhibit 11, # 9 Exhibit Schott deposition exhibit 12, # 10 Exhibit Schott deposition exhibit 13, # 11 Exhibit Schott deposition exhibit 14, # 12 Exhibit Schott deposition exhibit 15, # 13 Exhibit Schott deposition exhibit 16, # 14 Exhibit Schott deposition exhibit 17, # 15 Exhibit Morrell deposition transcript, # 16 Exhibit Morrell deposition exhibit 1, # 17 Exhibit Musselman deposition transcript, # 18 Exhibit Peterson deposition transcript)(Vitagliano, Daniel) (Entered: 04/25/2025) |
| 04/29/2025 | 58 | NOTICE OF NONELECTRONIC FILING of Exhibits L, M, and N to the Declaration of Daniel M. Vitagliano filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas re 57 Affidavit/Declaration in Opposition to Motion,,,, (Vitagliano, Daniel) (Entered: 04/29/2025) |
| 04/29/2025 | 59 | MEMORANDUM in Opposition re 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Plaintiffs Bryan Schott, Utah Political Watch. (Miller, Charles) (Entered: 04/29/2025) |
| 05/06/2025 | 60 | EXHIBITS filed by Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas re 58 Notice of Nonelectronic Filing: The exhibits are not uploaded to the docket due to file type. The drive with the exhibits will be retained in a case file folder in the Clerk's Office while the case is active, and according to the retention schedule set forth by the Judicial Conference thereafter. (mh) (Entered: 05/06/2025) |
| 05/09/2025 | 61 | REPLY to Response to Motion re 37 Amended MOTION for Preliminary Injunction filed by Plaintiffs Bryan Schott, Utah Political Watch. (Attachments: # 1 Exhibit Exhibit A - Counsel email)(Miller, Charles) (Entered: 05/09/2025) |
| 05/13/2025 | 62 | REPLY to Response to Motion re 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas. (Green, Tyler) (Entered: 05/13/2025) |
| 06/02/2025 | 63 | **NOTICE OF HEARING ON MOTION** re: 37 Amended MOTION for Preliminary Injunction, 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support : (Notice generated by Mary Jane McNamee) Motion Hearing set |

| | | |
|---|---|---|
| | | for 8/14/2025 at 01:30 PM in Rm 3.100 before Judge Robert J. Shelby. (mjm) (Entered: 06/02/2025) |
| 07/31/2025 | 64 | NOTICE of SUPPLEMENTAL AUTHORITY by Alexa Musselman, Abby Osborne, Aundrea Peterson, Mark Thomas re 37 Amended MOTION for Preliminary Injunction, 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support (Attachments: # 1 Exhibit CADC Order) (Green, Tyler) (Entered: 07/31/2025) |
| 08/06/2025 | 65 | **NOTICE VACATING MOTION HEARING** set for 8/14/2025 at 01:30 PM before Judge Robert J. Shelby. A written decision will be forthcoming. (Notice generated by Mary Jane McNamee) (mjm) (Entered: 08/06/2025) |
| 08/07/2025 | 66 | Plaintiff's RESPONSE re 64 Notice of Supplemental Authority,, filed by Bryan Schott, Utah Political Watch. (Miller, Charles) (Entered: 08/07/2025) |
| 09/29/2025 | 67 | MEMORANDUM DECISION AND ORDER - The court GRANTS Defendants' 53 Motion to Dismiss and DENIES as moot Plaintiffs' 37 Amended Motion for Preliminary Injunction. Signed by Judge Robert J. Shelby on 9/29/2025. (mh) (Entered: 09/29/2025) |
| 09/29/2025 | 68 | JUDGMENT - Per the Order entered on September 29, 2025, the court dismisses with prejudice the above-captioned case, and the Clerk of Court is directed to close the case. Magistrate Judge Cecilia M. Romero no longer assigned to case. Case Closed. Signed by Judge Robert J. Shelby on 9/29/2025. (mh) (Entered: 09/29/2025) |
| 09/30/2025 | 69 | NOTICE OF APPEAL as to 67 Order on Motion for Preliminary Injunction,, Order on Motion to Dismiss for Failure to State a Claim,, Memorandum Decision, 68 Judgment, filed by Bryan Schott, Utah Political Watch. Appeals to the USCA for the 10th Circuit. Filing fee $ 605, receipt number AUTDC-5570392. (Miller, Charles) (Entered: 09/30/2025) |
| 09/30/2025 | 70 | Transmission of Preliminary Record to USCA re 69 Notice of Appeal. (Attachments: # 1 Appendix)(jrj) (Entered: 09/30/2025) |
| 09/30/2025 | 71 | USCA Case Number Case Appealed to Tenth Circuit Case Number 25-4124 for 69 Notice of Appeal, filed by Utah Political Watch, Bryan Schott. A transcript order form or notice that no transcript is necessary per 10th Cir. R. 10.2. This form must be filed in both the district court and this court. See letter for additional information. (jrj) (Entered: 09/30/2025) |
| 10/01/2025 | 72 | TENTH CIRCUIT APPEALS TRANSCRIPT ORDER FORM filed by Bryan Schott, Utah Political Watch for proceedings held on February 5, 2005 before Judge Shelby, re 69 Notice of Appeal, (Miller, Charles) (Entered: 10/01/2025) |
| 10/01/2025 | 73 | Please be advised the Record is complete for purposes of appeal for USCA case number 25-4124 re 69 Notice of Appeal. (jrj) (Entered: 10/01/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/08/2025 21:30:40 | | |
| **PACER Login:** | ConsovoyMcCarthyLLC | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:25-cv-00050-RJS |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF UTAH

 3                        CENTRAL DIVISION

 4

 5    UTAH POLITICAL WATCH, INC.,      )

 6    and BRYAN SCHOTT,                )

 7              Plaintiffs,            )

 8    vs.                             )  Case No. 2:25-CV-50-RJS

 9    ALEXA MUSSELMAN, Utah House of   )

10    Representatives Communications   )

11    Director Media Liaison           )

12    Designee, et al.,                )

13              Defendants.            )

14    _____)

15

16

                BEFORE THE HONORABLE ROBERT J. SHELBY
17              -------------------------------------

18                       February 5, 2025

19

20                        Motion Hearing

21

22

23

24

25
```

```
1

2                        A P P E A R A N C E S

3


4

    For Plaintiff:              ROBERT P. HARRINGTON
5                               50 West Broadway
                                Suite 1000
6                               Salt Lake City, Utah

7                               CHARLES MILLER
                                1150 Connecticut Avenue, NW
8                               Suite 801
                                Washington, D.C

9


10


11


12

    For Defendants:             TYLER GREEN
13                              222 South Main Street
                                5th Floor
14                              Salt Lake City, Utah

15                              DANIEL M. VITAGLIANO
                                1600 Wilson Boulevard
16                              Suite 700
                                Arlington, Virginia

17
                                VICTORIA ASHBY
18                              CHRISTINE GILBERT

19


20


21

    Court Reporter:             Ed Young
22                              351 South West Temple
                                Room 3.302
23                              Salt Lake City, Utah 84101-2180
                                801-328-3202
24                              ed_young@utd.uscourts.gov

25
```

```
1   February 5, 2025                                    1:30 p.m.

2                     P R O C E E D I N G S

3

4           THE COURT:  Good afternoon, everyone, and welcome

5   back.

6           We'll go on the record and call case number

7   2:25-CV-50.  This is Utah Political Watch and others versus

8   Musselman and others.  It is the time set for hearing on the

9   plaintiffs' application for a temporary restraining order.

10  Let's begin, should we, with our appearances.

11          Mr. Miller, for the plaintiffs.

12          MR. MILLER:  Yes.  Good afternoon, Your Honor.

13  Charles Miller of the Institute For Free Speech on behalf of

14  the plaintiffs.

15          MR. HARRINGTON:  Robert Harrington from Kunzler,

16  Bean & Adamson on behalf of the plaintiffs.

17          THE COURT:  Of course I know you, Mr. Schott.

18  Thank you.

19          For the defendants?

20          MR. GREEN:  Good afternoon, Your Honor.  Tyler

21  Green from Consovoy & McCarthy on behalf of the defendants.

22          MR. VITAGLIANO:  Good afternoon, Your Honor.

23  Daniel Vitagliano from Consovoy & McCarthy on behalf of the

24  defendants.

25          MS. ASHBY:  Hi, Your Honor.  Victoria Ashby with
```

 1    the Office of Legislative Research and General Counsel for

 2    the defendants.

 3                MS. GILBERT:  Your Honor, Christine Gilbert with

 4    the Office of Legislative Research and General Counsel on

 5    behalf of the defendants.

 6                THE COURT:  Thank you.

 7                And then we have some of the named defendants here

 8    with us as well, do we?

 9                MS. GILBERT:  We do.  We have Ms. Alexa Musselman

10    and Aundrea Peterson.

11                THE COURT:  Terrific.  Welcome to all of you.

12    Thank you.

13                I must confess that I'm coming to the bench with

14    some uncertainty today, more than is normal.  I think I

15    would like to spend some time -- I believe in transparency,

16    so let me share with you what I'm thinking and what I'm

17    concerned about and then hear from all of you.

18                We received your communication this morning, and I

19    appreciate that counsel followed our instruction and met and

20    conferred about evidence.  And maybe we'll get to evidence

21    and maybe we won't today.  I'm not trying to be cute with

22    the story, but it is a helpful way, I think, to frame the

23    issue.

24                I often say that my law clerks are alarmed when

25    they begin their clerkships with me because they learn on

 1    their first day that they are going to be required to get

 2    two large tattoos, one on each arm; one that says standards

 3    and one that says burdens, because that is what controls the

 4    work that we do in our chambers.  We are laser focused on

 5    the standards that we are required to apply, and we evaluate

 6    who carries the burden, and then the question is have they

 7    satisfied that burden.

 8          I think my law clerks, some of them, are also

 9    disappointed to learn that I think the work of a trial court

10    is necessarily pedestrian.  We are not deciding in most

11    instances what the law should be.  We are trying to

12    understand what we think the law is and how it applies on

13    the facts that the parties have put before us, and we try to

14    be disciplined and constrain ourselves to the arguments that

15    the parties advance.  That is some general background.

16          Part of my practice that has evolved over time

17    with TROs is that I always make an initial threshold review

18    when we receive an application for a TRO to try to evaluate

19    whether I think the plaintiff has met what is a high

20    standard under Rule 65 to obtain injunctive relief.  It is

21    an invocation, a TRO is or a preliminary injunction, and

22    Rule 65 relief is the invocation of the extraordinary power

23    of the judiciary when we start interfering with the affairs

24    of others, especially when we start directing people about

25    what they should and shouldn't be doing, and especially

1    before we have had an opportunity to resolve issues on the

2    merits after an opportunity for an orderly exchange of

3    information.

4         There are instances where I can tell in my initial

5    review that I'm not satisfied that the plaintiffs have shown

6    an entitlement to a TRO in the first instance.  In that case

7    I ordinarily will deny the TRO, but without requiring the

8    responding parties to incur attorneys' fees and costs

9    preparing an opposition.

10         Part of the reason for that, of course, is I won't

11    allow an applicant for a TRO or any party in a hearing

12    before the Court to raise in reply new arguments, new law,

13    new issues that were not raised in the first instance,

14    because we deprive the respondents of an opportunity to, A,

15    notice, and a chance to respond.

16         This TRO came to me at a very busy time.  I

17    reviewed it quickly, and I could see that there was

18    substantial authority supporting the relief that the

19    plaintiffs were requesting, and it looked to me like this

20    was a real and meaningful submission in support of a TRO.

21         Now that the briefing is complete and I have had

22    more time to focus on the papers and on the arguments, I'm

23    not certain whether I made an error in judgment in the first

24    instance.  I think in our first meeting I disclaimed -- I am

25    not a First Amendment expert.  I mean, my work has caused me

1    to intersect with the First Amendment many times in my time

2    on the bench, but it is not an area of expertise.  I have

3    not seen the issues presented in this case before, so I

4    don't have good instincts for them, and I am relying on all

5    of you, the experts, to teach me about the law.

6         Here is what I have now become concerned about, is

7    that while the complaint and application for the TRO

8    generally describe the story about the facts that Mr. Schott

9    and the Utah Political Watch are alleging, it is clear and

10   the story comes through.  Where I realize I feel handicapped

11   is evaluating the standards that apply.  As I went back and

12   reread the plaintiffs' papers, I think there are some

13   fundamental failings.  We may overcome them today, but I'm

14   not sure.

15        The first thing I ordinarily hope to see when I am

16   reviewing a Rule 65 motion is some statement about the

17   standard that applies.  Back to standards.  Part of that

18   standard is Rule 65 and the four elements that a plaintiff

19   is required to establish in order to obtain injunctive

20   relief.  But in the Tenth Circuit, at least, there is always

21   a secondary threshold issue, and the defendants touched on

22   it in the opposition, and it is not something mentioned by

23   the plaintiffs.  And I focus on it because the Tenth Circuit

24   is constantly reminding trial judges in this circuit of the

25   importance of applying the correct standard.

1          There are, as the defendants said in their

2    opposition, some kinds of injunctions that are sought that

3    are disfavored in the Tenth Circuit, including injunctions

4    that are mandatory or that change or alter the status quo.

5    The defendants argue for both.  It is a meaningful and

6    important distinction.

7          This looks and reads to me like a mandatory

8    injunction.  I am not sure about the status quo, and because

9    the plaintiffs didn't address this in the first instance, I

10   really engaged with this in the reply, and I feel like there

11   is an inadequate record for me to make a conclusion beyond

12   the fact that it appears to me to be that the requested

13   injunction is mandatory.  Because you're asking me to

14   affirmatively order somebody to take an affirmative action,

15   and then you're inviting oversight, because the

16   certification that the plaintiffs seek here comes with

17   certain benefits that you're also asking me to order the

18   defendants to provide, and that would require, I think, some

19   ongoing supervision to ensure compliance.

20         On balance my best guess, without the benefit of

21   much briefing about this, is that this is a mandatory

22   injunction.  If that is true, while injunctive relief is

23   already extraordinary relief, and an applicant must show an

24   entitlement to the relief sought, under the heightened

25   standard a plaintiff is required to make even a higher

1   showing, a strong showing on two of the four Rule 65

2   factors, the likelihood of success on the merits and the

3   likelihood of irreparable harm.

4           Coming to the bench today, I realized that what I

5   at least perceive as a deficiency in the plaintiffs'

6   application -- and you may tell me why it is not -- is I

7   started to think that the next thing I would look for in

8   briefing ordinarily is the identification of which claims

9   you're moving on, whether the relief you're seeking is

10  related to those claims, and then, with respect to the

11  likelihood of success on the merits, what are the elements

12  of those claims?

13          Nowhere in the plaintiffs' application is there

14  any identification of any elements of any of the claims that

15  are asserted.  There are four constitutional claims asserted

16  in the complaint and invoked in the application for the TRO.

17  I don't know what the elements of those claims are even now

18  as I am coming to court on this motion, and that leaves me

19  wondering how am I to evaluate whether the plaintiff has

20  shown a likelihood of success on the merits.

21          Ordinarily, I would go look at the elements and I

22  would look at the facts asserted in support of the

23  application, and we would begin thinking about whether there

24  is evidence in the record on each of those points.  Only

25  then ordinarily would we turn to see what the defense has to

1  say about that and whether it is sufficient or not.

2  Sometimes we become kind of a mini fact finder.

3        Here the plaintiffs haven't told me what it is you

4  are required to show to succeed on your claims at trial,

5  which is the question before I can establish a likelihood of

6  success on the merits.  Without that information in the

7  opening brief, I'm left without any guidance here, and it is

8  not addressed in your reply.

9        The defendants were deprived of the opportunity to

10  try to address those arguments and issues because they lack

11  notice because you didn't move on that basis.  And I'm

12  deprived of the benefit of the adversarial process in trying

13  to draw conclusions.

14        My initial conclusion, and I will tell you we have

15  prepared a draft oral ruling to this effect, and my initial

16  view coming to the bench is that the plaintiff has failed to

17  show a likelihood of success on the merits at the standard

18  required in the Tenth Circuit and has failed to show a

19  likelihood of irreparable harm based on the submissions.  I

20  don't believe either of those findings are really dependent

21  much on the factual record before us.

22        I know that the plaintiffs take issue with what

23  really motivated the amendments to the credentialing policy

24  in November of 2024 and the like, and in response we heard

25  and read from the defendants that the changes happened

1    before the issues with Mr. Schott and maybe there are some

2    factual issues there.

3         Coming back again to the standards, another

4    failing that I think applies here, and I think the

5    plaintiffs don't dispute this in reply, is that it looks

6    like the Public Forum Doctrine applies to these claims, and

7    in the Tenth Circuit there is a three-step inquiry that

8    applies, and the plaintiffs don't argue the application of

9    those three steps to any of their claims here.

10        The words strict scrutiny -- I don't even know

11   what standard you're asking me to apply to which of your

12   claims.  The phrase strict scrutiny appears in your opening

13   brief I think one time and I think in the reply one time,

14   but strict scrutiny applies to which of these claims and

15   which parts of these claims?  It is not everything, I don't

16   think.

17        Let me think about this.  I will just say that it

18   is not evident to me that you have made a showing that

19   strict scrutiny applies to each of your four claims or how

20   it would apply in reviewing the state's credentialing

21   policies.

22        Also, it is not until the reply that I read

23   anything about whether this was a facial attack or an

24   as-applied attack.  I read in a footnote what I infer to be

25   a suggestion that the plaintiffs here are making an

1    as-applied attack and not a facial attack and, of course,

2    that is a distinction that matters.

3           So all of these things are legal questions that I

4    think are presented for my consideration today on an

5    incomplete and inadequate record.  Ultimately, it is the

6    plaintiffs, of course, who bear the burden of establishing

7    their entitlement to relief.

8           So, at least coming to the bench, I don't know

9    whether we can cure any of that with any witness testimony.

10   I mean, it seems to me that these failings are foundational,

11   and they don't really depend on what witnesses would say

12   here at least.  That is just my initial orientation.

13          Mr. Miller, why don't you and I walk through that

14   and visit about this a little bit.  I'm sure I'll have

15   questions, and you may have questions for me.

16          You still intend to proceed today, and I know that

17   coming into court.  What do you think about what I have just

18   said?

19          I will add as you are walking that I am not a

20   fragile little flower.  I am not afraid of you telling me

21   I'm dead wrong and I misunderstood everything.  That is the

22   point of being here in court and having oral argument.

23          MR. MILLER:  Well, Your Honor, I am going to say

24   that you are misunderstanding.

25          THE COURT:  I missed that.  I'm sorry.

1          MR. MILLER:  Your Honor, since you indicated that

2    you think that we have an unlikelihood to succeed on the

3    merits and that there is no irreparable harm, I probably

4    will say that you are wrong about everything.

5          But just sort of to get going through here, so

6    obviously, you know, you indicated that you are very

7    concerned about the standards here and what is being

8    evaluated in the claims, and also the other thing that it

9    sounds like you are concerned about is the nature of the

10   injunctive relief and whether or not it is a mandatory

11   injunction.

12         So just walking through the matters, first, I

13   think maybe we did in our briefing sort of skip past some of

14   that analysis about the forum, but we didn't do the analysis

15   because we just -- you know, we concluded and we stated

16   there that this is a limited purpose public forum.  It is a

17   limited purpose public forum because what the defendants

18   created was they created the opportunity for media to come

19   and gather information about what is happening in the

20   capital.

21         THE COURT:  So then what standard applies in a

22   limited public forum, we evaluate a First Amendment

23   challenge?

24         MR. MILLER:  Right.  In that context the broad

25   standard that applies is that there must be reasonable

1    standards that are set forth that are not viewpoint based or

2    content based if the content is not relevant to creating the

3    forum.  So when you have the scenario where --

4            THE COURT:  Can I say that back to you and make

5    sure we are saying the same thing?

6            MR. MILLER:  Yes.

7            THE COURT:  Control over access to a limited

8    public forum can be based on subject matter and speaker

9    identity, so long as the distinctions drawn are reasonable

10   in light of the purpose served by the forum --

11           MR. MILLER:  That is right.

12           THE COURT:  -- and are viewpoint neutral?  Is that

13   the correct standard?

14           MR. MILLER:  Yes.

15           THE COURT:  How come that is not in your papers?

16           MR. MILLER:  Your Honor, we stated it was a

17   limited purpose public forum, and then from there we

18   immediately began discussing the viewpoint nature of it and

19   the aspects of content discrimination that are not -- we

20   spent much time discussing the cases where it says that once

21   you create that limited public forum and once you have that

22   limited public forum, then you cannot discriminate against

23   members that are permitted there in the forum.  Once that

24   happens, that is where you get to the scrutiny.  Once those

25   violations happen, that is what triggers the scrutiny and is

1    not reasonable.

2            THE COURT:  I see.  I mean, I agree with you that

3    there is much discussion in your papers about whether, at

4    least as applied to the plaintiffs, the credentialing

5    policies are viewpoint neutral.

6            MR. MILLER:  That is correct.

7            THE COURT:  And you think that they are not and

8    for that reason you think if they are not viewpoint neutral,

9    then strict scrutiny applies and that they fail here and

10   that is what renders the policies unreasonable.

11           Is that the argument?

12           MR. MILLER:  That is exactly right, Your Honor.

13           We essentially were very much drilled in on the

14   discussion about that.

15           THE COURT:  Well, let's set aside strict scrutiny

16   for a minute.  Where do you make an argument about whether

17   the credentialing policies are reasonable in light of the

18   purpose served by the forum?  Where do you even talk about

19   the purpose served by the forum, let alone whether these

20   credentialing policies are reasonable or not reasonable?

21           MR. MILLER:  The purpose of the forum is obvious.

22   It is a press credentialing process.  That is the forum is

23   that they are giving press access to their hearings and

24   their events and so then they have a policy.  Looking at the

25   policy, it basically allows for them to discriminate between

1    and amongst journalists who are there doing the same work at

2    the same level and does so based upon factors that are not

3    reasonable because they are not related to the journalism

4    itself.

5          The factors that they are using are, you know,

6    independence.  Quite frankly, usually the government and

7    people in society want an independent media, right?  That is

8    what most media prides themselves on, being independent.

9    The Tribune says so on its website.  It is independent.  The

10   Washington Post talks about how they are an independent

11   voice in dark times, yada, yada, yada.  Independence is

12   usually a quality that is greatly appreciated and desired in

13   the media.  Just independence on its own is not a reason to

14   disqualify.

15         It really appears that if you're looking at this

16   policy, and in good faith what they are trying to do is to

17   get people, they even sort of say in some of their arguments

18   here that folks that are kind of fly-by-night operators and

19   kind of coming and are not really doing legitimate

20   coverage -- that is fine.  I mean, that is what the policy

21   should be, but that is not what it says and that is not what

22   they apply here.

23         They said that they have two factors that they

24   apply here.  One is whether Mr. Schott has a separate editor

25   and whether he has an organization that he reports to that

**Suppl. App. 29**

1   they can sue for liable.  Those are the factors that they

2   utilized here, and that is not reasonable.

3          As we indicated in *NRA versus Vullo* from this

4   year, the Supreme Court expressly said that you can't use a

5   third party to punish someone for their speech, and that is

6   what they are saying that they want to be able to do.

7          THE COURT:  You have steered us into a discussion

8   on the merits.  We are going to spend as much time as we

9   need to today to hear your arguments and understand your

10  arguments.  You have not moved me yet off the first point,

11  which is you're the party that bears the burden of making

12  this showing, and, as a matter of fair play in federal

13  court, you're required to paint the target in your opening

14  brief so that the defendants have notice about what your

15  arguments are and what you're stating and the basis for your

16  relief so they can respond.  You don't mention the Public

17  Forum Doctrine in your opening brief.  There is no mention

18  of it at all.

19         MR. MILLER:  Your Honor, in our opening brief we

20  state that it is a limited public forum.

21         THE COURT:  Do you tell me what rules apply and

22  what standard then to apply?  Is that in your papers?  Did I

23  just miss it?

24         MR. MILLER:  We say it is a limited public forum,

25  and then we say within that limited public forum these

1    policies are void because they are content-based

2    discrimination and they are viewpoint-based discrimination.

3         THE COURT:  Without saying as much, do you just

4    acknowledge, or at least you don't contest, under the

5    circumstances that the credentialing policies are reasonable

6    in light of the purpose served by the forum?

7         MR. MILLER:  They are not reasonable for those

8    reasons.  They cannot be reasonable if they are

9    inappropriate content-based discrimination and inappropriate

10   viewpoint-based discrimination, and that is what makes them

11   unreasonable.

12        THE COURT:  Where do you say that in your papers?

13   There is no orientation to the standard that you're applying

14   under the subtext of your argument.  Just assume that I am

15   not the smartest trial court in the world, and just assume

16   that I don't have a great wealth of experience and knowledge

17   about the First Amendment.  Where do you guide me to the

18   standard I'm supposed to apply?  You didn't.  Maybe I

19   misunderstood part of your argument.

20        MR. MILLER:  Well, Your Honor, I think that we did

21   in the sense that those two arguments that I am telling you

22   and repeating about the content based -- unreasonable

23   content based and viewpoint based, those are trump cards

24   under the First Amendment.  Once those apply, those are what

25   trigger the strict scrutiny and require the defendants to

1    justify their policies.

2              THE COURT:  Okay.  What are the elements of your

3    causes of action, your claims?

4              MR. MILLER:  Your Honor, the claim is that they

5    have a policy that --

6              THE COURT:  These are Section 1983 claims, are

7    they?

8              MR. MILLER:  That is correct, Section 1983 claims

9    under the Fourteenth and First Amendments of the

10   Constitution.

11             What we have alleged is that the denial of the

12   press credentials violate those because of the policies and

13   the conduct, and the way that they implemented the policies

14   violate strict scrutiny because of the viewpoint

15   discrimination.  That is the claim.

16             THE COURT:  If this case goes to trial, what will

17   we instruct the jury?  They will be asked to decide what?

18             MR. MILLER:  Well, Your Honor, there is no jury.

19   These claims are only decided by the Court.

20             THE COURT:  Are you saying that there is no

21   elements to these causes of action you're asserting, it is

22   just a threshold question for the Court, and as a matter of

23   law can the credentialing policies survive strict scrutiny

24   and that is the sole question in this case?  Is that it?

25             MR. MILLER:  Yes, that and the credentialing

1    policies as applied to the defendant and also the

2    credentialing decision, right?  If the policy is there but

3    then they make a decision that is violative because of the

4    way that they apply the decision, that is correct.

5          THE COURT:  This is strictly an as-applied

6    challenge?

7          MR. MILLER:  Yes.

8          You also discussed the nature of the injunctive

9    relief.  One thing about injunctive relief is that, you

10   know, you can have entire treatises written sometimes on

11   what is a mandatory injunction and what is not a mandatory

12   injunction, and the request that we have made was that you

13   enjoin them from enforcing this policy as it applies to his

14   credentials.

15         THE COURT:  The flip side of that is you want me

16   to order them to issue press credentials.  Isn't that the

17   same thing as a parade permit, essentially, for speech and

18   isn't that a mandatory injunction?

19         MR. MILLER:  An order that says you must issue

20   credentials is a mandatory injunction.  An order saying that

21   you are prohibited from applying this policy as written

22   under these criteria is a prohibitive injunction.  It is

23   possible that you could say that these factors here cannot

24   be applied and maybe portions of the policy survive and now

25   evaluate his application.

1          THE COURT:  So what does that look like?  Does

2    that look like you can't enforce the policy so everybody

3    loses their credentials at the legislature now or anybody

4    who wants credentials gets them?

5          MR. MILLER:  No, of course not.  Again, this

6    is applied, and it is specifically -- it is a very, very

7    narrow thing that we're actually focusing on here.  The only

8    thing we are focusing on here is when you have a member of

9    the media who has an established career, right, an

10   established career covering this institution --

11         THE COURT:  He does, and I agree.

12         MR. MILLER:  Yes.  So what I'm trying to indicate

13   here is that it is the facts of this case that shape the

14   nature of the injunction, and what we are saying is that

15   applying the bar to independent journalism and to say that

16   he is not established under these facts, and under the

17   policy as written it just cannot be done because, one, those

18   terms are not really defined in a way that makes sense based

19   on how they are written in the policy and utilized, but they

20   don't apply in a way that makes any sense to the plaintiffs,

21   to Utah Political Watch and to Mr. Schott.

22         THE COURT:  Is that a First Amendment issue?

23         MR. MILLER:  Of course it is.

24         THE COURT:  Is it?  It sounds like you're arguing

25   about differential treatment.  Is the argument at bottom

1   that Mr. Schott is being treated differently than other

2   similarly situated applicants?  I think so, and you make

3   that argument in places in your papers.

4           MR. MILLER:  Yes, that is right.  And that is an

5   aspect of the First Amendment claims, and we discuss how

6   under the First Amendment -- the First Amendment is what

7   prohibits that differential conduct.  It is not a case where

8   we are saying he is a protected class or something like

9   that.  It is the First Amendment that gives you that right,

10  because of the concerns that courts have that if you don't

11  have these standards in place, then these policies will be

12  used or can be used for the viewpoint discrimination and

13  punishment.  That is why it is important that similarly

14  situated individuals be treated the same under the First

15  Amendment.

16          THE COURT:  You had in mind that you wanted to

17  cross-examine the defendants today, and you wanted an

18  opportunity to better develop a factual record.  I think I'm

19  about to ask you to proffer what you think that would

20  establish and how that would be helpful in resolving the

21  motion that is before me.  The witnesses are all in the

22  courtroom and, of course, they are all parties.

23          MR. MILLER:  Your Honor, I am happy to do this

24  informally with you, and I am not looking to hide anything

25  or to surprise anybody, so that is fine.

```
1              THE COURT:  I am not suggesting that.

2              MR. MILLER:  I know.  I am accepting your

3      invitation.

4              THE COURT:  Pause for a second.

5              Maybe before we get to that let me hear from Mr.

6      Green and see whether I just came to the bench today in a

7      haze and whether I am just misunderstanding what is in front

8      of us.

9              Thank you, Mr. Miller.

10             All that stuff that I said at the beginning of the

11     hearing, Mr. Green, is that just silly and is that just

12     nonsense and it does not apply in this context?

13             MR. GREEN:  It is not silly, Your Honor.  I think

14     you were exactly right at the beginning of this hearing.  To

15     be candid -- and, as the Court knows, we had a period of

16     about 96 hours or so to put together these briefs before

17     they were due, and we had the same question when we opened

18     them and started looking:  What is the claim?  What are the

19     elements?  How do we figure out the likelihood of success?

20     So day one was trying to answer that in our own minds and

21     then do the research that we put together for the Court in

22     our brief, in our opposition brief.

23             I think if I could say a couple of things about

24     that, and this question about what is the standard for us is

25     a really important one.  I don't want to speak for the
```

1    plaintiffs about which claim they are bringing or trying to

2    prove the likelihood of success on, but on this notion of

3    the forum, I think we have got some agreement today that we

4    are under a forum analysis at least for purposes of this

5    motion.  I think you're right that we didn't see that in

6    their briefs.  We tried to provide to the Court what our

7    thoughts should be on that and how you go about analyzing

8    it.

9         There are a couple of key pieces, I think, when it

10   comes to the forum question.  I pointed the Court to --

11        THE COURT:  Slow down just a little bit.  Mr.

12   Young is --

13        MR. GREEN:  Sorry.  Somebody is having a hard

14   time.  Excuse me.

15        There are three cases.  The *Evers* case from the

16   Seventh Circuit I think is directly on all fours and

17   squarely in our favor.  I think *Evers* builds on the Supreme

18   Court's holdings in *Cornelius* and in *Perry*.  The critical

19   pieces from those cases, Your Honor, I think are exactly

20   what the Court said a few minutes ago.  Once we get to this

21   question, are we trying to figure out whether there is an

22   access problem under a limited public forum or a nonpublic

23   forum analysis.

24        We have had some discussions today about does that

25   turn into a content-based restriction or a viewpoint-based

1    restriction?  If I could point the Court, actually, to a

2    couple of cases -- and I think you mentioned the footnote,

3    which we were a little taken back and surprised by, and once

4    we get to limited public forum or to nonpublic forum

5    analysis, this is not a content-based problem.  There is no

6    content-based problem.

7            Here are the cases I would point the Court to.

8    Starting in the Tenth Circuit, *Hawkins versus City & County*

9    *of Denver*, which is 170 F.3d 1281.  I believe the pincite is

10   1287.  This is what the Circuit had to say:  "In a nonpublic

11   forum, the government has much greater latitude to restrict

12   protected speech.  The law draws no distinction between

13   content-neutral and content-based restrictions in a

14   nonpublic forum."

15           Similarly, from the U.S. Supreme Court in *Good*

16   *News Club versus Milfor*d, and this is at 533 U.S. 98, and I

17   think the pincite is 106 to 107, and this is the quote.

18   "When the State establishes a limited public forum, the

19   State is not required to and does not allow persons to

20   engage in every type of speech.  The State may be justified

21   in reserving its forum for certain groups or for the

22   discussion of certain topics."  That is content-based

23   restrictions.

24           So the Supreme Court and the Tenth Circuit have

25   told us that once we get to this forum analysis, the

1    relevant question and the standard is exactly the one this

2    Court identified, which is is the restriction reasonable in

3    light of the purpose to be served by the forum and

4    viewpoint-neutral?  On the first question, the

5    reasonableness of the restriction in light of the purpose to

6    be served, we have not found a single case that has looked

7    at the denial of press credentials or access to a press

8    conference or anything that looks like that in those

9    headings, and every case that has looked at that that we

10   found that has analyzed the reasonableness of it has

11   approved it, no problem.  Nobody has found it to be

12   unreasonable.  These cases all, therefore, hinge on the

13   question of viewpoint discrimination, which is a subset of

14   content-based restriction, but it is not the entirely of it.

15          That is how we have tried to brief it and that is

16   our understanding of it.  We have submitted evidence as part

17   of our declaration, I think, showing that.

18          THE COURT:  I think, if I understood Mr. Miller's

19   argument correctly, he is saying that that evaluation of

20   viewpoint neutrality requires in a limited public forum

21   setting that your policy survives strict scrutiny.

22          MR. GREEN:  I am not even sure that I would call

23   it strict scrutiny.  I think viewpoint discrimination is the

24   ballgame.  If the Court were to find either the likelihood

25   of success at this stage or on the merits that it was in

 1    fact viewpoint discrimination, I think that is it.  It is

 2    over.  I'm not sure that we could overcome that.

 3            THE COURT:  Without the benefit of having read

 4    *Hawkins* or the Supreme Court case that you just cited to me,

 5    do either of those cases evaluate an as-applied challenge to

 6    viewpoint neutrality?

 7            MR. GREEN:  Your Honor, to be honest, I am not

 8    entirely sure.

 9            THE COURT:  That is totally fair.  We are all

10    moving --

11            MR. GREEN:  I don't want to mislead the Court

12    there, so I don't know.

13            THE COURT:  What does that look like, do you

14    think, under your public forum doctrine?  When we look at

15    viewpoint neutrality, what factors do you think the Court

16    considers?

17            MR. GREEN:  I think it would look a lot like the

18    *Evers* decision.  I think you would look at what were the

19    stated purposes for the policy itself.  Once we got to

20    reasonableness -- let me point the Court to the specific

21    part of *Evers* that I think gets us there.

22            I'm sorry.  This part of *Evers* is about

23    reasonableness.

24            I think the question is just what are the facts on

25    this particular point?  Why did they do it?  Why did they

**Suppl. App. 40**

1    say they did it?  Here the evidence we have is declaration

2    testimony from the defendants saying this was a

3    straightforward application of our viewpoint-neutral

4    criteria.

5           I don't think there is any argument, at least I

6    don't understand the plaintiffs to be arguing that the

7    criteria themselves are somehow not viewpoint neutral, that

8    they discriminate based on viewpoint.  So I think the

9    question would be what is the evidence that shows, if any,

10   whether they applied them to Mr. Schott for reasons other

11   than they said they did.

12          THE COURT:  I think I have understood the

13   plaintiffs to argue that the changes to the policy are not

14   viewpoint neutral because they were designed specifically

15   with Mr. Schott in mind, and so you had an end result that

16   you wanted to justify, and then you worked backwards to

17   construct requirements that you knew he couldn't satisfy.

18   Even though on their face they are neutral, as applied to

19   him it is discriminatory and you just mean to censor him

20   because you don't like what he says.

21          Is that the argument you think they advanced?

22          MR. GREEN:  I think it is something like that.  I

23   think a brief version of our response is, as we understand

24   the declarations and the briefing from the plaintiffs, Mr.

25   Schott has described himself as a left wing journalist who

1    has been sort of a burr in the saddle of the legislature for

2    a very long and illustrious career he has had covering the

3    legislature.

4            I guess our position would be that this is not the

5    first dustup I don't think that Mr. Schott has had with the

6    legislature.  I think there is some evidence in the record

7    about that, or at least there could be, and there is also

8    evidence in the record about how did the policy look

9    before -- we have copies of the policy going back to at

10   least 2018.  You can look at all of those policies and I

11   think look holistically at what happened here and say, If

12   Mr. Schott was the left wing journalist that he purports to

13   be and provoking the legislature in the way that he thinks

14   he has provoked the legislature, the legislature could have

15   taken steps at any point from the beginning, I guess, of his

16   coverage of the legislature all the way up until now to

17   revoke his press credential if they wanted to do it as

18   retaliation or punishment in response to whatever his

19   viewpoint was to his continual, I guess, poking the

20   legislature, for lack of a better way to talk about it, but

21   they have not done it.

22           The only reason they did it now, and what is

23   stated in the papers, is that his employer changed and there

24   was a change in the policy that predated that, and that

25   change in the policy was directionally consistent with what

1   the legislature had been doing since the first one that we

2   have evidence of in the record from 2018.

3         THE COURT:  Now you and I are wading into the

4   merits as well.  I think the question -- I would like to

5   visit again with Mr. Miller, but before you surrender the

6   podium, ultimately it is a decision I'm going to have to

7   make soon whether it is going to be beneficial for us to

8   further develop the record and whether we should do that by

9   proffer or whether those proffers might inform whether it is

10  going to be a good use of everyone's time to put witnesses

11  on the stand.

12        I can guess the answer to this question.  You

13  think we should proceed today how?

14        MR. GREEN:  I think we should proceed today the

15  way the Court outlined, which is to say the plaintiffs carry

16  the burden and they didn't meet it in their opening papers,

17  and because those papers were styled as a motion for either

18  a TRO, or a preliminary injunction in the alternative, both

19  of those should be denied so that we are not back here again

20  in two more weeks or three more weeks talking about

21  something else.  Then we can just move to the merits of the

22  case in the ordinary course.

23        THE COURT:  I think Mr. Miller may tell me that if

24  I deny the TRO today that he wants to schedule a preliminary

25  injunction and talk about a timeline for expedited discovery

 1   so that we have a more complete and robust record when he

 2   comes back to try to make that showing.

 3           Your response to that is what?

 4           MR. GREEN:  My response to that is I would not be

 5   surprised if he said that.  If that is ultimately what the

 6   Court decides to do, and I know that it is within the

 7   Court's discretion to do it, but, on the other hand, to your

 8   point, they had their chance and we have their papers and

 9   that standard was not met in the first place.

10           THE COURT:  What is last day of the legislative

11   session?  Is it in March?

12           MR. GREEN:  March 7th, Your Honor.

13           THE COURT:  Thank you, Mr. Green.

14           MR. GREEN:  Thank you.

15           THE COURT:  Mr. Miller, your thoughts?  I guess I

16   am still focused in the first instance on how it makes sense

17   for us to proceed today.

18           MR. MILLER:  Yes.

19           The answer to that question directly is I think

20   that perhaps the proffering would be useful, but first I

21   just want to kind of, you know, revisit that legal

22   discussion that you had about the standards.  I think

23   actually when Mr. Green got up here, it really showed the

24   clarity that we are talking on the same page and about the

25   same legal standards.

1          I did go back and I checked our original motion,

2     and we do specifically state on page 3 of the document, and

3     page ID 65 in the matter, that it is not only traditional

4     public forums or restrictions based on content must satisfy

5     strict scrutiny based on viewpoint, even in limited public

6     forums citing *Rosenberger*, the State must respect the lawful

7     boundaries it has set and may not discriminate against

8     speech based upon its viewpoint.

9          We had this discussion of *Rosenberger*, and I just

10    want to kind of remind the Court of what the Supreme Court

11    said.

12         THE COURT:  I am going to use the word

13    frustration, and that does not mean I am frustrated with

14    you, but what I am having a hard time making use of in your

15    brief is I think there is a lot of law in your brief --

16         MR. MILLER:  Good.

17         THE COURT:  -- at least as I read it, and I read

18    it a couple of times, and some of it I have read more than a

19    couple times, without any clear guidance about how you

20    thought we were supposed to go through the mechanics of

21    applying it.  I agree with you that maybe there is ten pages

22    of law in here without the benefit of context, and maybe

23    just because I don't have your expertise.  I agree with you

24    that you say those words on page 17 of your brief.

25         MR. MILLER:  Your Honor, I appreciate your

1    frustration and --

2          THE COURT:  That was a bad word.  Go ahead.

3          MR. MILLER:  You are not frustrated with me, and I

4    keep agreeing with you and you think I'm taking offense and

5    I'm really not.  I appreciate your concern with that.

6          Look, in this context these cases do move quickly,

7    so I have put it together, and there are court rules that we

8    have to abide by with space limitations and the like.  As

9    Mr. Green said, and I want to actually kind of go over the

10   standard in *Rosenberger*, but, as he said, if we are talking

11   about viewpoint discrimination, it is the ballgame.

12         THE COURT:  Okay.  How do we evaluate it?

13         MR. MILLER:  Yes.

14         *Rosenberger* and viewpoint discrimination.  Just as

15   it says here, and this is talking about the limited purpose

16   public forum.  Just briefly, the facts of that case was

17   where there was a university newspaper or university funds

18   that were available for publications, and they denied it to

19   a group because it sort of had religious viewpoints.  And

20   the Supreme Court said, No, you can't do that.  It was

21   saying that that is a limited purpose public forum.

22         It says in here -- I guess I'm starting on page

23   28.  "Discrimination against speech because of its message

24   is presumed to be unconstitutional.  These rules informed

25   our determination that the government offends the First

1    Amendment when it imposes financial burdens on certain

2    speakers based upon the content of their expression.  When

3    the government targets not subject matter, but particular

4    views taken by speakers on the subject, the violation of the

5    First Amendment is all the more blatant.  Viewpoint

6    discrimination is, thus, an egregious form of content

7    discrimination, and the government must abstain from

8    regulating speech when the specific motivating ideology or

9    the opinion or the perspective of the speaker is the

10   rationale for the restriction, the framework forbidding the

11   State from exercising viewpoint discrimination, even when

12   the limited public forum is one of its own creation.  That

13   is why this is the standard that we are applying."

14          It concludes, "In determining whether the State is

15   acting to preserve the limits of the forum it has created so

16   that the exclusion of a class of speech is legitimate, we

17   have observed the distinction between, on the one hand,

18   content discrimination, which may be permissible if it

19   preserves the purpose of the limited forum, and, on the

20   other hand, viewpoint discrimination, which is presumed

21   impermissible when directed against the speech otherwise

22   within the forum's limitations."

23          Now we have articulated two arguments of viewpoint

24   discrimination.  One was from the beginning, and the second,

25   I will tell you -- we only said it in the reply, because it

1    was only in their opposition that we heard, you know, the

2    actual kind of workings of the denial and what their

3    justifications were.  The initial viewpoint discrimination

4    was as you articulated earlier.

5            These policies have been in place that allow for

6    independent media to report and receive credentials from at

7    least 2019, if not 2018, and if not before, and all the way

8    through last year.  The 2019 policy said, you know, hey, if

9    a blogger meets this criteria, you can have it.  And the

10   2020 policy says independent media can do this in some

11   circumstances, and in '21 as well.

12           Then they modified it to say in some

13   circumstances -- they said in limited circumstances or

14   something along those lines more, you know, something that

15   sounds more restrictive than some, but they never changed

16   the evaluation criteria.  So through that entire period all

17   the way through this past November after my client started

18   his own business, until that time the independent media

19   could receive credentials and --

20           THE COURT:  Would you agree --

21           MR. MILLER:  -- now they don't.

22           THE COURT:  I am sorry.  What?

23           MR. MILLER:  And now they can't.  I am sorry.

24           THE COURT:  Do you agree that under the policy

25   that was in place in 2023, they could only receive

1    credentials in extraordinary or unusual circumstances?

2          MR. MILLER:  So that is what they call it.  That

3    would actually be some of the testimony that I would try to

4    gather from them to find out what that means, because I

5    actually think that, you know -- the testimony I was going

6    to try to elicit from them was to find out how they would

7    evaluate him under that policy, because I think under that

8    policy and because of who he is and how long he has been

9    reporting and his track record, and the fact that even Utah

10   Policy Watch for the three or four months it has been in

11   existence has a large following and has done regular news

12   reporting, and throughout this entire process he had

13   exclusive interviews with the now U.S. Senator and he met

14   with Senator Hatch and he has been breaking news, and the

15   fact that his breaking news was indicated in here -- because

16   they got upset about some of the news that he broke, we can

17   evaluate if you are actually looking at the substance of his

18   work, does he qualify?  We think that they intentionally

19   changed their policy for that reason.

20         Now, in their opposition they actually stated

21   viewpoint-based discrimination as their motivation.  What

22   they said was they do not want the views expressed of

23   someone whose work goes out unedited, whose work is the

24   stream of consciousness.  I will tell you that that is a

25   viewpoint.

1            THE COURT:  I don't know.

2            MR. MILLER:  It is a perspective.

3            THE COURT:  It is a procedure.

4            MR. MILLER:  If you --

5            THE COURT:  What is the viewpoint that is

6    expressed?

7            MR. MILLER:  The viewpoint is the viewpoint that

8    they are expressing.  If there is a journalist who is

9    expressing a viewpoint and they are putting their work

10   together in their editorial discretion, it is the editorial

11   discretion of the journalist of the publication to determine

12   how they are going to report and what they are going to

13   cover.  And this policy as they have applied it, not what it

14   says, but as they have applied it, says, Well, wait a

15   minute.  Actually, we don't want anyone who has their own

16   editorial discretion.  You are not allowed to report if you

17   are using your own editorial discretion.  You must have a

18   supervisor who has editorial discretion over you.  That is

19   not permitted.

20           THE COURT:  Why is that not permitted?  Why is

21   that unconstitutional?

22           MR. MILLER:  It is unconstitutional because the

23   speaker and the journalist and the press has the right to

24   determine their own editorial policies and content.  The

25   State cannot go to them and say, No, you need a supervisor.

1    You need someone else to come in and edit for you.

2          THE COURT:  Why is that not a fair indicia of

3    independence?  That is not the right word.

4          MR. MILLER:  Right, it is not.

5          Quality.  See, that is where we go, because they

6    can't enforce that either.

7          THE COURT:  That cannot be the case.  What

8    standard does the White House apply to a credentialed

9    journalist who can appear at the White House?

10          MR. MILLER:  The White House has announced on

11    social media that social media personalities, that TikTokers

12    and anyone else can apply so long as they produce original

13    content and cover the White House.

14          THE COURT:  That was a poor question.

15          Does the White House regulate who can come in for

16    press briefings?

17          MR. MILLER:  Of course it does.

18          THE COURT:  Does it decide what considerations it

19    will evaluate in deciding who to license and credential to

20    come in?

21          MR. MILLER:  There are some rules that it can have

22    and there are some that it cannot.  In saying that you have

23    to have an editor supervise your work is not one that is

24    constitutional.

25          THE COURT:  How is that viewpoint based at all,

1    content-based or viewpoint based?

2         MR. MILLER:  It is perspective-based because it is

3    telling that person that you cannot -- it is telling that

4    reporter that your perspective cannot be put out there

5    unless someone else reviews it first and changes it.

6         Your Honor --

7         THE COURT:  Not and changes it --

8         MR. MILLER:  Potentially -- we don't know what

9    they are going to do, and that is the point.  Unless someone

10   else has control over your work -- Your Honor, in this

11   framework the question does not come to the plaintiff.  The

12   question goes to the government.  The question to the

13   government is what is your justification for wanting to

14   control this publication's editorial discretion and demand

15   that they have a separate editor.

16        THE COURT:  I disagree with that.  I think as we

17   are here under Rule 65, I am pretty clear that the burden is

18   on the plaintiff to establish a constitutional violation, so

19   you identify the thing that you think violates the

20   Constitution and you have to show a likelihood of success on

21   that claim.

22        Am I wrong about that?

23        MR. MILLER:  Your Honor, in your *NetChoice*

24   decision, and that was a preliminary injunction, and in that

25   case you stated that it was the government's duty to

1  establish that its policies complied with the First

2  Amendment.  That was the standard you applied there under

3  the First Amendment, and it is the same standard that

4  applies here.

5          THE COURT:  I am sorry.  You said the name and I

6  didn't catch it.

7          MR. MILLER:  I'm sorry.  *NetChoice*.

8          THE COURT:  Right, from last year.

9          MR. MILLER:  Yes, Your Honor.

10         Under the First Amendment, it is the government's

11 burden to justify the policies even at the preliminary

12 injunction level.  As you indicated in that decision that

13 even at the preliminary injunction phase, the determination

14 and the burdens from the merits are the same that apply at

15 this stage.

16         THE COURT:  Of course in *NetChoice* -- I mean, an

17 awful lot of water crosses under the bridge in this court,

18 and I don't remember when that was, last summer maybe, but,

19 as I remember, in *NetChoice* we got far enough long in the

20 analysis that we were deciding what level of scrutiny

21 applied to the government action that was at issue, and we

22 have not gotten that far yet here.

23         That reminds me of a question that I still was not

24 clear about, about the standard that you think I'm required

25 to apply.  In a limited public forum when we are evaluating

1    whether a restriction is viewpoint neutral, what is the

2    test?

3          MR. MILLER:  Okay.  Your Honor, you read the test,

4    which it is a reasonableness test unless there is a

5    viewpoint-based issue, and so we're talking about that

6    subset, which is a viewpoint issue, and also we have the

7    vagueness challenge.

8          THE COURT:  Before we get to that, help me

9    understand, please -- I can tell that you are frustrated

10   with me now.

11         How do I evaluate viewpoint neutrality?  What case

12   would you point me to that says this is what makes a

13   restriction viewpoint neutral and what makes it not

14   viewpoint neutral?

15         MR. MILLER:  Okay.  The standard is whether the

16   policy and the rule is applied in a way that can allow and

17   permit viewpoint discrimination.

18         THE COURT:  Okay.  And what authority would you

19   point me to as the clearest articulation of that?

20         MR. MILLER:  Well, I think that -- I will point

21   you in the first instance, you know, back to *Rosenberger*.

22         THE COURT:  To what?

23         MR. MILLER:  *Rosenberger*.

24         THE COURT:  Okay.

25         MR. MILLER:  I do want to hit again on the

1   vagueness issue, because these standards that we are just

2   now talking about and about what they meant by independence

3   and essentially needing an editor and having someone to

4   report to, that was not in the policy.  Had Mr. Schott been

5   aware that that was the policy, he would have structured his

6   business in a way to meet that.  We didn't hear that until

7   they filed something in this court, so that was not even in

8   the written policy.

9           THE COURT:  Do you think that the defendants'

10  articulation of the standard for the void for vagueness

11  doctrine is incorrect?  You don't respond to it in reply,

12  the standard that they say governs.

13          MR. MILLER:  Your Honor, the vagueness that is

14  here is -- they have acknowledged the vagueness because they

15  are applying rules that are not written in the policy and

16  making up definitions and utilizing definitions that are not

17  necessarily tied to the meanings of the words.  They have to

18  go back to old policies to find it and say, Well, this is

19  what we mean by this.

20          THE COURT:  Does your answer mean that you accept

21  the standard for establishing void for vagueness?

22          MR. MILLER:  Your Honor, I'm looking for their

23  document now so I can see what they articulate the standard

24  is.

25          THE COURT:  I will find it for you.

**Suppl. App. 55**

1          I'm looking at your reply, and you don't take

2     issue with it in your argument on pages 8 to 10, which is

3     where you talk about it.

4          In fact, you don't talk about the standard there

5     at all.  I think it is on page 27.

6          In the civil context, at least with a civil

7     statute, and I don't think you have told me, and I think the

8     same standard would apply to a policy, but let's assume that

9     it does, to be void for vagueness it must be so vague and

10    indefinite as really to be no rule or standard at all.  If a

11    person of reasonable intelligence can derive a core meaning

12    from the statute, it is not unconstitutionally void for

13    vagueness.

14         Is that the right standard?

15         MR. MILLER:  So, Your Honor, under the First

16    Amendment, the vagueness standard that applies is that if

17    the definition is not clear enough that it allows for

18    discretion that can be unbridled, then it is

19    unconstitutionally vague.  It is the unbridled discretion

20    that would have that.

21         Our response to their argument is that, as I said,

22    because the standards that they said they are applying here

23    are not evident from the actual written policy, that is by

24    definition vague.  They are doing something different than

25    what the policy says.

1              THE COURT:  What is it that they are doing that is

2    different from what the policy says?

3              MR. MILLER:  Right.

4              Their analysis of whether something is independent

5    was based upon whether or not there is an editor and whether

6    or not there is someone that can fire the reporter.  I don't

7    understand that as independence.

8              THE COURT:  You don't understand it as

9    independence, so it is inconsistent because as applied to

10   Mr. Schott how?

11             MR. MILLER:  Okay.  As applied to Mr. Schott, he

12   didn't have, one, a fair opportunity to even try to comply

13   with what their actual policy was.  So if you have the term

14   independence and they are essentially secretly defining it

15   that way, and they are not articulating that their

16   definition is that you need an editor and you need to have

17   someone to report to, that is where the First Amendment

18   violation arises and whether the vagueness arises in the

19   application of that.

20             THE COURT:  Do you think that before they made a

21   change like this they are required to post the proposed rule

22   change and --

23             MR. MILLER:  No, of course not.

24             THE COURT:  Okay.  Well, you said Mr. Schott

25   didn't have a chance to comply because, what, he didn't have

```
 1    notice of how the rule was going to change before --
 2              MR. MILLER:  I didn't say before, Your Honor.
 3    When he went to do his application, right, so when he
 4    applied and even after he received the denial, he didn't
 5    know the standard was being applied to him.
 6              THE COURT:  Okay.  Is it a due process issue then?
 7              MR. MILLER:  No.  We are not bringing a due
 8    process issue.  We are saying that under the First
 9    Amendment -- because, again, this is a public forum and so
10    you have to have policies that are reasonable, and that is
11    not reasonable.
12              THE COURT:  Okay.  Will you help me so that this
13    does not turn into a deposition that I'm presiding over in
14    my courtroom while we are waiting on deciding the TRO, and
15    will you make a proffer of what you think the evidence and
16    testimony is you would elicit from the witnesses today in
17    support of your application?
18              MR. MILLER:  Yes, Your Honor.
19              First, we would elicit additional testimony
20    regarding some of the sort of exchanges that have been had
21    with Mr. Schott throughout this process and time period and
22    indicate some of the hostility there and some of the lack of
23    responses to him when he was initially inquiring and making
24    inquiries about getting added to the list and how those
25    things occurred prior to this policy being changed.
```

1          THE COURT:  And the purpose of that is, what, to

2   show that the policy change was pretext and that the

3   legislature was motivated by an improper purpose, which is

4   to punish Mr. Schott?

5          MR. MILLER:  That is correct, Your Honor.

6          THE COURT:  Okay.

7          MR. MILLER:  Right.

8          And then going forward from when the policy was

9   changed, and we see where, you know, in communications, both

10  publicly via acts I believe to him, and then they are sort

11  of disparaging him as a blogger, you know, not a member of

12  the media and setting up this denial, and so that further

13  shows the hostility that arose.

14         Again, because the policy as written and what

15  independence means, and then they had these other standards

16  that they said apply, we wanted to understand what happened

17  during that review process, because they had this 90-minute

18  period where they were reviewing him, and we want to inquire

19  about that and find out exactly what it is that they looked

20  at.

21         They didn't ask him, Do you have someone that you

22  use as an editor?  They didn't even ask him.  We would go

23  over that.

24         Then, Your Honor, there is the list of -- there is

25  one thing that is not currently in evidence, which is they

1    provided us today a list of media credentials for this year,

2    so we would have gone over that.  They say that

3    approximately 130 credentials have been issued for this

4    year.  I didn't count, but somewhere around that number have

5    been issued to approximately 17 organizations, meaning that

6    there were several organizations that received multiple

7    credentials.  We would ask about a few of those and the

8    entities that received them.

9         For example, there was one that is called Building

10   Salt Lake.  We would make some inquiries about the nature of

11   that entity, which largely is focused on building issues

12   and, you know, how that would meet their definition of being

13   journalistic.  We would have some questions about

14   established and what established means.  If they are saying

15   that Utah Political Watch is not established, well, you

16   know, it had been established for several months in advance

17   of doing this reporting.

18        They had issued credentials to, I believe, an

19   organization that is called Utah News Dispatch very shortly

20   after it was formed, and we would make some inquiries about

21   that to, again, establish and sort of contrast how they are

22   treating individuals.

23        There is one additional entity on that list, and

24   that is the Davis Journal that has one employee who is the

25   individual who has credentials and who is also listed as the

1    editor, so she is self-edited.  So we would try to

2    understand the contrast there and why that self-edited

3    entity is allowed credentials, but Mr. Schott is not.

4         Again, we would ask additional questions about if

5    the policy from last year was in effect and independent

6    media were able to receive -- how the plaintiffs would be

7    treated under that policy.

8         Your Honor, again, under this content standard,

9    you know, when there is a policy that is adopted because of

10   disagreement or applied because of disagreement with

11   someone's message, that is also viewpoint discrimination.

12   Again, here, you know, what they are saying is self-edited

13   content they have determined is a viewpoint that they

14   don't want expressed.

15        THE COURT:  They have not.  I just don't believe

16   that they have said that.  It is an indicia of how

17   established the news outlet is or the media is.  You have

18   lost me at viewpoint.  I don't understand, because you have

19   not articulated how there is an opposition to any message

20   that is being communicated.  It is a process of review as an

21   indicia of the reliability of the news organization.

22   Whether that is in favor of school vouchers or against

23   school vouchers, the same editorial review would take place

24   in that instance.  I don't read the policy, and I can get

25   the language in front of us, but I don't understand that to

1    be a singular factor.  It is a factor among others that are

2    considered in evaluating the credential.

3         I was thinking of this just a moment ago, and I'm

4    trying to evaluate whether this is going to be a good use of

5    our time, and generally what I think I hear you saying is,

6    Let us build more of a record about why Mr. Schott is

7    disliked and why he is such a thorn in the side of the

8    legislature, and then I will be able to convince you that

9    this was all a sham and it was all set up just to stop him

10   from being at the legislature.

11        I want to make sure I am giving your argument the

12   full weight that I think it is entitled to.  Is there a case

13   that says editorial review is viewpoint discrimination?

14        MR. MILLER:  Your Honor, there is a case that

15   says -- yes.  Let me pull up my reply.

16        THE COURT:  Go ahead.

17        MR. MILLER:  First is *New York Times versus*

18   *Sulliva*n which discusses how editorial control is at the

19   center of press freedoms, and it talks about how it is

20   important to have the profound national commitment and the

21   principles of debate on public issues should be uninhibited,

22   robust and wide open.

23        In the *the Miami Herald* publishing case, there is

24   a discussion about the history of the press.  In *Reed versus*

25   *the Town of Gilber*t -- the quote from that case is that it

1    fails to clear the barriers of the First Amendment because

2    the intrusion is on the function of the editors.  The choice

3    of material to go into a newspaper and the decision made as

4    to the limitations on the size and content of the paper and

5    treatment of public issues and public officials, whether

6    fair or unfair, constitutes the exercise of editorial

7    control and judgment.  That is the end of the quote.

8         Then the next quote is the same matter, page 258:

9    "It is yet to be demonstrated how governmental regulation of

10   this crucial process can be exercised consistent with the

11   First Amendment guarantees of a free press as they have

12   evolved to this time."

13        So the government has no business being involved

14   or reviewing the editorial process whatsoever.  They just

15   can't do it.  I understand what you're saying is that they

16   wanted to use that as a proxy, and I understand how in some

17   circumstances it can be a legitimate proxy even for

18   determining whether it is sort of legitimate coverage of

19   what is going on, but I don't think -- you know, no one here

20   has said that Mr. Schott individually as he performs his

21   work is not a legitimate journalist.  No one is saying that.

22        What they are saying is that he doesn't meet their

23   criteria.  What we are saying is applying that criteria to

24   Mr. Schott under these circumstances simply is not

25   permissible, and particularly when you dig in and look at

1    what they are saying and what they are doing.

2            Your Honor, I appreciate that we did not do a good

3    job of sort of informing the Court of how we were

4    structuring this argument, and that we, you know, if you

5    will, sort of skipped much of the analysis to get down and

6    focus on where we saw the problem lie.

7            I also agree with the Court that adding additional

8    testimony is not probably the most fruitful thing to do.

9    But I think what may be fruitful is hopefully now that I

10   have been able to better articulate why we focused on what

11   we did in this argument, and perhaps we could adjourn and

12   you could have an opportunity to kind of review this again,

13   and then we could come back and simply argue this, either in

14   person or remotely very soon.

15           THE COURT:  Thank you, Mr. Miller.

16           We try to make sure that our court reporter gets a

17   chance to stretch his fingers about every 90 minutes or so,

18   and we're close to that, but I would like to hear from Mr.

19   Green, and then during the recess I am going to think about

20   where we are and where I think we are headed and try to

21   decide what I think makes the most sense.

22           Thank you.

23           MR. GREEN:  Thank you, Your Honor.

24           If you have questions, let me have them,

25   otherwise, I have maybe three quick points.

1         THE COURT:  I am apparently doing a poor job of

2   communicating today in ways oral and not oral

3   communications.  Sorry.  No questions.

4         Go ahead.

5         MR. GREEN:  Great.

6         If I could start with point one and the Court's

7   question about what case defines or describes what viewpoint

8   discrimination is, I think I would point the Court to the

9   case, and it is on page 20 of our brief, and it is the

10   United States Supreme Court case of *Vidal*, *V-i-d-a-l*, versus

11   *Elster*.  That is a 2024 case at 602 U.S. 286.  This is

12   talking about that viewpoint discrimination at bottom is

13   sort of just what it sounds like.  It is the government

14   targeting particular views taken by speakers on a particular

15   subject.  This is from 294 of that case.  "Is the government

16   action based on the specific motivating ideology or the

17   opinion or the perspective of the speaker?"

18         So I understand the Court's confusion, and I think

19   I have the same confusion.  I agree with the Court.  If the

20   point of having an editor was to say that we are not going

21   to let you have a press credential unless an editor makes

22   your stories nicer to the legislature or meaner to the

23   legislature, maybe there is something there, but at the end

24   of the day that is not the function.

25         The function is exactly what the *Evers* case talked

1    about.  This goes to my second point.  I think you asked a

2    question about whether there was a case that said having an

3    editor constitutes viewpoint discrimination.

4          *Evers* actually stands for the exact opposite

5    proposition.  If I could point the Court specifically --

6    this is *Evers* at 994 F.3d, and it is the paragraph that

7    spans the page from 610 to page 611.  At the beginning of

8    this paragraph, the Seventh Circuit panel talks about what

9    the media access criteria were for the governor's press

10   conference in Wisconsin and lists those out here.  "The

11   governor contends that its criteria are intended to consider

12   limited space constraints, address security concerns, and

13   ensure that those in attendance will maximize the public's

14   access to the newsworthy information, and be more likely to

15   abide by professional journalistic standards such as

16   honoring embargoes and off-the-record communications."

17         Then, later in that same paragraph, and I think

18   this is the money quote, the governor's criteria are

19   "reasonably related to the viewpoint-neutral goal of

20   increasing the journalistic impact of the governor's

21   messages by including media that focus primarily on news

22   dissemination, have some longevity in the business, and

23   possess the ability to craft newsworthy stories."  So

24   viewpoint-neutral goals that are shared by the legislature

25   here for precisely the same reasons that the governor had

1    them.

2            That leads, I think, to my third point.  Actually,

3    maybe I have four, if you don't mind.  I will do a quick

4    third one.

5            My friend Mr. Miller is right that no one here is

6    suggesting that Mr. Schott is not an accomplished reporter,

7    but *Evers* also addressed that argument and had a direct

8    response to it on page 614 of the *Evers* opinion.  "Imagine a

9    system," the Seventh Circuit said, "where the government

10   dolled out the freedom of the press based on a government

11   official's assessment of the quality of the reporting or the

12   credentials of the reporters."

13           It seems like a hornet's nest and an invitation

14   for a lot of trouble, if the government thought that good

15   reporters get credentials and bad ones don't, and we would

16   be here a lot more often than this singular particular case.

17           That leads to my fourth point and final point,

18   Your Honor.  If we're talking about the evolution or how

19   this policy exists, I don't think it can be looked at in a

20   vacuum.  I think you have to look at it that this has been

21   something that the legislature and the folks working for

22   their press office have been grappling with since at least

23   we have a written record of their policy.

24           Specifically, Exhibit 5 to the Peterson

25   declaration is the 2018 credentialing criteria.  If we look

**Suppl. App. 67**

1   at page 2 of that, definition of reporter, defining the

2   characteristics of those who are eligible.  The first bullet

3   is characteristics of people to whom we have not issued

4   credentials, number one, blog site owners.  The writing is

5   essentially their own stream of consciousness with little or

6   no editorial oversight and little or no institutional

7   framework.

8            I guess this is the point.  The legislature is not

9   immune from the changing media reality that is affecting all

10  of us.  They have a different and special concern as it

11  relates to this particular credentialing function, which is,

12  again, a function of access to government control and

13  government-owned property.

14           So in trying to figure out what sort of folks

15  should qualify for that special access where content-based

16  restrictions aren't permissible, this has been a concern and

17  an issue that they have been grappling with since day one.

18  If we check the evolution of the policy from 2019 and 2020

19  all the way up until now, as the media has continued to

20  evolve, my clients have continued to try to evolve with it

21  and figure out what is going to serve those

22  viewpoint-neutral goals that we talked about from *Evers*,

23  while simultaneously respecting the politicians' ability to

24  get their message out and protecting the space at the same

25  time.

```
 1                If the Court has no other questions --

 2                THE COURT:  Before we recess I would benefit

 3      hearing from you.  You wanted to take witness testimony also

 4      and you wanted to examine Mr. Schott.

 5                Can you proffer for me what evidence you were

 6      hoping to elicit that would relate to the motion today?

 7                MR. GREEN:  Sure.  Two responses to that.

 8                Our initial bid when we were talking with Mr.

 9      Miller was that we thought evidence wouldn't be necessary

10      for this hearing, so our decision to cross-examine him was

11      based on their desire to cross-examine our defendant.  We

12      would be fine proceeding without cross-examination.  We did

13      have it prepared, and if the Court would permit a chance for

14      my colleague to speak, and he was going to do the

15      cross-examination, so if the Court wouldn't mind hearing

16      from Mr. Vitagliano --

17                THE COURT:  That would be helpful, a brief

18      proffer.

19                Come up, please.  Thank you.

20                MR. VITAGLIANO:  Thank you, Your Honor.

21                Just a few lines of questions.  We would ask about

22      Mr. Schott's experience at the Salt Lake Tribune and being

23      subject to editors there and the editorial process, or lack

24      thereof, with Utah Political Watch.  We would also inquire

25      about Mr. Schott's continued coverage of the 2025
```

```
 1    legislative session and how a denial of the press credential
 2    has not impeded that.  That goes to our arguments set forth
 3    in Section 1-A of our brief, which would --
 4              THE COURT:  Is that on irreparable harm?
 5              MR. VITAGLIANO:  I'm sorry?
 6              THE COURT:  What is that section?
 7              MR. VITAGLIANO:  The likelihood of success on the
 8    merits and before you determine the type of forum whether
 9    there is actually a burden on First Amendment protected
10    activity and that line of questioning would relate to that.
11              We would also inquire about Mr. Schott's history
12    of reporting at various different outlets before he formed
13    Utah Political Watch, and things he has written about the
14    legislature before and his continued receipt of a press
15    credential while with those entities.
16              THE COURT:  Thank you.
17              I am going to try to keep our recess to ten
18    minutes or so.  I don't know how optimistic I am about that.
19    I need the benefit of my law clerk's thoughts and some time
20    to evaluate what we have heard today.  I'll be as prompt as
21    I can.
22              Take a minute and stretch your legs, and we'll
23    take as least ten minutes.
24              We are in recess.  Thank you.
25              MR. VITAGLIANO:  Thank you, Your Honor.
```

1          (Recess)

2          THE COURT:  That was not even close to ten

3    minutes.  I'm sorry.  This is going to sound a little bit

4    like the twilight zone maybe.  I don't know.

5          I spent a lot of time thinking about what just

6    happened and where we are, and I'm more convinced than ever

7    that the issue we have here is foundational.

8          Mr. Miller, you told me in argument that there are

9    no elements for those claims.  That is false.  These are

10   Section 1983 claims of deprivation of a constitutional right

11   by a person acting under color of state authority.  I'm

12   getting those words not quite right, but there are elements

13   to Section 1983 claims.

14         Your complaint, which is the source of the causes

15   of action for which the plaintiff must show a likelihood of

16   success on the merits, purports to identify four discrete

17   claims.  And, of course, there is no discussion in any of

18   the briefs about Section 1983.  Those are the claims you're

19   asserting.

20         I have been at this long enough to know that under

21   Section 1983, the specific elements of the claims depend on

22   the nature of the constitutional violation you're alleging.

23   I know that under Section 1983 you must identify the alleged

24   constitutional deprivation specifically enough to provide

25   notice to the defendants.

1            Of course if we get to qualified immunity or other

2    issues pertaining to 1983 claims, we'll be asking ourselves

3    whether the specific violation you allege is clearly

4    established in the law, including in the Tenth Circuit or

5    the Supreme Court, sufficient to give notice to a state

6    actor that what the person is doing is unconstitutional.

7            We have not yet reached an answer or a Rule 12

8    pleading response from the defendants, but, among other

9    things, because we are moving in equity under Rule 65 I

10   think it is appropriate for me to note that the complaint

11   fails as a threshold matter because you group plead against

12   the defendants, which is not permitted in 1983 claims.  You

13   are required to identify what specific action each state

14   actor took in deprivation of those rights.

15           All of this, if it had been in the papers and in

16   the briefs in the first instance, would have sharpened our

17   focus on the specific allegations that are made.  You're

18   making four separate claims under the First and Fourteenth

19   Amendments, ostensibly because those claims are different in

20   some meaningful way.  That is not discussed in the briefing

21   and in the papers.  Generally it is, but not with any

22   specificity.

23           I think the plaintiffs conceded in the argument

24   today that the Public Forum Doctrine applies, and there are

25   three elements to that test.  I don't need to recite them

1    all here.  I don't think the plaintiffs take issue with the

2    defendants' description of the test and what it is and how

3    it operates.

4         I guess it is the failure to engage with these

5    standards in any directed fashion that leaves me guessing.

6    In my view, it is putting me in the position of doing the

7    lawyering for the plaintiff, which is impermissible because

8    it deprives the defendants of a meaningful opportunity to

9    respond.

10        Notwithstanding that those elements are not

11   alleged or set out in the plaintiffs' brief, I think, Mr.

12   Miller, your response would be, But I talk about all of

13   that.  For example, the first element is have the plaintiffs

14   shown that the activities are protected by the First

15   Amendment.  You said, For eight pages I talk about what is

16   protected by the First Amendment.  But it is the activities

17   that are at issue and that the defendants observe in their

18   brief that you have misdefined the protected activity.  It

19   is not a general statement about access to information by

20   news media to gather news.

21        I went back and reread during the break your reply

22   to see if you meaningfully engage with that argument.  As an

23   example, that is in the framework of the standards that I'm

24   required to apply.  If it is there, I'm missing it, though I

25   agree that you talk about things related to this issue.

1          The third factor is whether the justifications for

2     exclusion satisfy the requisite standard.  Again, I went

3     back and forth and I can see references to strict scrutiny,

4     but I still don't understand, having read both of your

5     briefs several times and had the benefit of oral argument

6     today, where or how in this analysis I am to apply strict

7     scrutiny to something and what it is I'm supposed to apply

8     it to.

9          I'm open-minded to the possibility that I'm just

10    being dense and missing something.  I mentioned to my law

11    clerk during the break that I have been at this for 13

12    years, and I'm sure I have found myself in court in an

13    instance like this before, but I can't remember where I just

14    from the beginning don't understand how the arguments before

15    me are appropriately and directly focused at the elements

16    and standards that I'm invited to apply.

17         I just think it is foundational.  I think the

18    motion never gets off the ground for those reasons.

19         I prepared an oral ruling, and I said this at the

20    beginning, and some of the shortcomings that I have just now

21    described didn't occur to me until after we had our argument

22    and I had a chance to go back and look at the complaint

23    during the break and think about it.  Much of that is not in

24    the oral ruling.

25         I'm going to beg your indulgence.  I think it may

1    be helpful for me to give this oral ruling anyway,

2    especially if we find ourselves moving in the direction of a

3    preliminary injunction, so that whether I'm right or wrong,

4    I am at least hopefully being clear about what I am

5    thinking, so that if I am wrong, you can help correct me in

6    the next round of briefing.

7         I'm going to give this ruling.  I am not going to

8    ask anybody to take notes or prepare a draft order.  We'll

9    enter a docket entry in the next few days referencing this

10   portion of the transcript of this hearing as my ruling and

11   the basis for my ruling.  I am afraid that it is only going

12   to be partially helpful, but it may be partially helpful.

13   As you can all ascertain from this discussion, it is not

14   going to be helpful for us, I don't think, to take

15   testimony.  I don't think we have moved to a sufficient

16   showing on the motion to implicate taking live testimony.

17        I'm going to beg you for patience.  This is going

18   to take a little while.  It is not a tremendously long

19   order, but it is not short.

20        This case arises from alleged constitutional

21   violations by individual staff members of the Utah

22   legislature in denying the plaintiffs' media credentials for

23   the 2025 Utah legislative session.  Before the Court and at

24   issue in the hearing today is plaintiffs' motion for a

25   temporary restraining order, which is docket number 3 on our

1    docket.

2          In the motion the plaintiffs argue they have a

3    First Amendment right to gather news and that the defendants

4    engaged in viewpoint and content discrimination by denying

5    their media credentials.  This is generally set out on pages

6    13 to 21 of the motion.

7          The plaintiffs further contend that the

8    defendants' press policy is vague and constitutes a prior

9    restraint.  I cite pages 20 to 23 of the TRO motion.  For

10   the reasons I have touched on in our argument and my

11   preliminary statements, and for those I'm about to more

12   fully explain now, I conclude that the plaintiffs have

13   failed to meet their burden in seeking a TRO, and the motion

14   will be denied.

15         I will begin, as I often do, with the factual

16   background.  These facts are largely taken from -- well,

17   they are all taken from the declarations and affidavits

18   submitted by the parties.  I'm not resolving any conflicts

19   in those declarations and submissions, and if there are any,

20   they are not material to the Court's ruling.

21         The defendants are individuals employed by the

22   Utah legislature.  Specifically, Mark Thomas is the Utah

23   Senate Chief of Staff; Abby Osborne is the Utah House of

24   Representatives Chief of Staff; Aundrea Peterson, if I am

25   saying that correctly, is the Utah Senate Deputy Chief of

1    Staff; and Alexa Musselman is the Utah House of

2    Representatives Director of Strategic Communications.

3           The plaintiff, Bryan Schott, is the owner of Utah

4    Political Watch, which I may at times refer to as UPW today,

5    a subscription-based newsletter service not affiliated with

6    any other news organization.  Schott established UPW in

7    September of 2024 and is its reporter, editor and publisher.

8           In 2018, the Utah State Legislature established

9    criteria for media access during the legislative sessions.

10   Media credential benefits include designated media parking

11   spaces, access to workspace in the press room in the Utah

12   capital's basement, access to press boxes in the public

13   galleries of the senate and house chambers, invitations to

14   certain press events, in-office media briefings by the

15   senate president and house speaker, and certain email

16   circulation for press releases.

17          However, the proceedings of the Senate and House

18   of Representatives are open to the public.  Any person may

19   observe the legislative action from the chamber galleries,

20   and the press boxes are immediately adjacent to the public

21   seating.

22          Additionally, all official legislative action is

23   live-streamed and archived on the legislature's website,

24   including, but not limited to, committee and subcommittee

25   meetings, debates, and votes.  The press events and

1    in-office media briefings are also recorded and made

2    available online.

3            The legislature's initial 2018 credentialing

4    policy required reporters to be associated with institutions

5    possessing at minimum the following characteristics:  First,

6    the institution hires and fires employees, can be held

7    responsible for actions and sued for libel.

8            Second, maintain editors to whom the reporters are

9    responsible.

10           Third, require employees to have some degree of

11   education and/or professional training in journalism.

12           Fourth, adhere to a defined professional code of

13   ethics.

14           Fifth, have been in business for a period of time

15   and have a track record.

16           Finally, sixth, are not lobbyist organizations or

17   political parties.

18           The 2018 credentialing policy also identified

19   characteristics of individuals who would not be given

20   credentials.  These include blog site owners with little or

21   no editorial oversight, individuals who have little or no

22   institutional framework, organizations with no history or

23   track record, institutions or reporters whose main purpose

24   seems to be lobbying or pushing a particular point of view,

25   and organizations not bound by a journalistic code of

1    ethics.

2              The legislature's media credentialing policy has

3    been periodically reviewed and updated.  For example, the

4    2020 policy was modified to require a reporter to be a

5    professional journalist who represented a news organization

6    or publication with a track record.

7              The 2021 policy changed the wording slightly to

8    require a reporter to represent, quote, "an established,

9    reputable news organization or publication," end quote, and

10   further provided that "Bloggers representing a legitimate

11   independent news organization may become credentialed under

12   some circumstances."

13             In 2023, the credentialing policy modified access

14   for bloggers and clarified that, quote, "Bloggers

15   representing a legitimate independent news organization may

16   become credentialed under limited rare circumstances."

17             The legislature changed the 2025 credentialing

18   policy, updated and published on November 5th of 2024 to

19   categorically exclude, quote, "blogs, independent media, or

20   other freelance media," end quote.  As of January 29th of

21   this year, the legislature had issued 130 professional media

22   credentials for the 2025 legislative session to diverse news

23   organizations and publications representing viewpoints along

24   the political spectrum.

25             Plaintiff Schott has been involved in media

**Suppl. App. 79**

1   reporting in various capacities since 1995.  Schott became a

2   political correspondent for the Salt Lake Tribune in 2020.

3   On September 9, 2024, a correspondent for the Salt Lake

4   Tribune informed Osborne and Musselman that Schott was no

5   longer employed with the Salt Lake Tribune.

6          Schott subsequently founded UPW in September of

7   2024.  As the owner, editor, and publisher of UPW, Schott

8   writes a daily newsletter and hosts a podcast discussing

9   Utah politics and news, including coverage of the Utah

10   legislative session.  Schott also maintains a UPW website

11   and discusses Utah politics on social media, including

12   TikTok and X.

13          Before starting UPW, Bryan Schott reported on the

14   2024 legislative session as a media-credentialed employee of

15   the Salt Lake Tribune.  During the 2024 session, Schott

16   posted an unflattering and critical comment of staffers on

17   X, which prompted a profane response from Defendant Osborne.

18   Schott continued to report on the Utah legislature through

19   the remainder of 2024 in a manner that Schott describes as

20   not always favorable.

21          On or about December 12 of last year, Schott

22   published a story on UPW reporting a local nonprofit group

23   had filed a complaint against Utah Senate President Stuart

24   Adams alleging that he had violated campaign disclosure

25   laws.

That same day, President Adams posted on X referring to Schott as a, quote, "former media member," end quote, and stated that Schott's story was part of a troubling pattern of neglectful journalism that undermines the profession's integrity.

President Adams denied any misconduct and stated that Schott failed to include information from the lieutenant governor's office or those in the story before publishing his blog, and he called Schott's story inaccurate and misleading.

President Adams' deputy chief of staff, Aundrea Peterson, also criticized Schott's conduct in publishing a story without Peterson's comment and accused Schott of lacking professionalism, being irresponsible, and disregarding accurate reporting and ethical standards.

On or about December 17th of last year Schott applied for a media credential for the 2025 legislative session. Musselman was aware that Schott no longer worked at the Salt Lake Tribune, and Musselman and other staff reviewed whether UPW satisfied the 2025 credentialing criteria.

Ultimately, legislative staff concluded that Schott operates as a blogger, independent media or freelance media because Schott is, quote, "not responsible to an editor," end quote, and as a newly formed entity, UPW,

1    quote, "did not have any institutional framework or a

2    sufficiently established track record," end quote.

3          Accordingly, Musselman informed Schott that he did

4    not qualify for a media credential because, quote, "Under

5    the policy, Utah capital media credentials were currently

6    not issued to blogs, independent, or other freelance

7    journalists," end quote.  But Musselman went on to assure

8    Schott that he could attend and view all Utah legislature

9    committee meetings and sessions in person or online and

10   contact media designees for interviews.

11         Schott appealed the initial denial, and on or

12   about December 26th of last year Osborne and Thomas upheld

13   the denial, explaining that Schott failed to meet the

14   requisite criteria of being a professional member of the

15   media, associated with an established, reputable news

16   organization or publication, and explaining that blogs,

17   independent media outlets, or freelance media do not qualify

18   for credentials.

19         Schott filed this Section 1983 lawsuit on

20   January 22nd of this year, asserting four violations of the

21   First and Fourteenth Amendments, and he simultaneously filed

22   the instant TRO motion requesting that the defendants be

23   ordered to grant the plaintiffs' media credentials to the

24   2025 Utah legislative session.

25         With that background in mind, I will now turn to

1    my analysis of the motion.  It is governed by Rule 65 of the

2    Federal Rules of Civil Procedure which require that

3    plaintiffs establish four elements in order to obtain

4    injunctive relief:  First, a substantial likelihood of

5    success on the merits; second, irreparable harm to the

6    movant if the TRO is denied; third, that the threatened

7    injury outweighs the harms that the TRO may cause the

8    opposing party; and, fourth, that the TRO, if issued, would

9    not adversely affect the public interest.  I'm citing

10   *General Motors Corporation versus Urban Gorill*a, a Tenth

11   Circuit decision from 2007.

12        Because a TRO is, in the words of the Tenth

13   Circuit, an extraordinary remedy, the movant's right to

14   relief must be clear and unequivocal.  That is a quote from

15   *Diné Citizens Against Ruining Our Environment versus Jewel*l.

16   That is a 2016 decision from the Tenth Circuit.

17        Moreover, the Tenth Circuit has identified three

18   types of injunctions which they refer to as disfavored

19   injunctions.  Those injunctions, quote, "require that the

20   movant satisfy an even heavier burden of showing that the

21   four injunction factors weigh in its favor."  I cite *SCFC*

22   *ILC, Inc. versus Visa US*A.  It is a Tenth Circuit decision

23   from 1991.

24        The three types of disfavored injunctions, at

25   least in the Tenth Circuit, are, first, those that disturb

**Suppl. App. 83**

1   the status quo; second, those that are mandatory as opposed

2   to prohibitory; and, third, those that afford the movant

3   substantially all the relief that he may recover at the

4   conclusion of a full trial on the merits.  I cite again the

5   *SCFC ILC* case from the Tenth Circuit.

6           Courts in this circuit, quote, "must recognize

7   that any preliminary injunction fitting within one of the

8   disfavored categories must be more closely scrutinized to

9   assure the exigencies of the case support the granting of a

10  remedy that is extraordinary even in the normal course," end

11  quote.  That is a quote from *O Centro Espirita Beneficente*

12  *Uniao Do Vegetal versus Ashcrof*t, a 2004 decision from the

13  Tenth Circuit.

14          The Circuit has clarified that in cases involving

15  disfavored injunctions, quote, "that the district court may

16  not grant a preliminary injunction unless the plaintiff

17  makes a strong showing both with regard to the likelihood of

18  success on the merits and with regard to the balance of

19  harms."  That is quote from *Beltronics USA versus Midwest*

20  *Inventory Distributio*n, another Tenth Circuit case.

21          Plaintiffs in their papers don't address whether

22  they seek a disfavored TRO.  The defendants assert that the

23  plaintiffs' TRO is disfavored because it would alter the

24  status quo and is otherwise a mandatory injunction.  These

25  arguments are set out on pages 32 and 33 of the opposition.

```
 1              I agree that the plaintiffs seek a disfavored TRO
 2     because it is mandatory as opposed to prohibitory, and
 3     because, really, the parties didn't meaningfully brief the
 4     question of the status quo, I think I'm not able to give a
 5     fulsome evaluation of that argument.  It is not going to be
 6     necessary because of my ruling that it is a mandatory
 7     injunction.
 8              The Tenth Circuit has explained that an injunction
 9     is mandatory, quote, "if the requested relief affirmatively
10     requires the nonmovant to act in a particular way and, as a
11     result, places the issuing court in a position where it may
12     have to provide ongoing supervision to assure the nonmovant
13     is abiding by the injunction."  That is a quote from
14     Schreier.  The pincite is 427 F.3d, 1261, a Tenth Circuit
15     decision.
16              Here, the TRO sought by the plaintiffs would
17     affirmatively require the defendants to act in a particular
18     way and to take specified action by order of the Court, that
19     is, to issue a media credential to the plaintiffs and
20     actively provide access and benefits associated with that
21     status.  Thus, I conclude that the requested TRO is
22     disfavored and requires plaintiffs to satisfy even the more
23     heightened burden in order to obtain the TRO.
24              Of course, as I said, I am then required to more
25     closely scrutinize the plaintiffs' showing to determine if
```

**Suppl. App. 85**

1    it is entitled to the extraordinary relief sought.

2          Turning to the Rule 65 analysis, and having

3    concluded that the plaintiffs seek a disfavored injunction,

4    I will turn to the merits to consider whether they satisfy

5    their heightened burden.  Because I ultimately conclude that

6    the plaintiffs failed to demonstrate both the likelihood of

7    success on the merits and irreparable injury if the TRO is

8    not granted, either of which would be alone sufficient to

9    deny the TRO, I confine my analysis to those two elements

10   for purposes of this ruling.

11         I will begin with the likelihood of success on the

12   merits.  The plaintiffs bring four claims of Section 1983

13   violations of the First and Fourteenth Amendments.  We know

14   from the Tenth Circuit in *Pahls versus Thomas*, a 2013

15   decision, that the elements necessary to establish a 1983

16   violation will necessarily vary with the constitutional

17   provision at issue.  As I have said, the plaintiffs do not

18   identify in their papers the elements associated with any of

19   their claims.  I think this itself likely establishes the

20   plaintiffs' failure to demonstrate a likelihood of success

21   on any of the asserted claims.

22         Generally, the First Amendment prohibits the

23   government from abridging the freedom of speech of the

24   press.  I cite the First Amendment to the U.S. Constitution.

25   In citing *Pahls*, again from the Tenth Circuit, quote, "At

1    the core of the First Amendment is the idea that the

2    government has no power to restrict expression because of

3    its message, its ideas, its subject matter or its content,"

4    end quote.

5         Here the plaintiffs generally allege that the

6    defendants have violated their First Amendment rights by,

7    first, arbitrarily and discriminatorily denying Schott press

8    credentials; second, they discriminated against Schott based

9    on content and viewpoint; and, third, they adopted a policy

10   constituting a prior restraint on Schott; and, fourth, by

11   adopting a credentialing policy that is unconstitutionally

12   vague.  These claims are set out in the complaint in

13   paragraphs 52 to 82, and I will take each of them up in

14   turn.

15        Beginning with arbitrary and discriminatory

16   treatment, "The plaintiffs assert that they have a First

17   Amendment right to gather and report information, and

18   because the defendants denied Schott a media credential on

19   the grounds that he is an independent reporter for a blog

20   and not a professional member of the media associated with

21   an established reputable news organization or publication."

22   I'm quoting there from paragraph 55 of the complaint.

23        At the heart of the plaintiffs' complaint is an

24   assertion of an unequivocal, quote, "right to gather news."

25   Actually, I think it is right to news gather.  That quote is

1       from page 13 of the plaintiffs' motion for a TRO.

2               However, we know that the First Amendment does not

3       invalidate every incident burdening of the press that may

4       result from the enforcement of government policies of

5       general applicability.  I'm citing the *Branzburg* case from

6       the Supreme Court in 1972.

7               Further, the Supreme Court has explained that

8       there is no constitutional right to have access to

9       particular government information.  That is a quote from

10      *Houchins versus KQE*D in 1978.  The First Amendment is, of

11      course, concerned with freedom of the media to communicate

12      information once it is obtained.  The Constitution does not

13      compel the government to provide the media with information

14      or access to it on demand.  That was explained by the

15      Supreme Court in the *Houchins* decision.

16              In *Smith versus Plat*i, the Tenth Circuit explained

17      that this applies equally to both the public and the press,

18      for the press, generally speaking, do not have a special

19      right of access to government information not available to

20      the public.  That *Smith* decision is a 2001 decision from the

21      Tenth Circuit.

22              As Justice Warren stated in *Zemel versus Rus*k from

23      the Supreme Court all the way back in 1965, quote, "There

24      are few restrictions on actions which could not be clothed

25      by the ingenious garb of decreased data flow.  For example,

1  the prohibition of unauthorized entry into the White House

2  diminishes the citizen's opportunity to gather information

3  he might find relevant to his opinion of the way the country

4  is being run, but that does not make entry into the White

5  House a First Amendment right.  The right to speak and

6  publish does not carry with it the unrestrained right to

7  gather information."  That is a quote, as I said, from *Zemel*

8  *versus Rusk*.  It is on pages 16 to 17.

9       Here I conclude, at least at this preliminary

10 stage, that the plaintiffs have not shown that the

11 defendants violate the First Amendment by establishing

12 certain criteria to regulate the distribution of media

13 credentials, because the plaintiffs do not have an

14 unfettered constitutional right of access.  In any case, the

15 Utah legislative rules do not prohibit Schott from entering

16 the legislature to, quote, "Gather information he might find

17 relevant to his opinion of the way the state is being run."

18 That is a variation of the quote from *Zemel*.

19      Turning to the plaintiffs' second constitutional

20 claim about the credentialing policy discriminating based on

21 content or viewpoint, "Though the government may restrict

22 access, the government generally may not impress

23 restrictions based on content or viewpoint.  Rather, the

24 Constitution requires the application of neutral principles,

25 because the dominant purpose of the First Amendment is to

**Suppl. App. 89**

1    prohibit governmental suppression.  I'm citing that *New York*

2    *Times versus Sulliva*n case that we discussed in oral

3    argument.  That quote that I just gave was from Justice

4    Douglas's concurring opinion.

5         Additionally, "The extent to which the government

6    may limit access depends on whether the forum is public or

7    nonpublic."  That is the *Cornelius* decision that Mr. Green

8    mentioned from the Supreme Court in 1985.

9         Defendants assert the restricted areas to which

10   the plaintiffs seek access are either a nonpublic forum or a

11   limited public forum.  This is argued on page 16 of the

12   opposition.  Mr. Miller made clear today that the plaintiffs

13   agree that the legislative session is a limited public

14   forum.

15        I will say that in reply the plaintiffs don't

16   appear to engage with the defendants' arguments concerning

17   the public forum doctrine and its application here.  When a

18   government entity creates a forum that is limited to use by

19   certain groups or dedicated solely to the discussion of

20   certain subjects, the government may impose restrictions

21   that are reasonable and viewpoint neutral.  I am citing here

22   *Pleasant Grove City versus Summu*m.  It is a Supreme Court

23   decision from 2009.

24        We know from *Cornelius* that reasonableness is

25   assessed in the light of the purpose of the forum and the

1    surrounding circumstances.  Plaintiffs argue that defendants

2    have engaged in content and viewpoint discrimination to deny

3    them press credentials.  This argument begins on page 16 of

4    the TRO motion.

5          In support of this contention, the plaintiffs

6    state that, "Schott easily obtained press credentials since

7    the policy was first established, but the defendants altered

8    their policy to deny independent journalists credentials

9    after Schott established his own independent news site in

10   response to Schott's unfavorable reporting on the

11   legislature and angering Senate President Adams."  I'm

12   citing now pages 18 and 19 of the plaintiffs' opening brief.

13         In opposition, the defendants maintain that their

14   credentialing policy is both reasonable and viewpoint

15   neutral.  I find, at least on the limited record before us

16   at this stage, that the credentialing criteria are

17   reasonable and viewpoint neutral, and that the defendants

18   have not been shown to have violated First Amendment rights

19   through content or viewpoint discrimination.

20         The legislature's 2025 credentialing policy draws

21   no distinctions based upon the viewpoint of the speaker, and

22   there is no reason to think that in application it would

23   tend to favor some viewpoints or ideas at the expense of

24   others.  That is mostly language drawn from *Pahls versus*

25   *Thomas*, the 2013 decision from the Tenth Circuit.

1            Rather, the policy states and provides that it is

2    designed to give professional journalists and media

3    representatives from reputable organizations access to cover

4    the legislature and other significant events at the Utah

5    State Capitol.

6            The term "reputable organizations" does not itself

7    assume or prescribe any particular viewpoint.  The criteria

8    do not govern what can be published, but how information is

9    disseminated.  I find that the plaintiffs have not, at least

10   on the record before the Court, shown that the credentialing

11   criteria were modified to discriminate against plaintiffs'

12   content or viewpoint.

13           The plaintiffs point to the timing of the angry

14   exchange, of course, with Senate President Adams and

15   Schott's credentialing denial, but the credentialing policy

16   was modified before that incident occurred.  In addition,

17   the plaintiffs are not unique in criticizing the legislature

18   or its members, and yet the criteria do not exclude other

19   critical reporters.

20           There is this issue that is briefed, and it was

21   raised here today in argument, about unconstitutional

22   vagueness, and the plaintiffs assert that the media

23   credentialing policy is unconstitutionally vague, and I

24   disagree.  The vagueness doctrine is an outgrowth of the due

25   process clause of the Fifth Amendment, not the First

1    Amendment, and it addresses the due process concerns that

2    regulated parties should know what is required of them so

3    that they may act accordingly and for ensuring that laws are

4    not enforced in an arbitrary or discriminatory way.  This is

5    the standard set out in *Wyoming Gun Owners versus Gra*y, a

6    Tenth Circuit decision from 2023.

7          Accordingly, at least in the Tenth Circuit and

8    under *Gray*, a district court may find a statute

9    unconstitutionally vague, quote, "if it fails to provide

10   people of ordinary intelligence a reasonable opportunity to

11   understand what conduct it prohibits," end quote, and then

12   it continues, quote, "if it authorizes or encourages

13   arbitrary and discriminatory enforcement," end quote.

14         In *Grayned versus City of Rockfor*d, the Supreme

15   Court explained that as we're condemned to the use of words,

16   we can never expect mathematical certainty from our

17   language.  The plaintiffs have not provided any authority

18   establishing that the doctrine necessarily applies to

19   credentialing policies like those at issue here, but

20   assuming that they do, the plaintiffs argue that the

21   credentialing policy is vague because certain criteria are

22   not defined.

23         More specifically, the plaintiffs contend it is

24   not clear what an established reputable news organization or

25   publication is, what it means to adhere to a professional

1    code of ethics is not explained, and that blogs and

2    independent media or other freelance media are not defined.

3    The plaintiffs also maintain that because these criteria are

4    not defined, the defendants can readily modify their meaning

5    at will.

6           In response, the defendants counter that it is not

7    necessary for the policy to define these terms because each

8    is commonly understand in the English language and all are

9    well understood, especially in context.

10          Again, assuming that the void for vagueness

11   doctrine applies to this policy, I agree with the defendants

12   that in context the terms of the credentialing criteria are

13   sufficient to, quote, "provide fair notice to the public,"

14   end quote, of what the requirements are and to ensure that

15   the policy is not administered arbitrarily.  That standard

16   is set out in the *Wyoming Gun Owners* case.

17          The 2025 credentialing policy does not include

18   terms not commonly understood in the English language and,

19   further, the 2018 and 2019 credentialing policies included

20   additional defining characteristics, some of which are

21   incorporated in later iterations of the policy.

22          For example, the 2018 and 2019 defining

23   characteristics include reporters who represent institutions

24   with a track record.  In any case, the defendants also

25   demonstrated that Schott likely understood the criteria when

1  he acknowledged on social media that the new credentialing

2  criteria could, quote, "shut him out," end quote, in a post

3  that he made.

4        In addition, the changes to the 2025 credentialing

5  policy were made in part to guard against the potential

6  arbitrary application.  In fact, I think they removed some

7  of the discretion that was previously permitted to the

8  credentialing officers, and in that respect they reduced the

9  potential for discriminatory and arbitrary application.

10        I cannot conclude on the record before me that the

11  plaintiffs have established that the credentialing criteria

12  are unconstitutionally vague.

13        I think the final argument asserted is one

14  concerning prior restraint.  The plaintiffs allege, without

15  citation to applicable authority, that I could see anyway,

16  that the policy constitutes an unconstitutional prior

17  restraint on their ability to obtain, write about, and

18  publish news of public import on the activities of the Utah

19  legislature.  That argument is largely set out on page 21 of

20  the TRO motion.

21        Prior restraint is a, quote, "governmental

22  restriction on speech or publication before its actual

23  expression," end quote, or, quote, "formal censorship before

24  publication," end quote.  Both of those are definitions from

25  Black's Law Dictionary, the 12th edition from last year.

1    "Thus, prior restraint is one that restricts speech in

2    advance on the basis of content," end quote.  That is a

3    quote from *Taylor versus Roswell Independent School*

4    *Distric*t, a 2013 decision by the Tenth Circuit.

5          Plaintiffs contend that the defendants changed the

6    credentialing policy prior to the 2025 legislative session

7    to prevent the plaintiffs' unfavorable coverage of the

8    legislature.  In response, the defendants maintain the

9    policy was merely updated and Schott was denied a credential

10   because he no longer satisfied the requirements to be

11   associated with an established, reputable news organization.

12         At this preliminary stage of the proceedings, I

13   cannot conclude that the plaintiffs have established or

14   demonstrated that the 2025 policy was changed to prevent the

15   plaintiffs from reporting or publishing.  In fact, of

16   course, it does not have that effect.  Though the criteria

17   have been modified and refined since their inception in

18   2018, the core criteria have remained consistent.  In all

19   iterations reporters are required to, among other things, be

20   appropriately related to a media institution with a track

21   record and editorial oversight and to adhere to a

22   professional code of ethics.

23         Beginning in 2021, the credentialing criteria

24   limited access for, quote, "bloggers representing a

25   legitimate independent news organization," end quote.  The

1   2021 policy permits such bloggers to become credentialed

2   only under some circumstances.  In 2023, the policy was

3   further restricted, stating that bloggers representing a

4   legitimate independent news organization were permitted

5   credentials only in limited rare circumstances, and, of

6   course, that restriction stayed in place until the 2024

7   revisions.

8          Though the 2025 credentialing policy was revised

9   to preclude blogs, independent media, or other freelance

10  media, this change appears to be a continuation of prior

11  limitations, and, importantly, the criteria do not make any

12  content-based distinctions, nor do they chill Schott's

13  ability to publish material by requiring any advance

14  permission from government actors.

15         Further, because Schott left the Salt Lake

16  Tribune, he would not have qualified for a media credential

17  even under the credentialing policies in place before the

18  November of 2024 amendment absent, quote, "rare

19  circumstances."

20         In any case, the plaintiffs have not been

21  restricted from speaking or publishing any commentary on the

22  2025 legislative session.  As explained, the plaintiffs are

23  able to attend and view the legislators' actions, and the

24  defendants have not instituted any policy prohibiting or

25  attempting to regulate the plaintiffs' speech in any way.

1          Having determined that the plaintiffs do not have

2    a First Amendment right to gather news that is not subject

3    to some restriction, and that the credentialing policy is

4    neither unconstitutionally vague nor discriminatory and does

5    not constitute a prior restraint, I ultimately conclude that

6    the plaintiffs have not shown a likelihood to succeed on the

7    merits of their First Amendment claims.

8          I will just briefly touch on one other issue.  I

9    think it may be relevant going forward, and that is

10   irreparable harm.

11         Having determined that plaintiffs have not

12   established a likelihood of prevailing on the merits, and I

13   could conclude the analysis there and deny the TRO.

14   However, I also conclude that the motion must be denied

15   because plaintiffs have failed to demonstrate they will

16   suffer irreparable injury if the TRO is not granted.  I will

17   now briefly discuss the basis for that conclusion.

18         Quoting *Heideman versus South Salt Lake* from the

19   Tenth Circuit in 2003, quote, "To constitute irreparable

20   harm, an injury must be certain, great, actual, and not

21   theoretical," end quote.  In *Elrod versus Burns*, the Supreme

22   Court said, "The loss of First Amendment freedoms, even for

23   minimal periods of time, constitutes irreparable injury.

24         However, the Tenth Circuit has stated that it is

25   still necessary to consider the specific character of the

**Suppl. App. 98**

1   First Amendment claim at issue.  That was discussed in the

2   *Heideman* decision.

3          Where restriction is minimal and a plaintiff

4   retains, quote, "ample capacity," end quote, to, quote,

5   "convey their chosen message," end quote, injunctive relief

6   is not necessary.  That is a quote from *Johnson versus Cache*

7   *County School Distric*t here in the District of Utah, a 2018

8   decision relying on and citing the *Heideman* decision from

9   the Tenth Circuit.

10          The plaintiffs argue they will suffer irreparable

11   injury if the TRO does not issue because the legislative

12   session is underway and the plaintiffs are missing press

13   briefings that they cannot attend in person or ask

14   questions.  Plaintiffs further contend that the availability

15   of alternative methods for a resource reporter is of no

16   consequence because segregated media seating prevents equal

17   access and is, therefore, unconstitutional.

18          However, Schott's lack of a media credential

19   imposes little, if any, restrictions on the plaintiffs'

20   ability to cover and report on the legislative session.

21   Schott may attend the proceedings on the Senate and House

22   floors from a position immediately adjacent to the press

23   boxes.  All official actions of the legislature are

24   live-streamed, as are the governor's monthly news

25   conferences and the senate president's and house speaker's

1    in-house briefings.  Recordings of these events and press

2    releases and other communications are also available on the

3    house and senate websites.

4            I will just say that the thing that I thought

5    critically was missing in the papers that could have been

6    helpful here -- I think there is a space that requires

7    specific focus and consideration, and it is the difference

8    between Schott's access to the information and the ability

9    to report without the credential versus the same

10    consideration with, and that analysis is just missing.

11    There is not any discussion about it in any of the

12    plaintiffs' briefs.

13            On balance and on the record before me and the

14    arguments asserted by the parties, I find that the

15    plaintiffs have failed to establish that they will suffer

16    irreparable injury if the TRO is not granted, and the motion

17    is denied on that separate and independent basis as well.

18            For all of these reasons I have discussed, and in

19    failing to establish a likelihood of prevailing on the

20    merits and failing to establish irreparable injury, I find

21    and conclude that the plaintiffs have failed to meet their

22    burden, and I will deny the TRO.

23            Setting aside any objections that you have and,

24    Mr. Miller, I know you have many, let me just ask if you

25    need some time to consult with your clients or if you have

1    in mind already how you would like to proceed from here.

2              MR. MILLER:  Your Honor, I think that we do have a

3    plan on how we would like to proceed.  We will articulate

4    that.

5              MR. HARRINGTON:  Thank you.

6              Your Honor, we want to thank the Court for its

7    careful consideration of these matters.  We know these are

8    important issues.  We appreciate you.

9              Obviously, one of our roles as lawyers is to be

10   resources for the Court, and we appreciate your feedback on

11   that point.  We would like to float or explore the idea of

12   supplemental briefing on these issues in anticipation of a

13   hearing for a preliminary injunction.

14             We have not discussed this with the other side,

15   but we just thought maybe that would be beneficial to the

16   Court.  Again, we appreciate your careful consideration and

17   very much appreciate your feedback.

18             THE COURT:  Well, thank you.  You don't need to --

19   and it must not have been helpful to hear, and I may be

20   wrong, and it is entirely possible that I just misunderstood

21   the context of the briefing.  I just did the best I could

22   with what I understood the standards to be.

23             I take it from what you just said that you would

24   like to pursue preliminary injunction, and you didn't say

25   this, but I assume with an opportunity to conduct some

1    expedited discovery, and then a chance to file a new or

2    different brief in view of what has been said here today.

3         If I am right about all of that, I am wondering if

4    I should just deny the motion outright without prejudice to

5    file a separate motion for a preliminary injunction, either

6    before or after you have taken that expedited discovery.  I

7    know that time is of the essence and the legislature is

8    meeting daily and there is not a lot of time left.

9         Have I stated that correctly?  Is there a better

10   way to do this?

11        MR. HARRINGTON:  I think that is spot on, Your

12   Honor.  We may contemplate a potential amendment to the

13   complaint as well, and we would be happy to meet and confer

14   with opposing counsel on that and to outline a potential

15   schedule for some limited discovery.  I think that would

16   make sense.

17        Mr. Miller, you can chime in if you have a

18   different view on any of that, but I think that would be a

19   good way to proceed.

20        THE COURT:  Let me eliminate some procedural

21   hurdles.  And, Mr. Green, you can try to claw some of this

22   back in a minute if you want.  But in the interest of just

23   being to the point, you have leave to amend your complaint

24   if you want.  I think you have that anyway as a matter of

25   right under Rule 41 before there is a response or a certain

1    period of time.  Whether it is a matter of right or not, you

2    have my blessing to file an amended complaint if you wish to

3    do so.  Notify the defendants as soon as you make that

4    decision.

5             What is today?  Wednesday.

6             Do you think you will be in a position to notify

7    them by the end of the week?  Otherwise they are going to

8    need to be preparing a response to the pleading, and I don't

9    want them spending time preparing a response to a pleading

10   that is going to become moot.

11            MR. HARRINGTON:  Your Honor, I think that that

12   would be feasible.  I would note that there was a waiver of

13   service, and so I think it was a 60-day response deadline,

14   so I think there is some leeway built in there.

15            I don't want to speak out of turn, but I think

16   what you're saying is just a decision on whether we will

17   amend and, obviously, not the amendment, but the decision of

18   when we will amend by the end of the week.

19            THE COURT:  I forgot that it is the 60-day

20   provision that is going to apply here.  I don't mean to put

21   your feet to the fire.  Friday may be too soon.  Just act

22   reasonably and promptly and communicate well with the

23   defendants so we are not wasting time and resources on

24   something that is going to become moot.

25            I am going to ask you to meet and confer with the

1    defendants, after you have had a chance to confer with your

2    colleagues and Mr. Schott, and think about how you would

3    like to proceed.  Looking at the lawyers in this room, I

4    think you will probably be able to reach some agreement on a

5    timeline for filing a motion for a preliminary injunction

6    and maybe a timeline that makes sense for some limited

7    expedited discovery.  Try to work that out.  If you can't,

8    file a motion with me and I will decide it as quickly as I

9    can.  We'll be here to answer questions.

10            Is that helpful, or is that too vague?

11            MR. HARRINGTON:  That is, Your Honor.  We have had

12   a good relationship with opposing counsel.  We have really

13   appreciated their professionalism, and I don't see any

14   problems there.

15            THE COURT:  There is professionalism on both sides

16   in this courtroom, and I appreciate that.  Thank you.

17            Mr. Green, your thoughts about this?

18            It is sort of squishy leaving it there without

19   firm deadlines, but things are in flux.

20            MR. GREEN:  A little squishy, and I would second

21   what Mr. Harrington and Mr. Miller said.  They have been

22   professionals.  We are happy to try to work with them to

23   make it something that is doable for both sides.

24            I will say two things.  On the amended complaint

25   front, no objection, and I understand they have the

1    procedural right to do that anyhow.  My bigger concern, Your

2    Honor, is on the timing front.  I think you heard earlier

3    from my clients that the session ends on March 7th.  We are

4    slightly over four weeks away from that period of time.

5            We have already had one fast-and-furious,

6    effectivity 96-hour round of briefing in this case trying to

7    get some injunctive relief.  Your Honor noted the issue of,

8    you know, our capacity for lawyers' fees to the legislative

9    and other considerations going on here, and in light of

10   those things and what this Court, I think appropriately,

11   called in its oral ruling some foundational problems with

12   the complaint, we would be interested in exploring, even

13   under an amended complaint, their potential motion to

14   dismiss questions that could come along with that.

15           So this is maybe some squishiness in response to

16   your squishiness, but I have two overarching thoughts that I

17   don't know are fully formed, but issues that I just want to

18   raise.

19           One, I guess, would be our right to move to

20   dismiss vis-a-vis whatever happens with a second bite of the

21   injunctive relief apple, since this one was obviously the

22   first.  Second would be what is the timing of that and how

23   does it work with respect to the legislature and my clients

24   who, as this Courts know, we have 45 days out of 365 where

25   they are fully slammed and absolutely at capacity.  The more

1    we have to detract from their efforts from doing the

2    public's business to focus on some sort of response to a

3    lawsuit, which by itself will take time, but also more

4    specifically, expedited discovery during that period.  We

5    can handle a lot of the legal lifting, but to the extent it

6    is discovery, that is going to involve some actual time and

7    effort that is taking away from the public's business.

8              I'm wondering if there is some way to get us to a

9    point where we could have a schedule built in that addresses

10   something to do with the motion to dismiss, or if we're

11   going to have discovery and a second PI motion, if that

12   could come after the end of the session.  I'm not sure,

13   based now on what I have heard from the Court's ruling

14   today, that there is a driving specific need to get an

15   injunctive question answered before the end of the session.

16   I think the suggestion that there might be is inconsistent

17   with what the Court has already ruled.  Maybe I am

18   misunderstanding that, but, if not, that is something I

19   would ask the Court to consider and think about how we can

20   manage that in relation to the timing of the session.

21             THE COURT:  Thank you.

22             Don't surrender the podium yet.

23             This is unusual, and now I'm just going to speak

24   in aspirational terms, but I hope this is helpful.  Let me

25   try to articulate some general principles that are floating

1    around in my mind.

2         I think there were some foundational problems with

3    the TRO application, at least as I read it and viewed it,

4    but that is just one guy's view of it.  I think there are

5    meaningful and substantial questions here, potentially

6    constitutional questions, and we know from the case law that

7    in some instances the deprivation of some of those

8    constitutional rights itself represents irreparable injury

9    in some circumstances.

10        I fully understand the importance of the

11   legislature and the work that it is doing, and while I can't

12   quite imagine, and I have not been in the shoes of these

13   folks that are in the courtroom, I can only guess what it is

14   like during the session.

15        On the other hand, the access of media to cover

16   the legislature is important both for the freedom of the

17   press and the Fourth Estate and the citizens of the state of

18   Utah and elsewhere.  They are meaningful and significant

19   issues and rights.

20        If there is a motion forthcoming for a preliminary

21   injunction, I will do my best to resolve it as quickly as we

22   can resolve it, so that if Mr. Schott is going to have

23   access to the legislature, it is not lost for the whole

24   session and then it is forever lost.  In my mind that will

25   involve some careful balancing between the demands on your

1    clients and the defendants and the legislature and the

2    discovery sought.  I don't say this lightly, but we find

3    ourselves in this position all the time, as you well know,

4    Mr. Green, from the work you have done.

5          If we're talking about a limited two-hour

6    deposition of two different witnesses on dates and times

7    that they can otherwise be available, that is less than

8    ideal.  That is not an insurmountable burden.  I think it is

9    really going to be a question of balancing what is necessary

10   and reasonable to obtain the factual record that the

11   plaintiffs need to make their showing.

12         These are general thoughts.  I will resolve

13   disputes if they arise and can't be resolved between the

14   parties.  I just used those as examples.  I wasn't defining

15   a limit, but it is close to there.  We are not going to be

16   deposing Senator Adams for a day during the legislative

17   session, and that is going to fall outside the line of

18   reasonableness.  I will know it when I see it.

19         On the first point, my standard practice, and I

20   don't think we got this far in our first discussion and you

21   were not here, but when there are Rule 12 challenges

22   asserted in a case where there is a preliminary injunction

23   or TRO, I always take up personal jurisdiction and subject

24   matter jurisdiction and all of the Rule 12 issues beforehand

25   so we know which claims survive against which parties, if

1    any, before we proceed.

2              We need to know what complaint is going to be the

3    operative complaint, and you need to know that with

4    sufficient time to prepare a motion.  If you can get a

5    motion filed, we'll have expedited briefing with that and

6    there will probably be contemporaneous briefing on the

7    preliminary injunction.  We'll have a single hearing and we

8    will begin with the motions to dismiss, if there are any,

9    and resolve those and then move to what is left for the

10   preliminary injunction.

11             Clear?

12             MR. GREEN:  Sounds workable, Your Honor,

13   particularly with some discussion with Mr. Miller and Mr.

14   Harrington.

15             THE COURT:  It is not ideal, and I understand the

16   timing, but this is where we are.

17             Any other questions?

18             MR. GREEN:  I don't think so, Your Honor.  Thank

19   you.

20             THE COURT:  Mr. Miller, anything more from the

21   plaintiffs?

22             MR. MILLER:  No, Your Honor.

23             I just want to thank the Court and the court staff

24   and your indulgence in working with this.  I know you have a

25   lot of things going on, so we appreciate the attention that

1    has been afforded to this matter thus far, and we will

2    continue to work diligently to get this in a position so

3    perhaps we can get past the procedural issues and get to the

4    merits or otherwise get it resolved.

5            THE COURT:  I'm going to do my best to do that, if

6    we can get that far.  I don't want any of my comments today

7    to suggest that I don't think this is a real dispute and an

8    important issue.  I think it is.  I also recognize that I

9    think you are the only person that flew in from out of state

10   for this hearing.  We have all done our part.

11           No, you came from out of state also.  I wrote this

12   down phonetically so I could get it right.

13           Mr. Vitagliano?

14           MR. VITAGLIANO:  Vitagliano.

15           THE COURT:  I skipped over the -- it is nice to

16   see you all here and I appreciate your patience and

17   indulgence.  I appreciated your briefing and argument today.

18   Sorry it took so long.

19           We'll be in recess.  Thank you.

20           (Proceedings concluded.)

21

22

23

24

25

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3
         UTAH POLITICAL WATCH,      )
 4       INC., and BRYAN           )  Deposition of:
         SCHOTT,                    )
 5                                  )  MALISSA MORRELL
              Plaintiffs,           )
 6                                  )  Case No.
         vs.                        )  2:25-cv-00050-RJS-CMR
 7                                  )
         ALEXA MUSSELMAN, Utah      )  Hon. Robert J. Shelby
 8       House of                   )
         Representatives            )  Hon. Cecilia M. Romero
 9       Communications            )
         Director and Media         )
10       Liaison Designee;          )
         AUNDREA PETERSON, Utah     )
11       Senate Deputy Chief of     )
         Staff and Media            )
12       Liaison Designee; ABBY     )
         OSBORNE, Utah House of     )
13       Representatives Chief      )
         of Staff; and MARK         )
14       THOMAS, Utah Senate        )
         Chief of Staff, in         )
15       their official and         )
         individual capacities,     )
16                                  )
              Defendants.           )
17
18
19              March 27, 2025 * 8:58 a.m.
20
21              Location:  Alta Club
22            100 E. South Temple Street
23                Salt Lake City, Utah
24
25           Reporter:  Dawn M. Perry, CSR
```

Case 2:25-cv-00050-RJS-CMR   Document 57-15   Filed 04/25/25   PageID.1219   Page
Appellate Case: 25-4124   Document: 3 of 73   Date Filed: 12/18/2025   Page: 114

Marissa Morelli                                    March 27, 2025

Page 2

```
 1              A P P E A R A N C E S
 2      FOR THE PLAINTIFFS:
 3              Courtney Corbello
                Charles Miler
 4              Attorneys at Law
                Institute for Free Speech
 5              1150 Connecticut Ave., NW
                Suite 801
 6              Washington, D.C.  20036
                (202) 301-3300
 7              cc@ifs.org
                cmiller@ifs.org
 8
        FOR THE DEFENDANTS:
 9
                Daniel M. Vitagliano
10              Attorney at Law
                Consovoy McCarthy PLLC
11              1600 Wilson Boulevard
                Suite 700
12              Arlington, Virginia  22209
                (703) 243-9423
13              dvitagliano@consovoymccarthy.com
14              and
15              Alan Houston
                Legislative Research and General Counsel
16              Associate General Counsel
                W210 State Capitol Complex
17              Salt Lake City, Utah  84114
                (385) 258-7086
18              ahouston@le.utah.gov
19      ALSO PRESENT:
20              Bryan Schott
21
22
23
24
25
```

Case 2:25-cv-00050-RJS-CMR     Document 57-15     Filed 04/25/25     PageID.1220     Page
Appellate Case: 25-4124     Document: 4-7/3     Date Filed: 12/18/2025     Page: 115

Malissa Morrell                                              March 27, 2025

Page 3

```
 1                            I N D E X
 2     MALISSA MORRELL                                      PAGE
 3          Examination by Mr. Vitagliano                    4
 4                           * * *
 5                       E X H I B I T S
 6     NO.                  DESCRIPTION                      PAGE
 7
       Exhibit 1     About page of malissamorrell.com        8
 8
       Exhibit 2     Staff page on Utah Political           22
 9                   Watch's website
10     Exhibit 3     Article titled Top Utah GOP            35
                     lawmaker accused of skirting
11                   state laws on campaign finance
                     disclosures
12
       Exhibit 4     Article titled Utah GOP Senator:       38
13                   Media rule change meant to show
                     journalist "Who's the boss"
14
       Exhibit 5     Article titled Utah Legislature        40
15                   quietly changes press rules,
                     shutting out independent media
16
       Exhibit 6     Article titled Latest Utah tax         42
17                   cut plan:  Nearly $2,000 for top
                     one percent, $31 for average
18                   family
19     Exhibit 7     Article titled Lawmakers quietly       44
                     gutted Utah's open records law
20                   in final hours of 2025
                     legislature
21
       Exhibit 8     Article titled No such thing as        47
22                   a free lunch?  Utah lawmakers
                     were treated to dozens of free
23                   meals and events
24     Exhibit 9     Article titled Day 28:  Don't          50
                     believe the hype
25
```

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1221    Page
Malissa Morrell                                                           March 27, 2025
Appellate Case: 25-4124    Document: 5 of 3    Date Filed: 12/18/2025    Page: 116

Page 4

1                    P R O C E E D I N G S

2                         MALISSA MORRELL,

3              called as a witness, being first sworn,

4              was examined and testified as follows:

5                         EXAMINATION

6       BY MR. VITAGLIANO:

7            Q.    For the record, this is Daniel Vitagliano

8       of Consovoy McCarthy for the defendants.

9                 Could you state your full name, please,

10      for the record?

11           A.    Sure.  And I apologize ahead of time, I'm

12      dealing with side effects that are dry mouth so I

13      have to have something in my mouth.  So if I need to

14      repeat, just ask me.

15           Q.    Of course.  No problem.

16           A.    Malissa, M-a-l-i-s-s-a, Morrell,

17      M-o-r-r-e-l-l.

18           Q.    Thank you.

19                 Ms. Morrell, have you ever been deposed

20      before?

21           A.    No.

22           Q.    Okay.  I'll just go over a couple of

23      ground rules.  I'll need an audible response to each

24      answer, so nodding doesn't really do it.  We can't

25      talk over each other.  It makes it difficult for the

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1222    Page
Appellate Case: 25-4124    Document: 6 of 73    Date Filed: 12/18/2025    Page: 117

Vanessa Morel                                    March 27, 2025

Page 5

1    court reporter to record everything.  Answer the

2    questions as best you can.

3                    If you need clarification, just ask.  Your

4    attorney may object, but then after the objection

5    you're required to answer unless they specifically

6    tell you not to.

7                    Given this is only one hour, presumably we

8    can go without breaks, but if you do need a break,

9    just let us know, we'll pause the clock.  If a

10    question is pending, just answer -- finish that

11    question and then we'll take a break.

12                    Is there any reason you can't give

13    complete and truthful testimony today?

14         A.    No.

15         Q.    And you understand that you are here to

16    provide testimony in this case about the denial of a

17    legislative press credential to Mr. Bryan Schott and

18    Utah Political Watch for the 2025 legislative

19    session?

20         A.    Yes.

21         Q.    Did you prepare for this deposition?

22         A.    Met with the lawyers for the first time

23    last night.

24         Q.    Okay.  And who was in the room when you

25    prepared?

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1223    Page
Appellate Case: 25-4124    Document: 46-3    Date Filed: 12/18/2025    Page: 118
Melissa Morel                                          March 27, 2025

Page 6

     1              A.    I was there, Courtney, Chip and --

     2       Mr. Schott.  Everybody on this side of the table.

     3              Q.    And how long did you prepare for?

     4              A.    Oh, it was probably 45 minutes.

     5              Q.    And it was just that one time?

     6              A.    Uh-huh.  Yes.

     7              Q.    Did you look at any documents to prepare

     8       for this deposition?

     9              A.    I'm acquainted with the filings, but

    10       that's it.

    11              Q.    Did you bring any documents with you here

    12       today?

    13              A.    No.

    14              Q.    Have you discussed your deposition with

    15       anybody other than your lawyers?

    16              A.    No.

    17              Q.    What's the highest level of education you

    18       received?

    19              A.    I'm currently a doctoral student, so it

    20       would be master's before that.

    21              Q.    Okay.  And where did you obtain your

    22       master's?

    23              A.    It's called Loyola Marymount in

    24       Los Angeles.

    25              Q.    Okay.  And what did you study?

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1224    Page
Appellate Case: 25-4124    Document: 8 of 73    Date Filed: 12/18/2025    Page: 119

Melissa Morrell    March 27, 2025

Page 7

1          A.     Marriage and family therapy.

2          Q.     And for your undergrad, bachelor's?

3          A.     I did a bachelor's of -- it was called

4     family science at the time.  It was sort of a grad

5     school preparation degree at Brigham Young

6     University.

7          Q.     Okay.  What is your primary occupation?

8          A.     That's a good question.  I do a lot of

9     things.  So my licensure is in psychotherapy here in

10    the state of Utah.  I'm a licensed marriage and

11    family therapist.

12         Q.     Where do you work?

13         A.     In many places, so let me start at the top

14    and go down.  As I mentioned, I'm a doctoral student

15    at the University of Utah.  So I am a research

16    assistant for Dr. Bettmann Schaefer there.  As part

17    of my work with her I was just appointed the

18    editorial assistant for a peer-review journal.

19               I'm also a research assistant for

20    Dean Philip Osteen.  And I'm try -- and I also teach.

21    So I teach as both a teaching assistant and an

22    adjunct professor at the U.

23         Q.     Okay.

24         A.     Excuse me, at the University of Utah.  I

25    have a private practice.  And I am the editor of the

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1225    Page
Appellate Case: 25-4124    Document: 9 of 73    Date Filed: 12/18/2025    Page: 120
Malissa Morrell                                    March 27, 2025

Page 8

1      Utah Political Watch website.

2              Q.     And how long have you worked at your

3      private practice?

4              A.     Gosh.  It started in Los Angeles in, like,

5      2008, I think, or '09.

6              Q.     What did you do before that?

7              A.     Well, I had been working in the agencies

8      and going to grad -- I graduated with my master's in

9      2005.

10             (EXHIBIT 1 WAS MARKED.)

11             Q.     Ms. Morrell, I'm handing you what we have

12     marked as Exhibit 1.  If you could please review this

13     document.

14             For the record, this is a copy of the

15     About page of malissamorrell.com.

16             Do you know what this document is?

17             A.     Yes, it looks like from my website.

18             Q.     On pages 2 and 3 the website lists your

19     credentials, education, additional trainings and

20     experience.

21             Is that correct?

22             A.     Yes.

23             Q.     Does this document fairly represent all of

24     your qualifications and experience separate from the

25     Ph.D. program that we just discussed?

Page 9

1          A.     Well, Daniel, it looks like I need to

2     update it, but largely.

3          Q.     Okay.

4          A.     Yes.

5          Q.     Anything in particular that's missing that

6     you would want to note?

7          A.     Like you said, my education.  I've taught

8     at a couple of other universities -- oh, no, that's

9     the Westminster and -- departments.  But other than

10    that, it looks pretty good.

11         Q.     Okay.  And what did you teach at those

12    other universities you mentioned?

13         A.     Psychotherapy-related clinical courses.

14         Q.     Have you taken any training courses in

15    journalism?

16         A.     No.

17         Q.     Have you taken any training courses in

18    editing?

19         A.     I don't remember.

20         Q.     Do you hold any professional

21    certifications in journalism?

22         A.     No.

23         Q.     Do you hold any professional

24    certifications in editing?

25         A.     No.

Page 10

1          Q.    Do you have any professional experience

2     working in media?

3          A.    Can --

4                MS. CORBELLO:  Objection.  Vague.

5                THE WITNESS:  Could you clarify what you

6     mean?

7          Q.    (BY MR. VITAGLIANO)  Prior to your working

8     at Utah Political Watch, have you ever worked

9     professionally in media or for a media company?

10         A.    It's the word "media" that I'm wondering

11    if you will clarify.

12         Q.    For a newspaper or similar publication.

13         A.    No.

14         Q.    Okay.  Do you have any -- prior to your

15    serving as an editor for Utah Political Watch, do you

16    have any professional experience working in

17    journalism?

18         A.    No.

19         Q.    And prior to your experience as the editor

20    for Utah Political Watch, do you have any

21    professional experience as an editor?

22         A.    Not prior, no.

23         Q.    And you mentioned that you now are

24    working -- I believe an editorial assistant for your

25    Ph.D. program?

Melissa Morell                                    March 27, 2025

                                                              Page 11

 1              A.    (Witness nods head.)

 2              Q.    How long have you been doing that?

 3              A.    It just -- just started and it's not

 4       connected to the program.  It's a peer-reviewed

 5       scientific journal.

 6              Q.    So how much editing have you done with

 7       that peer-review journal so far?

 8              A.    Right now we're in training.

 9              Q.    You're in training?

10              A.    (Witness nods head.)

11              Q.    So you have not edited any articles yet

12       for that?

13              A.    I will next week, but not yet.

14              Q.    Okay.  And is that a paid position or

15       voluntary?

16              A.    No, it's paid.

17              Q.    And what exactly is the discipline for the

18       journal that you'll be editing?

19              A.    It's called the Journal of Experiential

20       Education.

21              Q.    And what types of articles does the --

22       that journal publish?

23              A.    Like I said, scientific, peer-reviewed

24       either research or opinion.

25              Q.    And that journal is different type of

Page 12

 1      content or publications than what you're working on

 2      currently at Utah Political Watch?

 3          A.    Like I mentioned, it is peer-reviewed and

 4      mostly science.

 5          Q.    Nothing political, nothing about the

 6      legislature?

 7          A.    Nothing political.

 8          Q.    How long have you known Mr. Bryan Schott?

 9          A.    I want to say November 12th, 2011.

10          Q.    Okay.  And you're married; is that

11      correct?

12          A.    He and I are married.

13          Q.    How long have you been married?

14          A.    We are about to have our -- hold on.  I

15      think I'm -- I think I'm supposed to know this.  We

16      are about to have our 12th anniv -- 12th wedding --

17      marriage anniversary.

18          Q.    And you're still currently married, not

19      separated or anything?

20          A.    That's correct.

21          Q.    And legally married?

22          A.    Uh-huh (affirmative).

23          Q.    Mr. Schott has said that you have served

24      as his editor in an unofficial capacity prior to your

25      working at Utah Political Watch.

Case 2:25-cv-00050-RJS-CMR   Document 57-15   Filed 04/25/25   PageID.1230   Page
14 of 73
Appellate Case: 25-4124   Document: Date Filed: 12/18/2025   Page: 125

Marissa Morrell                                      March 27, 2025

Page 13

 1                    Is that correct?

 2          A.    Yes.

 3          Q.    For how long have you done that?

 4          A.    Probably since 2012.

 5          Q.    What exactly does it mean to serve as an

 6     editor in an unofficial capacity?

 7          A.    At times he has had formal editing through

 8     his employment and so in those times more just

 9     consulting and -- and assisting.  But when he has not

10     had a professional editor, I've done more.

11          Q.    Okay.  When were those times when he did

12     not have a professional editor?

13          A.    From when we met until he started at Salt

14     Lake Tribune, which was, like, 2020, maybe.  And then

15     he left The Tribune last year.

16          Q.    So when Mr. Schott was at The Tribune, if

17     you were his unofficial editor, you necessarily were

18     not his official editor?

19          A.    That is correct.

20          Q.    And The Tribune editor would have been his

21     official editor?

22          A.    Yes, sir.

23          Q.    What role did you play in Mr. Schott's

24     reporting when he worked at Utah Policy?

25          A.    As I mentioned, sort of a similar -- there

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1231    Page
Appellate Case: 25-4124    Document: 15 of 73    Date Filed: 12/18/2025    Page: 126

Marissa Morrell                                    March 27, 2025

Page 14

1    was an owner at that organization but no other

2    support, so I was doing consulting about the same

3    types of stuff that we do now.

4        Q.    And what are those types of things?

5        A.    I'm -- let's see.  We talk about sourcing

6    and sources.  We speak about story ideas.  I'm

7    helping with the editorial calendar.  And also the

8    sort of flow and clarity in just the work product.

9        Q.    Let's take each of those in turn.

10            So you mentioned sourcing.  Could you

11   elaborate on that, please?

12       A.    Sure.

13            As a reporter, Mr. Schott uses sources for

14   his stories and we talk about number of sources,

15   appropriateness of sources, background versus

16   on-the-record information, that type of stuff.

17       Q.    And is most of your work before he works

18   on a story or article or on the back end, after he's

19   written an article?

20       A.    Well, like I said, we do speak about story

21   ideas.

22       Q.    Uh-huh.

23       A.    So I would say before and during and

24   after.

25       Q.    And your role in assisting with story

Page 15

1      ideas, could you please elaborate on that?

2              A.    Sure.

3                    Most of the time he will come to me with

4      three or four things that he is considering as

5      stories and we talk them out and I give him a

6      non-Utah politics-involved perspective and ask

7      questions to kind of help him think through which

8      stories he wants to bring to fruition.

9              Q.    You also mentioned the editorial calendar?

10             A.    Uh-huh (affirmative).

11             Q.    Could you please elaborate on that?

12             A.    Sure.

13                   There -- there have been decisions made

14     about how often pieces will get published in this new

15     outlet and -- let's see.  You know, so sort of

16     figuring out pace and frequency and then -- of

17     publication.  And then looking at the different story

18     ideas and trying to just plan out when is the best

19     time for publication.

20             Q.    And you did all of those things, sourcing,

21     story ideas, editorial calendar when he was with Utah

22     Policy?

23             A.    Yes.

24             Q.    And you also mentioned you assist with the

25     flow of work.  Is that reviewing and editing his

Case 2:25-cv-00050-RJS-CMR   Document 57-15   Filed 04/25/25   PageID.1233   Page
Appellate Case: 25-4124   Document: 17 of 73   Date Filed: 12/18/2025   Page: 128

Marissa Morrell                                           March 27, 2025

                                                             Page 16

 1       written work product?

 2            A.    Yes.  I actually meant like grammatical

 3       flow and that type of stuff, but what you've just

 4       described is also true.

 5            Q.    So when Mr. Schott was at Utah Policy, how

 6       often would you review and edit his work?

 7            A.    Oh, I would say maybe three times a week.

 8            Q.    Every article that he published?

 9            A.    No.

10            Q.    And when you say you would do it three

11       times a week, do you mean three stories a week or

12       were there multiple stories each time?

13            A.    Probably just three discussions per week.

14            Q.    Discussions.  Did those involve reviewing

15       and editing his drafts?

16            A.    Sometimes.

17            Q.    And what exactly did that review and

18       editing process look like?

19            A.    I wasn't anywhere in the organizational

20       chart so I didn't have an email address associated or

21       anything like that, so we would usually look at

22       things together at the same time.

23            Q.    So he would show you a draft that he

24       wrote?

25            A.    Yes, show or read me a draft.

1          Q.    And how would you assist him in editing

2    that?

3          A.    I would give feedback.

4          Q.    And, more specifically -- I think you

5    mentioned grammar or flow, things like that -- if you

6    could just elaborate, please.

7          A.    Just making sure that it was readable to

8    someone else and that there weren't logic gaps or --

9    yeah, it was mostly just how it read.

10         Q.    Did you ever fact check or verify accuracy

11   of things he reported on when he was at Utah Policy?

12         A.    We would talk about number of sources and,

13   like I said, background versus on the record versus

14   anonymous or saying different things like that.  But

15   I didn't do any of the research, no.

16         Q.    So you did not go independently verify

17   certain things he's citing or discussing?

18         A.    No.

19         Q.    Was your role similar when he worked at

20   The Salt Lake Tribune?

21         A.    You mentioned before it was -- it became

22   more informal because he had other editors that he

23   was sending things to.

24         Q.    Okay.  When he was at The Salt Lake

25   Tribune, did you still assist him with sourcing?

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1235    Page
Appellate Case: 25-4124    Document: 19 of 73    Date Filed: 12/18/2025    Page: 130

Melissa Morrell                                                      March 27, 2025

Page 18

1              A.    No.

2              Q.    Did you assist him with story ideas when

3        he was at The Salt Lake Tribune?

4              A.    Yes.

5              Q.    Did you assist him with the editorial

6        calendar when he was at The Salt Lake Tribune?

7              A.    No.

8              Q.    Did you review and edit drafts of his work

9        before it was published when he was at The Salt Lake

10       Tribune?

11             A.    As I said, informally.  So sometimes he

12       would read me something, pieces of what he was going

13       to send to the other editors before he sent them.

14             Q.    Just read to you or would he give you

15       drafts to read yourself?

16             A.    At the Trib, I don't think it made sense

17       for me to have drafts because he had editors.

18             Q.    So you didn't mark up or redline drafts of

19       his with edits?

20             A.    No.

21             Q.    And how often would you review his work

22       when he was at The Tribune?

23             A.    Probably about the same, maybe -- in a

24       different role, but maybe three times a week.

25             Q.    And when you say three times a week, three

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1236    Page
Appellate Case: 25-4124    Document: 20 of 73    Date Filed: 12/18/2025    Page: 131

Malissa Morrell                                                    March 27, 2025

Page 19

 1      articles a week or three sessions a week?  How would

 2      you want to describe it?

 3          A.    Yeah.  It varied, but it wasn't anything

 4      formal, like I look at everything he put out or

 5      anything like that.

 6          Q.    So you did not review every article he

 7      published?

 8          A.    No.

 9          Q.    Did your review and editing process, when

10      he was at The Tribune, involve any sort of fact

11      checking or verifying the accuracy of matters that he

12      reported on?

13          A.    No.

14          Q.    Was there ever a conflict between your

15      unofficial edits and The Tribune's official edits?

16          A.    Not that I know of.  I mean, if there

17      were, the official editors would have superseded my

18      recommendation.

19          Q.    Do you know if, you know, you ever had a

20      difference of opinion with his Tribune editor?

21          A.    You know what?  I don't --

22              MS. CORBELLO:  Objection.  Speculation.

23              THE WITNESS:  Thank you.

24              MS. CORBELLO:  You can answer.  Sorry.  Go

25      ahead and answer.

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1237    Page
Appellate Case: 25-4124    Document: 21 of 73    Date Filed: 12/18/2025    Page: 132

Marissa Morrell    March 27, 2025

Page 20

1                    THE WITNESS:  Not that I know of.

2          Q.    (BY MR. VITAGLIANO)  Okay.  But as you

3     said, The Tribune editor would basically trump any of

4     your edits or feedback?

5          A.    Correct.

6          Q.    Okay.  Do you know when Mr. Schott left

7     The Salt Lake Tribune?

8          A.    Yes, ish.  August of last year.

9          Q.    Last year being 2024?

10         A.    2024.

11         Q.    Are you familiar with the circumstances

12    surrounding his departure?

13         A.    As much as I know, yeah.

14         Q.    What do you know?

15                    MS. CORBELLO:  Objection.  This is outside

16    the scope of her deposition and goes to private

17    employee matters between Mr. Schott and The Salt Lake

18    Tribune, so I'm going to instruct her not to answer

19    any questions about the circumstances of his

20    departure.

21                    MR. VITAGLIANO:  Private employee matters?

22    She was not an employee of The Tribune.

23                    MS. CORBELLO:  I understand, but her

24    discussions with the private employee of The Salt

25    Lake Tribune is her husband and so that falls under

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1238    Page
Appellate Case: 25-4124    Document: 22 of 73  Date Filed: 12/18/2025    Page: 133

Melissa Morrell                                                March 27, 2025

Page 21

1     the marital privilege and, again, this is outside the

2     scope of her deposition.  You are deposing her about

3     her editing the work at Utah Policy Watch -- or, I'm

4     sorry, Utah Political Watch.

5          Q.    (BY MR. VITAGLIANO)  You are familiar with

6     Utah Political Watch?

7          A.    Yes.

8          Q.    Are you employed by Utah Political Watch?

9          A.    I'm the editor.  By "employed," do you

10    mean am I -- am I on salary or something?

11         Q.    Would you consider yourself an employee of

12    Utah Political Watch?

13         A.    Yes.

14         Q.    And your position is editor?

15         A.    Uh-huh.  Yes.

16         Q.    How long have you worked at Utah Political

17    Watch?

18         A.    Since it started.

19         Q.    How many hours a week do you work at Utah

20    Political Watch?

21         A.    Probably five hours a week.

22         Q.    Do you work for Utah Political Watch

23    pursuant to an employment contract?

24         A.    It's a very small organization.  No.

25         Q.    Are you compensated by Utah Political

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1239    Page
Appellate Case: 25-4124    Document: 23 of 73    Date Filed: 12/18/2025    Page: 134

Melissa Morrell    March 27, 2025

Page 22

1        Watch for your time and work?

2              A.    No.

3              Q.    So you do not receive a paycheck from Utah

4        Political Watch?

5              A.    No.

6              Q.    You did not receive a W-2 from Utah

7        Political Watch for last year?

8              A.    No.

9              Q.    Do you receive any benefits like health

10       insurance or 401(k) from Utah Political Watch?

11             A.    No.

12             Q.    So would you describe yourself as an

13       employee of Utah Political Watch?

14             A.    Yes.

15                   (EXHIBIT 2 WAS MARKED.)

16             Q.    Ms. Morrell, I am handing you what we will

17       mark as Exhibit 2.  If you could please review this.

18                   For the record, this is a copy of the

19       staff page on Utah Political Watch's website.

20                   Do you know what this document is?

21             A.    Yes.

22             Q.    Have you seen it before?

23             A.    Yes.

24             Q.    You are listed on there; is that correct?

25             A.    Correct.

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1240    Page
Appellate Case: 25-4124    Document 24 of 73    Date Filed: 12/18/2025    Page: 135

Marissa Morrell                                              March 27, 2025

Page 23

1          Q.    And you are listed as editor, correct?

2          A.    Correct.

3          Q.    And Mr. Schott is listed as managing

4     editor?

5          A.    Yes.

6          Q.    Does Mr. Schott manage your editing work?

7          A.    He's the final say.

8          Q.    Is Mr. Schott senior to you, would you

9     say?

10         A.    Oh, gosh.  We have not had those

11    conversations.

12         Q.    Would you consider Mr. Schott your

13    supervisor?

14         A.    No.

15         Q.    Do you answer to anyone at Utah Political

16    Watch other than Mr. Schott?

17         A.    No.

18         Q.    And, as you've said, Mr. Schott has the

19    final say?

20         A.    In the work product.

21         Q.    And that's a yes on the work product?

22         A.    Yes.

23         Q.    Thank you.

24               Can you describe the editing process for

25    Utah Political Watch's published articles?

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1241    Page
Appellate Case: 25-4124    Document 25 of 73    Date Filed: 12/18/2025    Page: 136

Marissa Morrell                                                    March 27, 2025

Page 24

 1                    MS. CORBELLO:  Objection.  Calls for a

 2         narrative.

 3                    You can answer.

 4                    THE WITNESS:  Sure.

 5                    Editing process.  Similarly, as I

 6         mentioned, we're doing editorial calendars, so making

 7         plans after reviewing story ideas.  When a story

 8         needs -- what's the word I'm looking for --

 9         clarification or support with sourcing, we discuss

10         that.  And then as -- as things go out, I do review

11         for wording and flow, grammar.

12              Q.    So does Mr. Schott send you articles to

13         review before they are published?

14              A.    Sometimes.

15              Q.    About how many times, would you say?

16              A.    We're often in the same place.

17              Q.    Could you just clarify that or elaborate?

18              A.    Not -- not as often as we review them

19         verbally.

20              Q.    Okay.  So normally you're together, in

21         person going over articles?

22              A.    (Witness nods head.)

23              Q.    Not as often, but there are times where

24         you do not review articles together, in person?

25              A.    I'm trying to think.  Right.  Yes.

Page 25

1          Q.    And does he send you those articles in

2     some way?  Does he email them to you?

3          A.    Sometimes.

4          Q.    And does he email them to you at your

5     official Utah Political Watch email address on this

6     document?

7          A.    I don't know.  We have a -- there's some

8     forwarding that happens with emails and different

9     things, so...

10         Q.    So do you use a separate email address for

11    your work for Utah Political Watch?

12         A.    Do I use a separate.  I don't check it as

13    often as I check my other emails, so often I'm

14    looking at it through other means.

15         Q.    What are those other means?

16         A.    Like a Gmail that I look at all the time.

17         Q.    So Mr. Schott would send you articles to

18    review to your Gmail account?

19         A.    Well, like I said, I am not exactly sure

20    how -- if he is sending it -- I have never looked if

21    he is sending it directly or if it's getting

22    forwarded.

23         Q.    But you would receive draft articles in

24    your personal Gmail account?

25         A.    Sometimes.

Page 26

```
 1              Q.    About how often, would you say?

 2              A.    A few times a month.

 3              Q.    Other than reviewing articles in person

 4        and him sending to you via email, is there any other

 5        means that draft articles are transmitted to you?

 6              A.    I want to make sure I'm covering it.

 7        Sometimes portions might get texted through a secure

 8        texting.

 9              Q.    When you say "secure texting," a certain

10        app that you use?

11              A.    (Witness nods head.)

12              Q.    What is that app?

13              A.    Signal.  Infamous this week.

14              Q.    Oh, yes.

15                    And how long have you had your Utah

16        Political Watch address?

17              A.    Oh, I don't know.  This has been a -- I

18        mean, it's a start-up that we're building from the

19        ground up, so I couldn't tell you.

20              Q.    When was Utah Political Watch formed?

21              A.    I don't know that date as well as I know

22        some others.  Yeah, I don't know.

23              Q.    Do you have a month that you can provide,

24        if not a specific date?

25              A.    It was after August of 2024.
```

Page 27

```
 1          Q.    Did you have that official Utah Political

 2    Watch email address set up in October of 2024?

 3          A.    I don't know.

 4          Q.    Did you have it set up in November

 5    of 2024?

 6          A.    I'm sorry.  I don't know.

 7          Q.    Do you know the first time you accessed

 8    that official Utah Political Watch account?

 9          A.    No.

10          Q.    So you mentioned in your work as an editor

11    for Utah Political Watch it's, you know, sourcing,

12    story ideas.  I have some specific questions about

13    the actual editing of the work product.  You

14    mentioned that you, you know, read for grammar and

15    clarity.  Anything else that you do?

16          A.    (Witness nods head.)

17          Q.    If you could provide an audible answer to

18    that.  You nodded your head.

19          A.    Oh.  I was waiting for you to finish your

20    question.  Can you just say it again?

21          Q.    Sorry.

22                You mentioned that you review draft

23    articles for grammar and clarity; is that correct?

24          A.    Yes.

25          Q.    And when you review those draft articles,
```

Case 2:25-cv-00050-RJS-CMR   Document 57-15   Filed 04/25/25   PageID.1245   Page
Appellate Case: 25-4124   Document: 29 of 73   Date Filed: 12/18/2025   Page: 140

Melissa Morrell                    March 27, 2025

Page 28

```
 1        is there anything else that you're reviewing for?

 2               A.    No.

 3               Q.    Do you do any sort of fact checking or

 4        verifying the accuracy of matters that are reported

 5        on?

 6               A.    No.

 7               Q.    Do you review any sources that are cited

 8        in draft articles?

 9               A.    Review -- can you elaborate on "review"?

10               Q.    If Mr. Schott were to cite a source in a

11        draft article, would you pull that source and review

12        it yourself personally?

13               A.    Like, communicate with the source as well?

14               Q.    I'll clarify.  When I mean source, like a

15        public document.

16               A.    Oh.

17               Q.    So like a draft bill or something like

18        that.

19               A.    If it's a document, yes.

20               Q.    So you --

21               A.    Not every time.  Sometimes.

22               Q.    How often would you do that?

23               A.    I'm sorry.  I would have to have the

24        breakout of how often a source is document versus

25        something else.
```

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1246    Page
Appellate Case: 25-4124    Document: 30 of 73    Date Filed: 12/18/2025    Page: 141

Melissa Morrell                                            March 27, 2025

Page 29

1          Q.    But would you say that you go pull every

2     document that is cited in every article and review

3     it?

4          A.    No.

5          Q.    Do you have any general ballpark how often

6     you would do that?

7          A.    I think it varies too much to ballpark.

8          Q.    Now other sources.  So, for example, if an

9     article discusses legislative proceedings like a

10    floor debate, would you review footage of the floor

11    debate?

12         A.    No.

13         Q.    If an article discussed legislative

14    proceedings like committee meetings, would you review

15    footage of the committee meetings?

16         A.    Usually not, no.

17         Q.    Usually not.  Have you ever?

18         A.    Like I said, we're in the same place a

19    lot, so often when he's watching or listening to

20    things, I'm also listening to them.

21         Q.    When he sends you a draft, do you go,

22    yourself, independently pull footage of these things

23    and review them?

24         A.    No.

25         Q.    Now, speaking of sources like individuals,

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID 1247    27    Page
Appellate Case: 25-4124    Document 31 of 73    Date Filed: 12/18/2025    Page: 142

Marissa Morrell                    March 27, 2025

Page 30

1      say, when an article includes quotes from a source

2      like that, do you verify those quotes --

3              A.    No.

4              Q.    -- in some way?

5              So if Mr. Schott receives information via

6      text message, do you personally review his text

7      messages?

8              A.    No.

9              Q.    If Mr. Schott receives information from a

10     source via email, would you personally review his

11     emails?

12             A.    Sometimes they are shared during our

13     conversations about -- during our meetings about,

14     like, sourcing and ideas, but I don't independently

15     take action.

16             Q.    Does he provide you a written copy of

17     those emails or text messages?

18             A.    Sometimes I've seen written copies, yes.

19             Q.    You've seen them?  Can you elaborate on

20     that, please?

21             A.    He will share them with me.

22             Q.    Physically show you his phone?

23             A.    Sometimes.

24             Q.    Okay.  But when he sends you a draft

25     article, he doesn't include the email or text

Page 31

1      message?

2             A.    No.

3             Q.    Do you verify the identity of unnamed

4      sources that he reports on?

5             A.    No.

6             Q.    Do you review and edit every article that

7      Mr. Schott publishes with Utah Political Watch?

8             A.    To be safe, I'll say no.

9             Q.    How many Utah Political Watch articles

10     have you edited?

11            A.    I don't know.

12            Q.    Can you ballpark?

13            A.    I'd have to do some math.  Sorry.  I don't

14     know.

15            Q.    How many articles a week would you say you

16     edit for Utah Political Watch?

17            A.    Probably four or five.

18            Q.    Is that about one per day or --

19            A.    (Witness nods head.)

20            Q.    -- you know, several together at a time?

21            A.    I would say one per day.

22            Q.    Have you ever had any disagreements with

23     Mr. Schott over your suggested edits?

24            A.    Over my suggested edits?  No.

25            Q.    Have you had disagreements with Mr. Schott

Page 32

1     over other aspects of your editing?

2                    MS. CORBELLO:  Objection.  Vague.

3                    THE WITNESS:  Can you clarify?

4                    MR. VITAGLIANO:  Sure.

5          Q.    Have you ever had disagreements with

6     Mr. Schott over your sourcing?

7          A.    This is my remembering blanking.  Sorry.

8     Hang on.

9                    I don't remember.

10         Q.    Have you ever had disagreements with

11    Mr. Schott over story ideas?

12         A.    No.

13         Q.    Have you ever had disagreements with

14    Mr. Schott over the editorial calendar?

15         A.    I don't remember.  Probably not.

16         Q.    Have you ever advised Mr. Schott not to

17    publish something?

18         A.    Ever?

19         Q.    During his time at Utah Political Watch.

20         A.    Utah Political Watch.  When we discuss

21    story ideas, we sometimes talk about prudence and --

22    yeah, we sometimes have disagreements, I think.

23         Q.    And before you said Mr. Schott has the

24    final say?

25         A.    Yes.

Melissa Morrell                                        March 27, 2025

Page 33

 1          Q.   So if you have a disagreement with him

 2     over publishing something, he can freely publish it?

 3          A.   Yes.

 4          Q.   And have there been any instances of that?

 5          A.   I can't think of any.

 6          Q.   Do you play any sort of role in the

 7     production of Utah Political Watch's podcast special

 8     session?

 9          A.   No.  That's just a similar role as

10     anything else we've already talked about.  But I

11     don't hold the microphone or edit the audio.

12          Q.   Do you assist him with sourcing for his

13     episodes of his podcast?

14          A.   We talk about who will be on the podcast

15     and -- yeah.

16          Q.   Do you assist him with story ideas for the

17     podcast?

18          A.   Yes.

19          Q.   Do you assist him with the editorial

20     calendar with respect to the podcast?

21          A.   Yes.

22          Q.   But you don't review or edit the clip

23     before -- or the audio recording of the podcast

24     before it's published?

25          A.   I usually hear it before it goes live.

Page 34

1          Q.    Do you offer feedback --

2          A.    Yes.

3          Q.    -- on those recordings?

4                Does Mr. Schott ever re-record anything

5     after your feedback?

6          A.    Yes.

7          Q.    Does Mr. Schott ever edit clips of the

8     recording in response to your feedback?

9          A.    Just -- you just mean segment -- or just

10    audio, in general?

11         Q.    Yes, the audio.

12         A.    Yeah.  Yes.

13         Q.    Okay.  How often would you say he's done

14    that?

15         A.    Oh, gosh.  I don't know.  Sorry.

16         Q.    Do you play any role in producing the

17    content for Mr. Schott's social media pages?

18         A.    Similar role.

19         Q.    Could you just explain what "similar role"

20    is?

21         A.    Yes.  Sorry.

22                Calendar ideas.  Sourcing as much as goes

23    into a world where you, like, repost things and

24    stuff.  But, yeah, we do all of that.

25         Q.    Okay.

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1252    Page
Appellate Case: 25-4124    Document: 36 of 73    Date Filed: 12/18/2025    Page: 147

Marissa Morrell    March 27, 2025

Page 35

  1                   MS. CORBELLO:  And just make sure that you

  2        let him finish his question before you answer.  A

  3        couple times you guys have talked over each other.

  4                   THE WITNESS:  Sorry.

  5                   MR. VITAGLIANO:  She'll let us know if

  6        there's an issue.

  7             Q.    So when Mr. Schott posts videos on

  8        Instagram, for example --

  9             A.    Uh-huh (affirmative).

 10             Q.    -- do you edit those videos at all?

 11             A.    Sometimes.

 12             Q.    And how many times, would you say?

 13             A.    I don't know.

 14             Q.    Every post?

 15             A.    Probably not every.

 16             Q.    About how many, if you can ballpark?

 17             A.    I can't.

 18             Q.    Once a week?  Twice a week?

 19             A.    I don't -- I'm sorry.

 20                   (EXHIBIT 3 WAS MARKED.)

 21             Q.    I am handing you what we will mark as

 22        Exhibit 3.

 23             A.    After this it would help me to have a

 24        break.

 25             Q.    Sure.

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1253    Page
Appellate Case: 25-4124    Document: 37 of 73    Date Filed: 12/18/2025    Page: 148

Marissa Morrell                                March 27, 2025

Page 36

```
 1                Could you review this?  And, for the

 2       record, this is a copy of an article titled Top Utah

 3       GOP lawmaker accused of skirting state laws on

 4       campaign finance disclosures, by Bryan Schott,

 5       published on Utah Political Watch's website on

 6       December 12th, 2024.

 7                Do you know what this document is?

 8       A.    Yes.

 9       Q.    Have you read this article before?

10       A.    Yes.

11       Q.    Did you review or edit this article before

12       it was published?

13       A.    Yes.

14       Q.    And what exactly did your editing look

15       like on this article?

16       A.    As we've -- everything that we've already

17       talked about.

18       Q.    So just grammar and clarity and the

19       stylistic aspect of the writing?

20       A.    No, more than that.

21       Q.    What was the "more than that"?

22       A.    Again, sourcing, timing, that kind of

23       stuff.

24       Q.    If I could direct you to the second page

25       and the second-to-last paragraph beginning with
```

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1254    Page
Appellate Case: 25-4124    Document 38 of 73    Date Filed: 12/18/2025    Page: 149

Marissa Morrell                                      March 27, 2025

Page 37

1        "Emails shared."  If you could please read that

2    paragraph --

3            A.    Sure.

4            Q.    -- aloud.

5            A.    "Emails shared with Utah Political Watch

6    reveal that Adams was given conflicting information

7    about whether his reports were in compliance or not.

8    While it's true he was told his reports did not

9    violate the law, Adams was also informed on three

10   separate occasions that listing a credit card company

11   as a payee was not allowed."

12           Q.    Did you review those emails that were

13   shared with Utah Political Watch?

14           A.    Some of them.  Sorry.  I spoke over you.

15   Some of them.

16           Q.    And did you review those emails before

17   this article was published?

18           A.    Yes.

19           MS. CORBELLO:  David, if you are going to

20   ask a lot more questions about this article, can we

21   take the break or are you almost done with it?

22           MR. VITAGLIANO:  I just have two or three

23   more quick questions.

24           MS. CORBELLO:  Okay.

25           Q.    (BY MR. VITAGLIANO)  On page 4, if you

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1255    Page
Appellate Case: 25-4124    Document 39 of 73    Date Filed: 12/18/2025    Page: 150

Melissa Morrell                                              March 27, 2025

Page 38

1     could please read aloud in the center of the page, in

2     parentheses, that begins with "This story."

3              A.    Yes.

4                    "This story has been updated to include

5     the response from Adams and his email exchanges with

6     the lieutenant governor's office."

7              Q.    So those emails, were they obtained after

8     this story was initially published?

9              A.    I -- I would not want to -- I can't

10    remember.

11             Q.    But once those emails were obtained, you

12    then reviewed them?

13             A.    Yes.

14             Q.    And you reviewed an updated draft of this

15    article before the update was published?

16             A.    To my memory, yes.

17                   MR. VITAGLIANO:  We can take our break.

18                   MS. CORBELLO:  Okay.

19                   (A break was taken from 9:40 a.m. to

20                   9:48 a.m.)

21                   MR. VITAGLIANO:  The time is 9:48, 20

22    minutes left.  It shouldn't be an issue.

23                   (EXHIBIT 4 WAS MARKED.)

24             Q.    Ms. Morrell, I'm handing you what we will

25    mark as Exhibit 4.  Can you please review this?

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1256    Page
Appellate Case: 25-4124    Document: 40 of 73    Date Filed: 12/18/2025    Page: 151

Marissa Morrell                                                    March 27, 2025

Page 39

             1                  For the record, this is a copy of an

             2        article titled Utah GOP Senator:  Media rule change

             3        meant to show journalist "Who's the boss," by

             4        Bryan Schott, published on Utah Political Watch's

             5        website on March 24th, 2025.

             6                  Do you know what this document is?

             7        A.    Yes.

             8        Q.    You've seen it before?

             9        A.    Yes.

            10        Q.    Did you review or edit this article before

            11        it was published?

            12        A.    Yes.

            13        Q.    And what did that review and editing

            14        entail?

            15        A.    Everything we've spoken about.  So

            16        sourcing, timing, grammar, flow.

            17        Q.    When you say sourcing, could you just

            18        elaborate on that?

            19        A.    I think the sources in here in this story

            20        have to do with mostly the recording.

            21        Q.    I'll just note for the record that

            22        Mr. Schott has entered the room and he was in the

            23        room for the first portion before the break.

            24                  Now, about that recording that you

            25        mentioned, did you listen to the audio recording

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1257    Page
Appellate Case: 25-4124    Document: 41 of 73    Date Filed: 12/18/2025    Page: 152

Marissa Morrell                                    March 27, 2025

Page 40

 1    before this edit -- or this piece was published?

 2         A.    Yes.

 3         Q.    Did you listen to the full recording or

 4    only the clip that was included in the article?

 5         A.    I think the full.  I heard things that

 6    aren't listed here.

 7         Q.    Did you advise Mr. Schott to edit out the

 8    part of the recording that says he was fired from The

 9    Salt Lake Tribune last year?

10         A.    No.

11         Q.    Did you advise Mr. Schott to edit out the

12    part of the recording that says he is not with one of

13    the established papers?

14         A.    No.

15         Q.    Did you advise Mr. Schott to edit out the

16    part of the recording that says most people that are

17    credentialed are with a legitimate news source and he

18    was fired from a legitimate news source?

19         A.    No.

20         Q.    Mr. Schott made all of those editorial

21    decisions for what to include in this clip in this

22    article?

23         A.    Correct.

24         Q.    Thank you.

25              (EXHIBIT 5 WAS MARKED.)

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1258    Page
Appellate Case: 25-4124    Document 42 of 73    Date Filed: 12/18/2025    Page: 153

Melissa Morrell                                March 27, 2025

Page 41

1              I am handing you what we will mark as

2        Exhibit 5.

3              A.    Thank you.

4              Q.    Can you please review this?

5              For the record, this is a copy of an

6        article titled Utah Legislature quietly changes press

7        rules, shutting out independent media by Bryan

8        Schott, published on Utah Political Watch's website

9        on December 17th, 2024.

10             Do you know what this document is?

11             A.    Yes.

12             Q.    Did you review or edit this article before

13       it was published?

14             A.    Yes.

15             Q.    And more of the same type of review and

16       editing that we've discussed so far today?

17             A.    Yes.

18             Q.    Could you please read aloud the paragraph

19       on the second page that begins with "The policy for

20       approving credentials"?  It's the third paragraph up

21       from the bottom.

22             A.    Yes.

23             "The policy for approving credentials was

24       quietly revised last month shortly after I had

25       reached out to ask about adding Utah Political Watch

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1259    Page
Appellate Case: 25-4124    Document 43 of 73    Date Filed: 12/18/2025    Page: 154

Melissa Morrell    March 27, 2025

Page 42

 1      to the legislature's press release distribution list

 2      and the timeline for applying for a 2025 press badge.

 3      That email was sent on November 5th.  The metadata

 4      for the revised media credential policy says the

 5      document was created on November 24th."

 6          Q.    Did you verify that November 5th email

 7      before this article was published?

 8          A.    I knew of the email.  Are you wondering if

 9      I verified the date?

10          Q.    The date.  Did you read the email?

11          A.    Yes.

12          Q.    And you did that before this article was

13      published?

14          A.    Yes.

15          Q.    And did you review the metadata for the

16      revised media credential?

17          A.    No.

18              (EXHIBIT 6 WAS MARKED.)

19          Q.    Ms. Morrell, I'm handing you what we will

20      mark as Exhibit 6.  If you could please review that.

21              For the record, this is a copy of an

22      article titled Latest Utah tax cut plan:  Nearly

23      $2,000 for top one percent, $31 for average family,

24      by Bryan Schott, published on Utah Political Watch's

25      website on February 25th, 2025.

Marissa Morrell                                    March 27, 2025

Page 43

 1                Do you know what this document is?

 2         A.    Yes.

 3         Q.    Did you review or edit this article before

 4    it was published?

 5         A.    Yes.

 6         Q.    And what did that review and editing

 7    entail?

 8         A.    The same.

 9         Q.    Could you please read the last paragraph

10    on the first page aloud?

11         A.    "The 0.05 percent reduction would cost

12    $118 million next year, including $21 million in

13    one-time costs and $97 million every year after

14    that."

15         Q.    Did you verify those numbers before this

16    article was published?

17         A.    No.

18         Q.    And if you could please read the preceding

19    paragraph that begins, "On Tuesday morning."

20         A.    Sure.

21                "On Tuesday morning, the House Revenue and

22    Taxation Committee advanced a revised HB106 sponsored

23    by Representative Kay Christofferson.  The previous

24    version lowered Utah's corporate and income tax rate

25    by 0.1 percent from 4.55 to 4.45 percent.  The new

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1261    Page
Appellate Case: 25-4124    Document: 45 of 73    Date Filed: 12/18/2025    Page: 156

Melissa Morrell    March 27, 2025

Page 44

1      bill cuts the proposed tax reduction in half to

2      4.5 percent."

3            Q.    Did you review the previous version of the

4      bill discussed in that paragraph?

5            A.    No.

6            Q.    So did you verify those numbers that are

7      included in the paragraph?

8            A.    No, I don't remember doing that.

9            Q.    Did you review the revised version of the

10     bill that is mentioned in that paragraph?

11           A.    No.

12                 (EXHIBIT 7 WAS MARKED.)

13           Q.    I am handing you what we will mark as

14     Exhibit 7.  If you could please review that.

15                 For the record, this is a copy of an

16     article titled Lawmakers quietly gutted Utah's open

17     records law in final hours of 2025 legislature --

18           A.    Uh-huh (affirmative).

19           Q.    -- by Bryan Schott, published on Utah

20     Political Watch's website on March 13th, 2025.

21                 Do you know what this document is?

22           A.    Yes.

23           Q.    Did you review or edit this article before

24     it was published?

25           A.    Yes.

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1262    Page
Appellate Case: 25-4124    Document: 46 of 73    Date Filed: 12/18/2025    Page: 157
Marissa Morrell                                   March 27, 2025

Page 45

 1          Q.    If I could direct you to the second

 2     paragraph, and if you could just read the first

 3     sentence aloud.

 4          A.    Yes.

 5                "Buried at the bottom of HB394 is a

 6     provision that repeals 'intent language' that

 7     lawmakers included with Utah's Government Access and

 8     Records Management Act known as GRAMA.  Intent

 9     language is sometimes" -- oh, I was supposed to do

10     the first sentence.

11          Q.    Just the first sentence.  That's fine.

12     Thank you.

13                Did you review HB394 before this article

14     was published?

15          A.    Parts of it.

16          Q.    Parts of it?

17          A.    (Witness nods head.)

18          Q.    Do you remember which parts?

19          A.    No.

20          Q.    Did you review the bottom of it, the

21     specific provision that is referenced in this

22     paragraph?

23          A.    Yes.

24          Q.    And if you could please turn to the second

25     page.  If you could please read the third paragraph

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1263    Page
Appellate Case: 25-4124    Document: 47 of 73    Date Filed: 12/18/2025    Page: 158

Marissa Montel    March 27, 2025

Page 46

1    that begins with "I believe."

2            A.    Yes.

3                "'I believe this is a very significant

4    policy decision, and I am not comfortable voting to

5    strike that language, recognizing the right of the

6    public to know what we're doing and for their data to

7    be private,' Thatcher declared.  'I think this is a

8    serious policy call and I think we should reject

9    this.'"

10            Q.    And just to make clear for the record,

11    will you please read the preceding paragraph that

12    begins --

13            A.    Yes.

14                "Senator Daniel Thatcher warned that

15    deleting this section from the law was too much of a

16    change."

17            Q.    Did you review those quotes or verify

18    those quotes from Senator Daniel Thatcher before this

19    article was published?

20            MS. CORBELLO:  Objection.  Compound.

21            Q.    (BY MR. VITAGLIANO)  Did you -- sorry.

22    Withdrawn.

23                Did you verify those quotes from Senator

24    Daniel Thatcher before this article was published?

25            A.    I believe I heard them when they happened.

Case 2:25-cv-00050-RJS-CMR     Document 57-15     Filed 04/25/25     PageID.1264     Page
Appellate Case: 25-4124     Document: 48 of 73     Date Filed: 12/18/2025     Page: 159

Melissa Morrell                                    March 27, 2025

                                                      Page 47

 1          Q.    And when you say "when they happened,"

 2     could you please clarify that?

 3          A.    I was in the vicinity when the

 4     conversation occurred.

 5          Q.    Mr. Schott's conversation with

 6     Daniel Thatcher?

 7          A.    Yes.

 8          Q.    This was a conversation by telephone?

 9          A.    In my memory, if I'm not remembering that

10     wrong.

11          Q.    Do you know if Mr. Schott wrote down the

12     quotes from that conversation?

13          A.    I do not.

14          Q.    Do you know if he recorded the

15     conversation?

16          A.    I don't, but I do know that -- and I'm

17     sorry, I won't be able to say how often, but when he

18     records, he lets people know and -- so that's very

19     likely.

20          Q.    Do you listen to those recordings if they

21     are then used for an article?

22          A.    Sometimes.

23          Q.    How often, would you say?

24          A.    I don't know.

25                (EXHIBIT 8 WAS MARKED.)

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1265    Page
Appellate Case: 25-4124    Document 49 of 73    Date Filed: 12/18/2025    Page: 160
Marissa Morrell                                March 27, 2025

Page 48

1          Q.    I am handing you what we will mark as

2     Exhibit 8.  If you could please review that.

3               For the record, this is a copy of an

4     article titled, No such thing as a free lunch?  Utah

5     lawmakers were treated to dozens of free meals and

6     events, by Bryan Schott, published on Utah Political

7     Watch's website on March 11th, 2025.

8               Do you know what this document is?

9          A.    Yes.

10         Q.    Have you seen it before?

11         A.    Yes.

12         Q.    Did you review or edit this article before

13    it was published?

14         A.    Yes.

15         Q.     If I could direct you to the

16    second-to-last paragraph on the first page beginning

17    with "According to a schedule."  Could you please

18    read that sentence aloud?

19         A.    Yes.

20               "According to a schedule obtained by Utah

21    Political Watch, many of the sponsoring organizations

22    either had business before the legislature or were

23    special interest groups advocating for specific

24    legislation.  For instance, the Utah State Board of

25    Education, Snow College and Southern Utah University

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1266    Page
Appellate Case: 25-4124    Document 50 of 73    Date Filed: 12/18/2025    Page: 161

Melissa Morrell                                               March 27, 2025

Page 49

```
 1      depend on the legislature to set their annual

 2      budgets."

 3             Q.   Did you review this schedule before the

 4      article was published?

 5             A.   I don't know.

 6             Q.   Did you verify the unnamed source of this

 7      schedule before this article was published?

 8                  MS. CORBELLO:  Objection.  Vague.

 9                  THE WITNESS:  Verify?  Can you just define

10      "verify"?

11             Q.   (BY MR. VITAGLIANO)  Do you know where

12      Mr. Schott obtained this schedule from?

13             A.   Yes.

14             Q.   Do you know how he obtained it?

15                  MS. CORBELLO:  I'm going to object to the

16      extent it -- your answer goes to any sort of

17      reporter's privilege about obtaining sources or

18      private sources.

19                  If you can answer, go ahead otherwise.

20                  THE WITNESS:  I -- the question again was?

21             Q.   (BY MR. VITAGLIANO)  Do you know how he

22      obtained it?  I'm not asking you who he obtained

23      it --

24             A.   I don't remember.

25             Q.   -- from.
```

Melissa Morrell                                      March 27, 2025

Page 50

1              A.    No, I don't remember.

2                    (EXHIBIT 9 WAS MARKED.)

3              Q.    And I'm handing you what we will mark as

4        Exhibit 9.  If you could please review this.

5                    For the record, this is a copy of an

6        article entitled No such thing as a free lunch.  Utah

7        lawmakers were treated --

8                    MS. CORBELLO:  No.

9                    MR. VITAGLIANO:  Oh, I'm sorry.  My

10       apologies.

11             Q.    For the record, this is a copy of an

12       article titled Day 28:  Don't believe the hype, by

13       Bryan Schott, published on Utah Political Watch's

14       website on February 18th, 2025.  Apologize about

15       that.

16                   Do you know what this document is?

17             A.    Yes.

18             Q.    Have you seen this document before?

19             A.    I don't remember.

20             Q.    Did you review or edit this article before

21       it was published?

22             A.    I don't remember.  There were a lot of

23       these at that time.

24             Q.    But you don't recall specifically

25       reviewing and editing this one?

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1268    27 Page
Appellate Case: 25-4124    Document 52 of 73    Date Filed: 12/18/2025    Page: 163

Melissa Morrel                                      March 27, 2025

Page 51

```
 1              A.    I don't remember.

 2              Q.    If I could direct you to the second page,

 3      first paragraph.  Could you please read that aloud?

 4              A.    "The four percent increase"?

 5              Q.    Yes.

 6              A.    Okay.

 7                    "The four percent increase, amounting to

 8      approximately $180 million, is required under state

 9      law to cover inflationary costs to public schools,

10      calculated on a five-year rolling average.  Lawmakers

11      are also required to cover the cost of enrollment

12      growth, which adds about $21 million."

13              Q.    Did you verify those numbers before this

14      article --

15              A.    No.

16              Q.    -- was published?

17              A.    Sorry.  No.

18              Q.    If you could please read the third

19      paragraph on this page, beginning with "The public

20      education appropriations."

21              A.    "The public education appropriations

22      subcommittee is recommending a discretionary increase

23      to the WPU of just one percent, which amounts to

24      $43 million."

25              Q.    Did you verify those numbers, one percent
```

Marissa Morrell                                      March 27, 2025

Page 52

1    and $43 million?

2            A.    No.

3            Q.    When I showed you this document you said

4    there were a lot of these.  Could you please explain

5    what you meant by that?

6            A.    Yeah.

7                  The -- during the time that the

8    legislature was in session, there were extra editions

9    of the newsletter going out to some of the readers

10   for -- to just report on day-to-day legislature

11   information.

12           Q.    When the legislature is in session, is

13   Utah Political Watch busier than normal?

14           A.    We've done it once, but yes.

15           Q.    Is it fair to say that Utah Political

16   Watch was busier during the session than the time

17   before the session started --

18           A.    Busier.

19           Q.    -- and also the time after the session

20   concluded?

21           A.    More was being published.

22           Q.    And you did not review every newsletter

23   that was published?

24           A.    No.

25           Q.    Thank you.

Marissa Morrell                                    March 27, 2025

Page 53

1              A.     Uh-huh (affirmative).

2                     MR. VITAGLIANO:  That's all I have.

3                     MS. CORBELLO:  Okay.  We'll reserve.

4                     (Deposition concluded at 10:05 a.m.)

5                              * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Malissa Morrell                                                                    March 27, 2025

Page 54

```
 1                    REPORTER'S CERTIFICATE
 2      STATE OF UTAH            )
                                 ) ss.
 3      COUNTY OF SALT LAKE      )
 4
                I, Dawn M. Perry, Certified Shorthand
 5      Reporter for the State of Utah, do hereby certify:
 6                That prior to being examined, the witness,
        MALISSA MORRELL, was by me duly sworn to tell the
 7      truth, the whole truth, and nothing but the truth;
 8                That said deposition was taken down by me
        in stenotype on March 27, 2025, at the place therein
 9      named, and was thereafter transcribed and that a true
        and correct transcription of said testimony is set
10      forth in the preceding pages.
11                I further certify that, in accordance with
        Rule 30(e), a request having been made to review the
12      transcript, a reading copy was sent to Courtney
        Corbello, Attorney at Law, for the witness to read
13      and sign under penalty of perjury and then return to
        me for filing with Daniel M. Vitagliano, Attorney at
14      Law.
15                I further certify that I am not kin or
        otherwise associated with any of the parties to said
16      cause of action and that I am not interested in the
        outcome thereof.
17
                  WITNESS MY HAND this 4th day of April,
18      2025.
19
20                        Dawn M. Perry
21
22                        Dawn M. Perry, CSR
23
24
25
```

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1272    Page
Appellate Case: 25-4124    Document: 57-3    Date Filed: 12/18/2025    Page: 167

Malissa Morrell                                                    March 27, 2025
56 of 73

Page 55

 1    Courtney Corbello, Esquire

 2    cc@ifs.org

 3                        April 4, 2025

 4    RE:Utah Political Watch Inc Et Al v. Musselman, Alexa Et Al

 5        3/27/2025, Malissa  Morrell (#7275655)

 6        The above-referenced transcript is available for

 7    review.

 8        Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    clientservices-va@veritext.com

16     Return completed errata within 30 days from

17    receipt of testimony.

18      If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 56

```
 1    Utah Political Watch Inc Et Al v. Musselman, Alexa Et Al

 2    Malissa  Morrell (#7275655)

 3               E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Malissa  Morrell                              Date

25
```

Malissa Morrell                                            March 27, 2025

Page 57

1    Utah Political Watch Inc Et Al v. Musselman, Alexa Et Al

2    Malissa  Morrell (#7275655)

3                ACKNOWLEDGEMENT OF DEPONENT

4        I, Malissa  Morrell, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Malissa  Morrell                    Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1275    27  Page
Appellate Case: 25-4124    Document: 59 of 73    Date Filed: 12/18/2025    Page: 170

Melissa Morrell    March 27, 2025
[0.05 - advocating]    Page 1

**0**

**0.05**  43:11
**0.1**  43:25
**00050**  1:6
**09**  8:5

**1**

**1**  3:7 8:10,12
**100**  1:22
**10:05**  53:4
**1150**  2:5
**118**  43:12
**11th**  48:7
**12th**  12:9,16,16
  36:6
**13th**  44:20
**1600**  2:11
**17th**  41:9
**180**  51:8
**18th**  50:14

**2**

**2**  3:8 8:18 22:6
  22:15,17
**2,000**  3:17
  42:23
**20**  38:21 57:15
**20036**  2:6
**2005**  8:9
**2008**  8:5
**2011**  12:9
**2012**  13:4
**202**  2:6
**2020**  13:14
**2024**  20:9,10
  26:25 27:2,5
  36:6 41:9

**2025**  1:19 3:20
  5:18 39:5 42:2
  42:25 44:17,20
  48:7 50:14
  54:8,18 55:3
**21**  43:12 51:12
**22**  3:8
**22209**  2:12
**243-9423**  2:12
**24th**  39:5 42:5
**258-7086**  2:17
**25th**  42:25
**26849**  54:21
**27**  1:19 54:8
**28**  3:24 50:12
**2:25**  1:6

**3**

**3**  3:10 8:18
  35:20,22
**3/27/2025**  55:5
**30**  54:11 55:16
**301-3300**  2:6
**31**  3:17 42:23
**35**  3:10
**38**  3:12
**385**  2:17

**4**

**4**  3:3,12 37:25
  38:23,25 55:3
**4.45**  43:25
**4.5**  44:2
**4.55**  43:25
**40**  3:14
**401**  22:10
**42**  3:16
**43**  51:24 52:1

**44**  3:19
**45**  6:4
**47**  3:21
**4th**  54:17

**5**

**5**  3:14 40:25
  41:2
**50**  3:24
**5th**  42:3,6

**6**

**6**  3:16 42:18,20

**7**

**7**  3:19 44:12,14
**700**  2:11
**703**  2:12
**7275655**  55:5
  56:2 57:2

**8**

**8**  3:7,21 47:25
  48:2
**801**  2:5
**84114**  2:17
**8:58**  1:19

**9**

**9**  3:24 50:2,4
**97**  43:13
**9:40**  38:19
**9:48**  38:20,21

**a**

**a.m.**  1:19 38:19
  38:20 53:4
**abby**  1:12
**able**  47:17
**above**  55:6
  57:7

**access**  45:7
**accessed**  27:7
**accordance**
  54:11
**account**  25:18
  25:24 27:8
**accuracy**  17:10
  19:11 28:4
  55:9
**accused**  3:10
  36:3
**acknowledge...**
  57:3
**acknowledg...**
  55:12
**acquainted**  6:9
**act**  45:8
**action**  30:15
  54:16
**actual**  27:13
**actually**  16:2
**adams**  37:6,9
  38:5
**adding**  41:25
**additional**  8:19
**additions**  57:6
**address**  16:20
  25:5,10 26:16
  27:2
**adds**  51:12
**adjunct**  7:22
**advanced**
  43:22
**advise**  40:7,11
  40:15
**advised**  32:16
**advocating**
  48:23

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1276    Page
Appellate Case: 25-4124    Document: 28    Date Filed: 12/18/2025    Page: 171

Marissa Mortell    March 27, 2025
60 of 73

[affirmative - breaks]                                             Page 2

| | | | **b** |
|---|---|---|---|

**affirmative**
  12:22 15:10
  35:9 44:18
  53:1
**agencies** 8:7
**ahead** 4:11
  19:25 49:19
**ahouston** 2:18
**al** 55:4,4 56:1,1
  57:1,1
**alan** 2:15
**alexa** 1:7 55:4
  56:1 57:1
**allotted** 55:19
**allowed** 37:11
**aloud** 37:4 38:1
  41:18 43:10
  45:3 48:18
  51:3
**alta** 1:21
**amounting**
  51:7
**amounts** 51:23
**angeles** 6:24
  8:4
**anniv** 12:16
**anniversary**
  12:17
**annual** 49:1
**anonymous**
  17:14
**answer** 4:24
  5:1,5,10 19:24
  19:25 20:18
  23:15 24:3
  27:17 35:2
  49:16,19

**anybody** 6:15
**apologies** 50:10
**apologize** 4:11
  50:14
**app** 26:10,12
**appended** 57:7
**applicable** 55:8
**applying** 42:2
**appointed** 7:17
**appropriaten...**
  14:15
**appropriations**
  51:20,21
**approving**
  41:20,23
**approximately**
  51:8
**april** 54:17
  55:3
**arlington** 2:12
**article** 3:10,12
  3:14,16,19,21
  3:24 14:18,19
  16:8 19:6
  28:11 29:2,9
  29:13 30:1,25
  31:6 36:2,9,11
  36:15 37:17,20
  38:15 39:2,10
  40:4,22 41:6
  41:12 42:7,12
  42:22 43:3,16
  44:16,23 45:13
  46:19,24 47:21
  48:4,12 49:4,7
  50:6,12,20
  51:14

**articles** 11:11
  11:21 19:1
  23:25 24:12,21
  24:24 25:1,17
  25:23 26:3,5
  27:23,25 28:8
  31:9,15
**asking** 49:22
**aspect** 36:19
**aspects** 32:1
**assist** 15:24
  17:1,25 18:2,5
  33:12,16,19
**assistant** 7:16
  7:18,19,21
  10:24
**assisting** 13:9
  14:25
**associate** 2:16
**associated**
  16:20 54:15
**attached** 55:11
**attorney** 2:10
  5:4 54:12,13
  55:13
**attorneys** 2:4
**audible** 4:23
  27:17
**audio** 33:11,23
  34:10,11 39:25
**august** 20:8
  26:25
**aundrea** 1:10
**available** 55:6
**ave** 2:5
**average** 3:17
  42:23 51:10

**b** 3:5
**bachelor's** 7:2
  7:3
**back** 14:18
**background**
  14:15 17:13
**badge** 42:2
**ballpark** 29:5,7
  31:12 35:16
**basically** 20:3
**beginning**
  36:25 48:16
  51:19
**begins** 38:2
  41:19 43:19
  46:1,12
**believe** 3:24
  10:24 46:1,3
  46:25 50:12
**benefits** 22:9
**best** 5:2 15:18
**bettmann** 7:16
**bill** 28:17 44:1
  44:4,10
**blanking** 32:7
**board** 48:24
**boss** 3:13 39:3
**bottom** 41:21
  45:5,20
**boulevard** 2:11
**break** 5:8,11
  35:24 37:21
  38:17,19 39:23
**breakout** 28:24
**breaks** 5:8

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1277    Page
Appellate Case: 25-4124    Document: 61 of 73    Date Filed: 12/18/2025    Page: 172

Melissa Morrell    March 27, 2025

[brigham - corbello]    Page 3

| | | | |
|---|---|---|---|
| **brigham** 7:5 | **cecilia** 1:8 | **clarify** 10:5,11 | **compound** |
| **bring** 6:11 15:8 | **center** 38:1 | 24:17 28:14 | 46:20 |
| **bryan** 1:4 2:20 | **central** 1:2 | 32:3 47:2 | **concluded** |
| 5:17 12:8 36:4 | **certain** 17:17 | **clarity** 14:8 | 52:20 53:4 |
| 39:4 41:7 | 26:9 | 27:15,23 36:18 | **conflict** 19:14 |
| 42:24 44:19 | **certificate** 54:1 | **clear** 46:10 | **conflicting** |
| 48:6 50:13 | **certifications** | **clientservices** | 37:6 |
| **budgets** 49:2 | 9:21,24 | 55:15 | **connected** 11:4 |
| **building** 26:18 | **certified** 54:4 | **clinical** 9:13 | **connecticut** 2:5 |
| **buried** 45:5 | **certify** 54:5,11 | **clip** 33:22 40:4 | **consider** 21:11 |
| **busier** 52:13,16 | 54:15 | 40:21 | 23:12 |
| 52:18 | **change** 3:13 | **clips** 34:7 | **considering** |
| **business** 48:22 | 39:2 46:16 | **clock** 5:9 | 15:4 |
| **c** | 56:4,7,10,13 | **club** 1:21 | **consovoy** 2:10 |
| | 56:16,19 | **cmiller** 2:7 | 4:8 |
| **c** 2:1 4:1 | **changes** 3:15 | **cmr** 1:6 | **consovoymc...** |
| **calculated** | 41:6 55:10 | **college** 48:25 | 2:13 |
| 51:10 | 57:6 | **come** 15:3 | **consulting** 13:9 |
| **calendar** 14:7 | **charles** 2:3 | **comfortable** | 14:2 |
| 15:9,21 18:6 | **chart** 16:20 | 46:4 | **content** 12:1 |
| 32:14 33:20 | **check** 17:10 | **committee** | 34:17 |
| 34:22 | 25:12,13 | 29:14,15 43:22 | **contract** 21:23 |
| **calendars** 24:6 | **checking** 19:11 | **communicate** | **conversation** |
| **call** 46:8 | 28:3 | 28:13 | 47:4,5,8,12,15 |
| **called** 4:3 6:23 | **chief** 1:11,13 | **communicati...** | **conversations** |
| 7:3 11:19 | 1:14 | 1:9 | 23:11 30:13 |
| **calls** 24:1 | **chip** 6:1 | **company** 10:9 | **copies** 30:18 |
| **campaign** 3:11 | **christofferson** | 37:10 | 55:14 |
| 36:4 | 43:23 | **compensated** | **copy** 8:14 |
| **capacities** 1:15 | **circumstances** | 21:25 | 22:18 30:16 |
| **capacity** 12:24 | 20:11,19 | **complete** 5:13 | 36:2 39:1 41:5 |
| 13:6 | **cite** 28:10 | 57:8 | 42:21 44:15 |
| **capitol** 2:16 | **cited** 28:7 29:2 | **completed** | 48:3 50:5,11 |
| **card** 37:10 | **citing** 17:17 | 55:16 | 54:12 |
| **case** 1:6 5:16 | **city** 1:23 2:17 | **complex** 2:16 | **corbello** 2:3 |
| **cause** 54:16 | **clarification** | **compliance** | 10:4 19:22,24 |
| **cc** 2:7 55:2 | 5:3 24:9 | 37:7 | 20:15,23 24:1 |
| | | | 32:2 35:1 |

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1278   27   Page
Appellate Case: 25-4124    Document: 62 of 73    Date Filed: 12/18/2025    Page: 173

Melissa Morrell                                                          March 27, 2025
[corbello - document]                                                          Page 4

37:19,24 38:18
46:20 49:8,15
50:8 53:3
54:12 55:1
**corporate**
43:24
**correct** 8:21
12:11,20 13:1
13:19 20:5
22:24,25 23:1
23:2 27:23
40:23 54:9
57:8
**corrections**
57:6
**cost** 43:11
51:11
**costs** 43:13
51:9
**counsel** 2:15,16
55:14
**county** 54:3
**couple** 4:22 9:8
35:3
**course** 4:15
**courses** 9:13,14
9:17
**court** 1:1 5:1
**courtney** 2:3
6:1 54:12 55:1
**cover** 51:9,11
**covering** 26:6
**created** 42:5
**credential** 5:17
42:4,16
**credentialed**
40:17

**credentials**
8:19 41:20,23
**credit** 37:10
**csr** 1:25 54:22
**currently** 6:19
12:2,18
**cut** 3:17 42:22
**cuts** 44:1
**cv** 1:6

**d**

**d** 3:1 4:1
**d.c.** 2:6
**daniel** 2:9 4:7
9:1 46:14,18
46:24 47:6
54:13
**data** 46:6
**date** 26:21,24
42:9,10 56:24
57:12
**david** 37:19
**dawn** 1:25 54:4
54:22
**day** 3:24 31:18
31:21 50:12
52:10,10 54:17
57:15
**days** 55:16
**dealing** 4:12
**dean** 7:20
**debate** 29:10
29:11
**december** 36:6
41:9
**decision** 46:4
**decisions** 15:13
40:21

**declare** 57:4
**declared** 46:7
**deemed** 57:6
**defendants**
1:16 2:8 4:8
**define** 49:9
**degree** 7:5
**deleting** 46:15
**denial** 5:16
**departments**
9:9
**departure**
20:12,20
**depend** 49:1
**deponent** 55:13
57:3
**deposed** 4:19
**deposing** 21:2
55:13
**deposition** 1:4
5:21 6:8,14
20:16 21:2
53:4 54:8
**deputy** 1:11
**describe** 19:2
22:12 23:24
**described** 16:4
**description** 3:6
**designee** 1:10
1:12
**difference**
19:20
**different** 11:25
15:17 17:14
18:24 25:8
**difficult** 4:25
**direct** 36:24
45:1 48:15

51:2
**directly** 25:21
**director** 1:9
**disagreement**
33:1
**disagreements**
31:22,25 32:5
32:10,13,22
**discipline**
11:17
**disclosures**
3:11 36:4
**discretionary**
51:22
**discuss** 24:9
32:20
**discussed** 6:14
8:25 29:13
41:16 44:4
**discusses** 29:9
**discussing**
17:17
**discussions**
16:13,14 20:24
**distribution**
42:1
**district** 1:1,2
**division** 1:2
**doctoral** 6:19
7:14
**document** 8:13
8:16,23 22:20
25:6 28:15,19
28:24 29:2
36:7 39:6
41:10 42:5
43:1 44:21
48:8 50:16,18

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1279    Page
Appellate Case: 25-4124    Document 63 of 73    Date Filed: 12/18/2025    Page: 174

Melissa Morrell    March 27, 2025
[document - feedback]    Page 5

52:3
**documents** 6:7
  6:11
**doing** 11:2 14:2
  24:6 44:8 46:6
**dozens** 3:22
  48:5
**dr** 7:16
**draft** 16:23,25
  25:23 26:5
  27:22,25 28:8
  28:11,17 29:21
  30:24 38:14
**drafts** 16:15
  18:8,15,17,18
**dry** 4:12
**duly** 54:6
**dvitagliano**
  2:13

**e**

**e** 1:22 2:1,1 3:1
  3:5 4:1,1,17
  54:11 56:3,3,3
**edit** 16:6 18:8
  31:6,16 33:11
  33:22 34:7
  35:10 36:11
  39:10 40:1,7
  40:11,15 41:12
  43:3 44:23
  48:12 50:20
**edited** 11:11
  31:10
**editing** 9:18,24
  11:6,18 13:7
  15:25 16:15,18
  17:1 19:9 21:3

23:6,24 24:5
27:13 32:1
36:14 39:13
41:16 43:6
50:25
**editions** 52:8
**editor** 7:25
  10:15,19,21
  12:24 13:6,10
  13:12,17,18,20
  13:21 19:20
  20:3 21:9,14
  23:1,4 27:10
**editorial** 7:18
  10:24 14:7
  15:9,21 18:5
  24:6 32:14
  33:19 40:20
**editors** 17:22
  18:13,17 19:17
**edits** 18:19
  19:15,15 20:4
  31:23,24
**education** 6:17
  8:19 9:7 11:20
  48:25 51:20,21
**effects** 4:12
**either** 11:24
  48:22
**elaborate**
  14:11 15:1,11
  17:6 24:17
  28:9 30:19
  39:18
**email** 16:20
  25:2,4,5,10
  26:4 27:2
  30:10,25 38:5

42:3,6,8,10
**emails** 25:8,13
  30:11,17 37:1
  37:5,12,16
  38:7,11
**employed** 21:8
  21:9
**employee**
  20:17,21,22,24
  21:11 22:13
**employment**
  13:8 21:23
**enrollment**
  51:11
**entail** 39:14
  43:7
**entered** 39:22
**entitled** 50:6
**episodes** 33:13
**errata** 55:11,13
  55:16
**esquire** 55:1
**established**
  40:13
**et** 55:4,4 56:1,1
  57:1,1
**events** 3:23
  48:6
**everybody** 6:2
**exactly** 11:17
  13:5 16:17
  25:19 36:14
**examination**
  3:3 4:5
**examined** 4:4
  54:6
**example** 29:8
  35:8

**exchanges** 38:5
**excuse** 7:24
**exhibit** 3:7,8,10
  3:12,14,16,19
  3:21,24 8:10
  8:12 22:15,17
  35:20,22 38:23
  38:25 40:25
  41:2 42:18,20
  44:12,14 47:25
  48:2 50:2,4
**experience**
  8:20,24 10:1
  10:16,19,21
**experiential**
  11:19
**explain** 34:19
  52:4
**extent** 49:16
**extra** 52:8

**f**

**fact** 17:10
  19:10 28:3
**fails** 55:18
**fair** 52:15
**fairly** 8:23
**falls** 20:25
**familiar** 20:11
  21:5
**family** 3:18 7:1
  7:4,11 42:23
**far** 11:7 41:16
**february** 42:25
  50:14
**feedback** 17:3
  20:4 34:1,5,8

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1280    Page
64 of 73
Appellate Case: 25-4124    Document: 64    Date Filed: 12/18/2025    Page: 175

Melissa Morrell                              March 27, 2025

[figuring - include]                                                    Page 6

| | | | |
|---|---|---|---|
| **figuring** 15:16 | **free** 2:4 3:22,22 | **government** | 45:17 |
| **filing** 54:13 | 48:4,5 50:6 | 45:7 | **health** 22:9 |
| **filings** 6:9 | **freely** 33:2 | **governor's** | **hear** 33:25 |
| **final** 3:20 23:7 | **frequency** | 38:6 | **heard** 40:5 |
| 23:19 32:24 | 15:16 | **grad** 7:4 8:8 | 46:25 |
| 44:17 | **fruition** 15:8 | **graduated** 8:8 | **help** 15:7 35:23 |
| **finance** 3:11 | **full** 4:9 40:3,5 | **grama** 45:8 | **helping** 14:7 |
| 36:4 | **further** 54:11 | **grammar** 17:5 | **hereto** 57:7 |
| **fine** 45:11 | 54:15 | 24:11 27:14,23 | **highest** 6:17 |
| **finish** 5:10 | | 36:18 39:16 | **hold** 9:20,23 |
| 27:19 35:2 | **g** | **grammatical** | 12:14 33:11 |
| **fired** 40:8,18 | | 16:2 | **hon** 1:7,8 |
| **first** 4:3 5:22 | **g** 4:1 | **ground** 4:23 | **hour** 5:7 |
| 27:7 39:23 | **gaps** 17:8 | 26:19 | **hours** 3:20 |
| 43:10 45:2,10 | **general** 2:15,16 | **groups** 48:23 | 21:19,21 44:17 |
| 45:11 48:16 | 29:5 34:10 | **growth** 51:12 | **house** 1:8,12 |
| 51:3 | **getting** 25:21 | **gutted** 3:19 | 43:21 |
| **five** 21:21 | **give** 5:12 15:5 | 44:16 | **houston** 2:15 |
| 31:17 51:10 | 17:3 18:14 | **guys** 35:3 | **huh** 6:6 12:22 |
| **floor** 29:10,10 | **given** 5:7 37:6 | | 14:22 15:10 |
| **flow** 14:8 15:25 | 57:9 | **h** | 21:15 35:9 |
| 16:3 17:5 | **gmail** 25:16,18 | | 44:18 53:1 |
| 24:11 39:16 | 25:24 | **h** 3:5 56:3 | **husband** 20:25 |
| **follows** 4:4 | **go** 4:22 5:8 | **half** 44:1 | **hype** 3:24 |
| **footage** 29:10 | 7:14 17:16 | **hand** 54:17 | 50:12 |
| 29:15,22 | 19:24 24:10 | **handing** 8:11 | |
| **foregoing** 57:5 | 29:1,21 49:19 | 22:16 35:21 | **i** |
| **formal** 13:7 | **goes** 20:16 | 38:24 41:1 | |
| 19:4 | 33:25 34:22 | 42:19 44:13 | **ideas** 14:6,21 |
| **formed** 26:20 | 49:16 | 48:1 50:3 | 15:1,18,21 |
| **forth** 54:10 | **going** 8:8 18:12 | **hang** 32:8 | 18:2 24:7 |
| **forwarded** | 20:18 24:21 | **happened** | 27:12 30:14 |
| 25:22 | 37:19 49:15 | 46:25 47:1 | 32:11,21 33:16 |
| **forwarding** | 52:9 | **happens** 25:8 | 34:22 |
| 25:8 | **good** 7:8 9:10 | **hb106** 43:22 | **identity** 31:3 |
| **four** 15:4 31:17 | **gop** 3:10,12 | **hb394** 45:5,13 | **ifs.org** 2:7,7 |
| 51:4,7 | 36:3 39:2 | **head** 11:1,10 | 55:2 |
| | **gosh** 8:4 23:10 | 24:22 26:11 | **include** 30:25 |
| | 34:15 | 27:16,18 31:19 | 38:4 40:21 |

| | | | |
|---|---|---|---|
| **included** 40:4 44:7 45:7 | **involve** 16:14 19:10 | 50:16 | **legislative** 2:15 5:17,18 29:9 29:13 |
| **includes** 30:1 | **involved** 15:6 | **known** 12:8 45:8 | |
| **including** 43:12 | **ish** 20:8 | **l** | **legislature** 3:14 3:20 12:6 41:6 44:17 48:22 49:1 52:8,10 52:12 |
| **income** 43:24 | **issue** 35:6 38:22 | **l** 4:16,17,17 | |
| **increase** 51:4,7 51:22 | **j** | **lake** 1:23 2:17 13:14 17:20,24 18:3,6,9 20:7 20:17,25 40:9 54:3 | |
| **independent** 3:15 41:7 | **j** 1:7 | | **legislature's** 42:1 |
| **independently** 17:16 29:22 30:14 | **journal** 7:18 11:5,7,18,19 11:22,25 | **language** 45:6 45:9 46:5 | **legitimate** 40:17,18 |
| **individual** 1:15 | **journalism** 9:15,21 10:17 | **largely** 9:2 | **level** 6:17 |
| **individuals** 29:25 | **journalist** 3:13 39:3 | **latest** 3:16 42:22 | **liaison** 1:10,12 |
| **infamous** 26:13 | **k** | **law** 2:4,10 3:19 37:9 44:17 46:15 51:9 54:12,14 | **licensed** 7:10 |
| **inflationary** 51:9 | **k** 22:10 | | **licensure** 7:9 |
| **informal** 17:22 | **kay** 43:23 | **lawmaker** 3:10 36:3 | **lieutenant** 38:6 |
| **informally** 18:11 | **kin** 54:15 | **lawmakers** 3:19,22 44:16 45:7 48:5 50:7 51:10 | **likely** 47:19 |
| **information** 14:16 30:5,9 37:6 52:11 | **kind** 15:7 36:22 | | **line** 56:4,7,10 56:13,16,19 |
| **informed** 37:9 | **knew** 42:8 | **laws** 3:11 36:3 | **list** 42:1 |
| **initially** 38:8 | **know** 5:9 8:16 12:15 15:15 19:16,19,19,21 20:1,6,13,14 22:20 25:7 26:17,21,21,22 27:3,6,7,11,14 31:11,14,20 34:15 35:5,13 36:7 39:6 41:10 43:1 44:21 46:6 47:11,14,16,18 47:24 48:8 49:5,11,14,21 | **lawyers** 5:22 6:15 | **listed** 22:24 23:1,3 40:6 |
| **instagram** 35:8 | | **le.utah.gov** 2:18 | **listen** 39:25 40:3 47:20 |
| **instance** 48:24 | | **left** 13:15 20:6 38:22 | **listening** 29:19 29:20 |
| **instances** 33:4 | | **legal** 55:23 | **listing** 37:10 |
| **institute** 2:4 | | **legally** 12:21 | **lists** 8:18 |
| **instruct** 20:18 | | **legislation** 48:24 | **live** 33:25 |
| **insurance** 22:10 | | | **location** 1:21 |
| **intent** 45:6,8 | | | **logic** 17:8 |
| **interest** 48:23 | | | **long** 6:3 8:2 11:2 12:8,13 13:3 21:16 26:15 |
| **interested** 54:16 | | | **look** 6:7 16:18 16:21 19:4 |

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1282    27    Page
Appellate Case: 25-4124    Document 66 of 73    Date Filed: 12/18/2025    Page: 177

Malissa Morrell                                                                March 27, 2025
[look - nodding]                                                                      Page 8

25:16 36:14
**looked** 25:20
**looking** 15:17
  24:8 25:14
**looks** 8:17 9:1
  9:10
**los** 6:24 8:4
**lot** 7:8 29:19
  37:20 50:22
  52:4
**lowered** 43:24
**loyola** 6:23
**lunch** 3:22 48:4
  50:6

### m

**m** 1:8,25 2:9
  4:16,17 54:4
  54:13,22
**made** 15:13
  18:16 40:20
  54:11 57:5
**make** 26:6 35:1
  46:10
**makes** 4:25
**making** 17:7
  24:6
**malissa** 1:5 3:2
  4:2,16 54:6
  55:5 56:2,24
  57:2,4,12
**malissamorre...**
  3:7
**malissamorre...**
  8:15
**manage** 23:6
**management**
  45:8

**managing** 23:3
**march** 1:19
  39:5 44:20
  48:7 54:8
**marital** 21:1
**mark** 1:13
  18:18 22:17
  35:21 38:25
  41:1 42:20
  44:13 48:1
  50:3
**marked** 8:10
  8:12 22:15
  35:20 38:23
  40:25 42:18
  44:12 47:25
  50:2
**marriage** 7:1
  7:10 12:17
**married** 12:10
  12:12,13,18,21
**marymount**
  6:23
**master's** 6:20
  6:22 8:8
**math** 31:13
**matters** 19:11
  20:17,21 28:4
**mccarthy** 2:10
  4:8
**meals** 3:23 48:5
**mean** 10:6 13:5
  16:11 19:16
  21:10 26:18
  28:14 34:9
**means** 25:14,15
  26:5

**meant** 3:13
  16:2 39:3 52:5
**media** 1:9,11
  3:13,15 10:2,9
  10:9,10 34:17
  39:2 41:7 42:4
  42:16
**meetings** 29:14
  29:15 30:13
**memory** 38:16
  47:9
**mentioned**
  7:14 9:12
  10:23 12:3
  13:25 14:10
  15:9,24 17:5
  17:21 24:6
  27:10,14,22
  39:25 44:10
**message** 30:6
  31:1
**messages** 30:7
  30:17
**met** 5:22 13:13
**metadata** 42:3
  42:15
**microphone**
  33:11
**miler** 2:3
**million** 43:12
  43:12,13 51:8
  51:12,24 52:1
**minutes** 6:4
  38:22
**missing** 9:5
**month** 26:2,23
  41:24

**morning** 43:19
  43:21
**morrell** 1:5 3:2
  4:2,16,19 8:11
  22:16 38:24
  42:19 54:6
  55:5 56:2,24
  57:2,4,12
**mouth** 4:12,13
**multiple** 16:12
**musselman** 1:7
  55:4 56:1 57:1

### n

**n** 2:1 3:1 4:1
**name** 4:9
**named** 54:9
**narrative** 24:2
**nearly** 3:17
  42:22
**necessarily**
  13:17
**necessary** 57:6
**need** 4:13,23
  5:3,8 9:1
**needs** 24:8
**never** 25:20
**new** 15:14
  43:25
**news** 40:17,18
**newsletter** 52:9
  52:22
**newspaper**
  10:12
**night** 5:23
**nodded** 27:18
**nodding** 4:24

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1283    27    Page
Appellate Case: 25-4124    Document 67 of 73    Date Filed: 12/18/2025    Page: 178

Melissa Morrell                                               March 27, 2025
[nods - plaintiffs]                                                    Page 9

**nods** 11:1,10 24:22 26:11 27:16 31:19 45:17
**non** 15:6
**normal** 52:13
**normally** 24:20
**notary** 57:13 57:19
**note** 9:6 39:21 55:10
**noted** 57:7
**november** 12:9 27:4 42:3,5,6
**number** 14:14 17:12
**numbers** 43:15 44:6 51:13,25
**nw** 2:5

**o**

**o** 4:1,17
**object** 5:4 49:15
**objection** 5:4 10:4 19:22 20:15 24:1 32:2 46:20 49:8
**obtain** 6:21
**obtained** 38:7 38:11 48:20 49:12,14,22,22
**obtaining** 49:17
**occasions** 37:10

**occupation** 7:7
**occurred** 47:4
**october** 27:2
**offer** 34:1
**office** 38:6
**official** 1:15 13:18,21 19:15 19:17 25:5 27:1,8
**oh** 6:4 9:8 16:7 23:10 26:14,17 27:19 28:16 34:15 45:9 50:9
**okay** 4:22 5:24 6:21,25 7:7,23 9:3,11 10:14 11:14 12:10 13:11 17:24 20:2,6 24:20 30:24 34:13,25 37:24 38:18 51:6 53:3
**once** 35:18 38:11 52:14
**open** 3:19 44:16
**opinion** 11:24 19:20
**organization** 14:1 21:24
**organizational** 16:19
**organizations** 48:21
**osborne** 1:12
**osteen** 7:20

**outcome** 54:16
**outlet** 15:15
**outside** 20:15 21:1
**owner** 14:1

**p**

**p** 2:1,1 4:1
**pace** 15:16
**page** 3:2,6,7,8 8:15 22:19 36:24 37:25 38:1 41:19 43:10 45:25 48:16 51:2,19 56:4,7,10,13 56:16,19
**pages** 8:18 34:17 54:10
**paid** 11:14,16
**papers** 40:13
**paragraph** 36:25 37:2 41:18,20 43:9 43:19 44:4,7 44:10 45:2,22 45:25 46:11 48:16 51:3,19
**parentheses** 38:2
**part** 7:16 40:8 40:12,16
**particular** 9:5
**parties** 54:15
**parts** 45:15,16 45:18
**pause** 5:9

**paycheck** 22:3
**payee** 37:11
**peer** 7:18 11:4 11:7,23 12:3
**penalty** 54:13
**pending** 5:10
**people** 40:16 47:18
**percent** 3:17 42:23 43:11,25 43:25 44:2 51:4,7,23,25
**perjury** 54:13
**perry** 1:25 54:4 54:22
**person** 24:21 24:24 26:3
**personal** 25:24
**personally** 28:12 30:6,10
**perspective** 15:6
**peterson** 1:10
**ph.d.** 8:25 10:25
**philip** 7:20
**phone** 30:22
**physically** 30:22
**piece** 40:1
**pieces** 15:14 18:12
**place** 24:16 29:18 54:8
**places** 7:13
**plaintiffs** 1:5 2:2

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1284    Page
Appellate Case: 25-4124    Document: 68 of 73    Date Filed: 12/18/2025    Page: 179
Melissa Mortell    March 27, 2025

[plan - question]                                                        Page 10

**plan** 3:17 15:18 42:22
**plans** 24:7
**play** 13:23 33:6 34:16
**please** 4:9 8:12 14:11 15:1,11 17:6 22:17 30:20 37:1 38:1,25 41:4 41:18 42:20 43:9,18 44:14 45:24,25 46:11 47:2 48:2,17 50:4 51:3,18 52:4
**pllc** 2:10
**podcast** 33:7 33:13,14,17,20 33:23
**policy** 13:24 15:22 16:5 17:11 21:3 41:19,23 42:4 46:4,8
**political** 1:3 3:8 5:18 8:1 10:8,15,20 12:2,5,7,25 21:4,6,8,12,16 21:20,22,25 22:4,7,10,13 22:19 23:15,25 25:5,11 26:16 26:20 27:1,8 27:11 31:7,9 31:16 32:19,20 33:7 36:5 37:5

37:13 39:4 41:8,25 42:24 44:20 48:6,21 50:13 52:13,15 55:4 56:1 57:1
**politics** 15:6
**portion** 39:23
**portions** 26:7
**position** 11:14 21:14
**post** 35:14
**posts** 35:7
**practice** 7:25 8:3
**preceding** 43:18 46:11 54:10
**preparation** 7:5
**prepare** 5:21 6:3,7
**prepared** 5:25
**present** 2:19
**press** 3:15 5:17 41:6 42:1,2
**presumably** 5:7
**pretty** 9:10
**previous** 43:23 44:3
**primary** 7:7
**prior** 10:7,14 10:19,22 12:24 54:6
**private** 7:25 8:3 20:16,21 20:24 46:7 49:18

**privilege** 21:1 49:17
**probably** 6:4 13:4 16:13 18:23 21:21 31:17 32:15 35:15
**problem** 4:15
**proceedings** 29:9,14
**process** 16:18 19:9 23:24 24:5
**producing** 34:16
**product** 14:8 16:1 23:20,21 27:13
**production** 33:7
**professional** 9:20,23 10:1 10:16,21 13:10 13:12
**professionally** 10:9
**professor** 7:22
**program** 8:25 10:25 11:4
**proposed** 44:1
**provide** 5:16 26:23 27:17 30:16
**provision** 45:6 45:21
**prudence** 32:21

**psychotherapy** 7:9 9:13
**public** 28:15 46:6 51:9,19 51:21 57:19
**publication** 10:12 15:17,19
**publications** 12:1
**publish** 11:22 32:17 33:2
**published** 15:14 16:8 18:9 19:7 23:25 24:13 33:24 36:5,12 37:17 38:8,15 39:4,11 40:1 41:8,13 42:7 42:13,24 43:4 43:16 44:19,24 45:14 46:19,24 48:6,13 49:4,7 50:13,21 51:16 52:21,23
**publishes** 31:7
**publishing** 33:2
**pull** 28:11 29:1 29:22
**pursuant** 21:23
**put** 19:4

**q**

**qualifications** 8:24
**question** 5:10 5:11 7:8 27:20

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1285    Page
Appellate Case: 25-4124    Document 69 of 73    Date Filed: 12/18/2025    Page: 180

Melissa Morrell                                              March 27, 2025
[question - romero]                                                      Page 11

35:2 49:20
**questions** 5:2
15:7 20:19
27:12 37:20,23
**quick** 37:23
**quietly** 3:15,19
41:6,24 44:16
**quotes** 30:1,2
46:17,18,23
47:12

**r**

**r** 2:1 4:1,17,17
56:3,3
**rate** 43:24
**reached** 41:25
**read** 16:25
17:9 18:12,14
18:15 27:14
36:9 37:1 38:1
41:18 42:10
43:9,18 45:2
45:25 46:11
48:18 51:3,18
54:12 55:9
57:5
**readable** 17:7
**readers** 52:9
**reading** 54:12
**really** 4:24
**reason** 5:12
55:11 56:6,9
56:12,15,18,21
**recall** 50:24
**receipt** 55:17
**receive** 22:3,6
22:9 25:23

**received** 6:18
**receives** 30:5,9
**recognizing**
46:5
**recommenda...**
19:18
**recommending**
51:22
**record** 4:7,10
5:1 8:14 14:16
17:13 22:18
34:4 36:2 39:1
39:21 41:5
42:21 44:15
46:10 48:3
50:5,11
**recorded** 47:14
**recording**
33:23 34:8
39:20,24,25
40:3,8,12,16
**recordings**
34:3 47:20
**records** 3:19
44:17 45:8
47:18
**redline** 18:18
**reduction**
43:11 44:1
**referenced**
45:21 55:6
**reject** 46:8
**related** 9:13
**release** 42:1
**remember** 9:19
32:9,15 38:10
44:8 45:18
49:24 50:1,19

50:22 51:1
**remembering**
32:7 47:9
**repeals** 45:6
**repeat** 4:14
**report** 52:10
**reported** 17:11
19:12 28:4
**reporter** 1:25
5:1 14:13 54:5
**reporter's**
49:17 54:1
**reporting**
13:24
**reports** 31:4
37:7,8
**repost** 34:23
**represent** 8:23
**representative**
43:23
**representatives**
1:8,13
**request** 54:11
**required** 5:5
51:8,11 57:13
**research** 2:15
7:15,19 11:24
17:15
**reserve** 53:3
**respect** 33:20
**response** 4:23
34:8 38:5
**return** 54:13
55:13,16
**reveal** 37:6
**revenue** 43:21
**review** 7:18
8:12 11:7 16:6

16:17 18:8,21
19:6,9 22:17
24:10,13,18,24
25:18 27:22,25
28:7,9,9,11
29:2,10,14,23
30:6,10 31:6
33:22 36:1,11
37:12,16 38:25
39:10,13 41:4
41:12,15 42:15
42:20 43:3,6
44:3,9,14,23
45:13,20 46:17
48:2,12 49:3
50:4,20 52:22
54:11 55:7
**reviewed** 11:4
11:23 12:3
38:12,14
**reviewing**
15:25 16:14
24:7 26:3 28:1
50:25
**revised** 41:24
42:4,16 43:22
44:9
**right** 11:8
24:25 46:5
**rjs** 1:6
**robert** 1:7
**role** 13:23
14:25 17:19
18:24 33:6,9
34:16,18,19
**rolling** 51:10
**romero** 1:8

Case 2:25-cv-00050-RJS-CMR     Document 57-15     Filed 04/25/25     PageID.1286     27     Page
Appellate Case: 25-4124     Document: 70 of 73     Date Filed: 12/18/2025     Page: 181

Melissa Mortel                                                                                    March 27, 2025
[room - sourcing]                                                                                    Page 12

| | | | |
|---|---|---|---|
| **room** 5:24<br>39:22,23<br>**rule** 3:13 39:2<br>54:11<br>**rules** 3:15 4:23<br>41:7<br><br>**s**<br><br>**s** 2:1 3:5 4:1,16<br>4:16 56:3<br>**safe** 31:8<br>**salary** 21:10<br>**salt** 1:23 2:17<br>13:13 17:20,24<br>18:3,6,9 20:7<br>20:17,24 40:9<br>54:3<br>**saying** 17:14<br>**says** 40:8,12,16<br>42:4<br>**schaefer** 7:16<br>**schedule** 48:17<br>48:20 49:3,7<br>49:12<br>**school** 7:5<br>**schools** 51:9<br>**schott** 1:4 2:20<br>5:17 6:2 12:8<br>12:23 13:16<br>14:13 16:5<br>20:6,17 23:3,6<br>23:8,12,16,18<br>24:12 25:17<br>28:10 30:5,9<br>31:7,23,25<br>32:6,11,14,16<br>32:23 34:4,7<br>35:7 36:4 39:4 | 39:22 40:7,11<br>40:15,20 41:8<br>42:24 44:19<br>47:11 48:6<br>49:12 50:13<br>**schott's** 13:23<br>34:17 47:5<br>**science** 7:4<br>12:4<br>**scientific** 11:5<br>11:23<br>**scope** 20:16<br>21:2<br>**second** 36:24<br>36:25 41:19<br>45:1,24 48:16<br>51:2<br>**section** 46:15<br>**secure** 26:7,9<br>**see** 14:5 15:15<br>**seen** 22:22<br>30:18,19 39:8<br>48:10 50:18<br>**segment** 34:9<br>**senate** 1:11,14<br>**senator** 3:12<br>39:2 46:14,18<br>46:23<br>**send** 18:13<br>24:12 25:1,17<br>**sending** 17:23<br>25:20,21 26:4<br>**sends** 29:21<br>30:24<br>**senior** 23:8<br>**sense** 18:16<br>**sent** 18:13 42:3<br>54:12 55:14 | **sentence** 45:3<br>45:10,11 48:18<br>**separate** 8:24<br>25:10,12 37:10<br>**separated**<br>12:19<br>**serious** 46:8<br>**serve** 13:5<br>**served** 12:23<br>**serving** 10:15<br>**session** 5:19<br>33:8 52:8,12<br>52:16,17,19<br>**sessions** 19:1<br>**set** 27:2,4 49:1<br>54:9<br>**several** 31:20<br>**share** 30:21<br>**shared** 30:12<br>37:1,5,13<br>**she'll** 35:5<br>**sheet** 55:11<br>**shelby** 1:7<br>**shorthand** 54:4<br>**shortly** 41:24<br>**show** 3:13<br>16:23,25 30:22<br>39:3<br>**showed** 52:3<br>**shutting** 3:15<br>41:7<br>**side** 4:12 6:2<br>**sign** 54:13<br>55:12<br>**signal** 26:13<br>**signature**<br>54:21 | **signed** 55:19<br>**significant** 46:3<br>**similar** 10:12<br>13:25 17:19<br>33:9 34:18,19<br>**similarly** 24:5<br>**sir** 13:22<br>**skirting** 3:10<br>36:3<br>**small** 21:24<br>**snow** 48:25<br>**social** 34:17<br>**solutions** 55:23<br>**sorry** 19:24<br>21:4 27:6,21<br>28:23 31:13<br>32:7 34:15,21<br>35:4,19 37:14<br>46:21 47:17<br>50:9 51:17<br>**sort** 7:4 13:25<br>14:8 15:15<br>19:10 28:3<br>33:6 49:16<br>**source** 28:10<br>28:11,13,14,24<br>30:1,10 40:17<br>40:18 49:6<br>**sources** 14:6,13<br>14:14,15 17:12<br>28:7 29:8,25<br>31:4 39:19<br>49:17,18<br>**sourcing** 14:5<br>14:10 15:20<br>17:25 24:9<br>27:11 30:14<br>32:6 33:12 |

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1287    27    Page
Appellate Case: 25-4124    Document: 71 of 73    Date Filed: 12/18/2025    Page: 182

Melissa Morrell
March 27, 2025

[sourcing - time]
Page 13

| | | | |
|---|---|---|---|
| 34:22 36:22 39:16,17 | 16:12 | **surrounding** 20:12 | **texting** 26:8,9 |
| **south** 1:22 | **story** 14:6,18 14:20,25 15:17 15:21 18:2 24:7,7 27:12 32:11,21 33:16 38:2,4,8 39:19 | **sworn** 4:3 54:6 57:14 | **thank** 4:18 19:23 23:23 40:24 41:3 45:12 52:25 |
| **southern** 48:25 | | | |
| **speak** 14:6,20 | | **t** | **thatcher** 46:7 46:14,18,24 47:6 |
| **speaking** 29:25 | | **t** 3:5 56:3,3 | |
| **special** 33:7 48:23 | | **table** 6:2 | **therapist** 7:11 |
| **specific** 26:24 27:12 45:21 48:23 | **street** 1:22 | **take** 5:11 14:9 30:15 37:21 38:17 | **therapy** 7:1 |
| | **strike** 46:5 | | **thereof** 54:16 |
| | **student** 6:19 7:14 | **taken** 9:14,17 38:19 54:8 | **thing** 3:21 48:4 50:6 |
| **specifically** 5:5 17:4 50:24 | **study** 6:25 | **talk** 4:25 14:5 14:14 15:5 17:12 32:21 33:14 | **things** 7:9 14:4 15:4,20 16:22 17:5,11,14,17 17:23 24:10 25:9 29:20,22 34:23 40:5 |
| **speculation** 19:22 | **stuff** 14:3,16 16:3 34:24 36:23 | | |
| **speech** 2:4 | **stylistic** 36:19 | | |
| **spoke** 37:14 | **subcommittee** 51:22 | **talked** 33:10 35:3 36:17 | |
| **spoken** 39:15 | | **taught** 9:7 | **think** 8:5 12:15 12:15 15:7 17:4 18:16 24:25 29:7 32:22 33:5 39:19 40:5 46:7,8 |
| **sponsored** 43:22 | **subscribed** 57:14 | **tax** 3:16 42:22 43:24 44:1 | |
| **sponsoring** 48:21 | **suggested** 31:23,24 | **taxation** 43:22 | |
| **ss** 54:2 | **suite** 2:5,11 | **teach** 7:20,21 9:11 | |
| **staff** 1:11,13,14 3:8 22:19 | **superseded** 19:17 | **teaching** 7:21 | **third** 41:20 45:25 51:18 |
| **start** 7:13 26:18 | **supervisor** 23:13 | **telephone** 47:8 | **thomas** 1:14 |
| **started** 8:4 11:3 13:13 21:18 52:17 | **support** 14:2 24:9 | **tell** 5:6 26:19 54:6 | **three** 15:4 16:7 16:10,11,13 18:24,25,25 19:1 37:9,22 |
| | | **temple** 1:22 | |
| | **supposed** 12:15 45:9 | **testified** 4:4 | |
| **state** 2:16 3:11 4:9 7:10 36:3 48:24 51:8 54:2,5 | **sure** 4:11 14:12 15:2,12 17:7 24:4 25:19 26:6 32:4 35:1 35:25 37:3 43:20 | **testimony** 5:13 5:16 54:9 55:9 55:17 57:8 | **time** 4:11 5:22 6:5 7:4 15:3,19 16:12,22 22:1 25:16 27:7 28:21 31:20 |
| **states** 1:1 | | | |
| **stenotype** 54:8 | | **text** 30:6,6,17 30:25 | |
| **stories** 14:14 15:5,8 16:11 | | **texted** 26:7 | |

| | | | |
|---|---|---|---|
| 32:19 38:21 | treated 3:22 | undergrad 7:2 | 25:11 26:15,20 |
| 43:13 50:23 | 48:5 50:7 | understand | 27:1,8,11 31:7 |
| 52:7,16,19 | trib 18:16 | 5:15 20:23 | 31:9,16 32:19 |
| 55:18 | tribune 13:14 | united 1:1 | 32:20 33:7 |
| timeframe 55:8 | 13:15,16,20 | universities 9:8 | 36:2,5 37:5,13 |
| timeline 42:2 | 17:20,25 18:3 | 9:12 | 39:2,4 41:6,8 |
| times 13:7,8,11 | 18:6,10,22 | university 7:6 | 41:25 42:22,24 |
| 16:7,11 18:24 | 19:10,20 20:3 | 7:15,24 48:25 | 44:19 48:4,6 |
| 18:25 24:15,23 | 20:7,18,22,25 | unnamed 31:3 | 48:20,24,25 |
| 26:2 35:3,12 | 40:9 | 49:6 | 50:6,13 52:13 |
| timing 36:22 | tribune's 19:15 | unofficial | 52:15 54:2,5 |
| 39:16 | true 16:4 37:8 | 12:24 13:6,17 | 55:4 56:1 57:1 |
| titled 3:10,12 | 54:9 57:8 | 19:15 | utah's 3:19 |
| 3:14,16,19,21 | trump 20:3 | update 9:2 | 43:24 44:16 |
| 3:24 36:2 39:2 | truth 54:7,7,7 | 38:15 | 45:7 |
| 41:6 42:22 | truthful 5:13 | updated 38:4 | |
| 44:16 48:4 | try 7:20 | 38:14 | **v** |
| 50:12 | trying 15:18 | use 25:10,12 | v 55:4 56:1 |
| today 5:13 6:12 | 24:25 | 26:10 | 57:1 |
| 41:16 | tuesday 43:19 | used 47:21 | va 55:15 |
| together 16:22 | 43:21 | 55:19 | vague 10:4 |
| 24:20,24 31:20 | turn 14:9 45:24 | uses 14:13 | 32:2 49:8 |
| told 37:8 | twice 35:18 | usually 16:21 | varied 19:3 |
| top 3:10,17 | two 37:22 | 29:16,17 33:25 | varies 29:7 |
| 7:13 36:2 | type 11:25 | utah 1:2,3,7,10 | verbally 24:19 |
| 42:23 | 14:16 16:3 | 1:12,14,23 | verified 42:9 |
| training 9:14 | 41:15 | 2:17 3:8,10,12 | verify 17:10,16 |
| 9:17 11:8,9 | types 11:21 | 3:14,16,22 | 30:2 31:3 42:6 |
| trainings 8:19 | 14:3,4 | 5:18 7:10,15 | 43:15 44:6 |
| transcribed | | 7:24 8:1 10:8 | 46:17,23 49:6 |
| 54:9 | **u** | 10:15,20 12:2 | 49:9,10 51:13 |
| transcript | u 7:22 | 12:25 13:24 | 51:25 55:9 |
| 54:12 55:6,19 | uh 6:6 12:22 | 15:6,21 16:5 | verifying 19:11 |
| 57:5,8 | 14:22 15:10 | 17:11 21:3,4,6 | 28:4 |
| transcription | 21:15 35:9 | 21:8,12,16,19 | veritext 55:14 |
| 54:9 | 44:18 53:1 | 21:22,25 22:3 | 55:23 |
| transmitted | under 20:25 | 22:6,10,13,19 | veritext.com |
| 26:5 | 51:8 54:13 | 23:15,25 25:5 | 55:15 |

Case 2:25-cv-00050-RJS-CMR    Document 57-15    Filed 04/25/25    PageID.1289    Page
Appellate Case: 25-4124    Document: 73 of 73    Date Filed: 12/18/2025    Page: 184

Melissa Mortel    March 27, 2025

[version - young]                                                                    Page 15

| | | | |
|---|---|---|---|
| **version** 43:24 | 27:8,11 31:7,9 | 32:3 35:4 | 34:12,24 52:6 |
| 44:3,9 | 31:16 32:19,20 | 45:17 49:9,20 | **year** 13:15 20:8 |
| **versus** 14:15 | 37:5,13 41:25 | 54:6,12,17 | 20:9 22:7 40:9 |
| 17:13,13 28:24 | 48:21 52:13,16 | 55:8,10,12,18 | 43:12,13 51:10 |
| **vicinity** 47:3 | 55:4 56:1 57:1 | **wondering** | **young** 7:5 |
| **videos** 35:7,10 | **watch's** 3:9 | 10:10 42:8 | |
| **violate** 37:9 | 22:19 23:25 | **word** 10:10 | |
| **virginia** 2:12 | 33:7 36:5 39:4 | 24:8 | |
| **vitagliano** 2:9 | 41:8 42:24 | **wording** 24:11 | |
| 3:3 4:6,7 10:7 | 44:20 48:7 | **work** 7:12,17 | |
| 20:2,21 21:5 | 50:13 | 14:8,17 15:25 | |
| 32:4 35:5 | **watching** 29:19 | 16:1,6 18:8,21 | |
| 37:22,25 38:17 | **way** 25:2 30:4 | 21:3,19,22 | |
| 38:21 46:21 | **we've** 33:10 | 22:1 23:6,20 | |
| 49:11,21 50:9 | 36:16,16 39:15 | 23:21 25:11 | |
| 53:2 54:13 | 41:16 52:14 | 27:10,13 | |
| **voluntary** | **website** 3:9 8:1 | **worked** 8:2 | |
| 11:15 | 8:17,18 22:19 | 10:8 13:24 | |
| **voting** 46:4 | 36:5 39:5 41:8 | 17:19 21:16 | |
| **vs** 1:6 | 42:25 44:20 | **working** 8:7 | |
| **w** | 48:7 50:14 | 10:2,7,16,24 | |
| **w** 22:6 | **wedding** 12:16 | 12:1,25 | |
| **w210** 2:16 | **week** 11:13 | **works** 14:17 | |
| **waiting** 27:19 | 16:7,11,11,13 | **world** 34:23 | |
| **want** 9:6 12:9 | 18:24,25 19:1 | **wpu** 51:23 | |
| 19:2 26:6 38:9 | 19:1 21:19,21 | **writing** 36:19 | |
| **wants** 15:8 | 26:13 31:15 | **written** 14:19 | |
| **warned** 46:14 | 35:18,18 | 16:1 30:16,18 | |
| **washington** 2:6 | **westminster** | **wrong** 47:10 | |
| **watch** 1:3 5:18 | 9:9 | **wrote** 16:24 | |
| 8:1 10:8,15,20 | **wilson** 2:11 | 47:11 | |
| 12:2,25 21:3,4 | **withdrawn** | **x** | |
| 21:6,8,12,17 | 46:22 | **x** 3:1,5 | |
| 21:20,22 22:1 | **witness** 4:3 | **y** | |
| 22:4,7,10,13 | 10:5 11:1,10 | **yeah** 17:9 19:3 | |
| 23:16 25:5,11 | 19:23 20:1 | 20:13 26:22 | |
| 26:16,20 27:2 | 24:4,22 26:11 | 32:22 33:15 | |
| | 27:16 31:19 | | |





EXHIBIT

Suppl. App. 183



About Me

About Art Therapy

About Therapy

About Finding the Right Therapist

About My Education and Experience

Suppl. App. 184

### Credentials

- ATR-BC (Registered and Board-Certified Art Therapist)
- LMFT (Licensed Marriage and Family Therapist)
- ATCS (Art Therapy Certified Supervisor)

### Education

- BS in Family Science from Brigham Young University
- MA in Marital and Family Therapy and Clinical Art Therapy from Loyola Marymount University

### Additional Trainings

- DBT (Dialectical Behavioral Therapy, Intensive 2-week Training)
- RO-DBT (Radically-Open Dialectical Behavioral Therapy)
- EMDR Therapy (Eye Movement Desensitization and Reprocessing)
- IFS (Internal Family Systems)
- EFT (Emotionally-Focused Couples Therapy)
- ERP (Exposure Response Prevention)
- ACT (Acceptance and Commitment Therapy)

### Experience

- Professor at *University of Utah* (Master's in Social Work program), *Westminster College* (Undergraduate Psychology), and *PennWest Edinboro* (Master's in Counseling – Art Therapy)
- Therapist in Community Mental Health (Outpatient) Clinics
- School-based Therapist (Elementary and High Schools)
- Director and Art Therapist in Medical/Pediatric Hospital
- Director, Art Therapist, Primary Therapist in Residential Treatment Center
- Private Practice (2008-present)
- Supervision (2007-present)



Designed by **Elegant Themes** | Powered by **WordPress**

**Suppl. App. 185**



Legislature · Feb 25, 2025 · 3 min read

## Latest Utah tax cut plan: Nearly $2,000 for top 1%, $31 for average family

 Bryan Schott



Utah State Capitol (Photo by Scott Catron from Sandy, Utah, USA is licensed under CC BY-SA 2.0.)

The wealthiest residents stand to gain the most from yet another proposed tax cut, even as state revenue projections fall short of expectations. The Republican-controlled legislature is pushing forward with a plan that would give top earners nearly $2,000 in annual savings, while the average Utah family would see just $31.

On Tuesday morning, the House Revenue and Taxation Committee advanced a revised HB106, sponsored by Rep. Kay Christofferson. The previous version lowered Utah's corporate and income tax rate by 0.1%, from 4.55 to 4.45%. The new bill cuts the proposed tax reduction in half, to 4.5%.

The 0.05% reduction would cost $118 million next year, including $21 million in one-time costs, and $97 million every year after that.



EXHIBIT

Suppl. App 186

Case 2:25-cv-00050-RJS-CMR    Document 57-4    Filed 04/25/25    PageID.1172    Page
Appellate Case: 25-4124    Document: 3 of 6    Date Filed: 12/18/2025    Page: 189

3/21/25, 1:25 PM                         Utah tax cut plan $2,000 for top 1%, $31 for average family

Lawmakers appear committed to another round of tax cuts, despite disappointing revenue projections released last week that show revenues from corporate and income taxes will be lower than anticipated.

Moe Hickey, Executive Director of Voices for Utah Children, says lawmakers would be better off foregoing tax cuts this year in case Utah's economic picture continues to darken.

"That's money that is desperately needed in social services and healthcare and education, and we continue to wonder why our revenues aren't matching our expectations. The fact that we're coming in slightly below revenue projections this year is something we should be really concerned about as we look forward," Hickey said.

During public comment on Tuesday morning, Billy Hesterman of the Utah Taxpayers Association praised the plan to reduce taxes, which he says will make Utah more competitive economically.

"When you look at the states surrounding us, we have two states that have no income tax in Wyoming and Nevada. And then if you look at the rates of others, Arizona's is 2.5% and Colorado is 4.4%. Moving this to 4.5% and hopefully lower as time goes on we think is the right thing to make sure that we're in balance with what the other states are doing," Hesterman said.

According to an analysis from Voices for Utah Children and the nonprofit Institute on Taxation and Economic Policy, 31% of the tax cut would go to the top 1% of income earners in the state with annual salaries of $882,000 or more. Those taxpayers would receive, on average, $1,929 in tax savings.

The next 4% of earners with a median annual salary of $483,000 would see an average tax reduction of about $200 per year.

The tax bill for the average Utah household with an annual income of $81,600 would decline by $31 per year, or about $2.58 per month.

Just 7% of the overall tax cut would go to Utahns in the bottom 40% of income earners. The bottom 20% with an income of $36,000 or less would receive, on average, about $0.42 per month or $5 per year. Fewer than half of those low-income Utahns are even eligible to qualify for the tax cut because they either don't earn enough to pay taxes or see their tax bill eliminated due to low-income tax credits.

Suppl. App. 187

Since 2021, the GOP-controlled Legislature has dropped the state's corporate and individual income tax rate from 4.95% to the current rate of 4.55%. The approximately $640 million to pay for that reduction comes from future revenues that, under Utah's Constitution, can only go to public education, higher education and some social services. If this year's reduction is approved, those future revenues will decline by another $97 million annually.

As a reader of Utah Political Watch, you know how vital independent journalism is to our state, but I can only continue this essential work with your support.

Will you join other Utahns who've already stepped up to support this effort? Choose between a monthly subscription starting at just $5 or a one-time contribution that fits your budget.

Your investment helps maintain our independence, and dig deeper into the stories that matter to you.

Together, we can ensure Utah has the strong, independent journalism it deserves. Join us today in building a more informed, transparent, and democratic Utah.



Share        X Share        🦋 Share        𝑓 Share        in Share        ✉ Email        🔗 Copy

Suppl. App. 188

## Comments



Start the conversation                                    0 comments

## Read next



Legislature  ·  Mar 21, 2025    ⭐

### Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway

Utah is about to become the first state in America to completely ban adding fluoride to drinking water, even though

 Bryan Schott



Legislature  ·  Mar 13, 2025    ⭐

### Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night

 Bryan Schott

**Suppl. App. 189**

3/21/25, 1:25 PM



Legislature · Mar 12, 2025 ⭐

## Report: Pride flag ban threatens Utah's Sundance Film Festival future

Utah's hopes for keeping the Sundance Film Festival — a cultural and economic powerhouse — from leaving the state could

**Bryan Schott**
Independent news and commentary about politics in Utah

f  𝕏  🔗  🦋  @  in  ⦿  ♪  ▶

**Utah Political Watch**                    **Legal**

Home                                        Archive

Subscribe                                   Tags

About

Support My Work

Buy me a coffee

Staff

**Categories**

2024 election

Congress

Environment

Legislature

©2025 Utah Political Watch. Published with Ghost & Flair.  ☀ ☾

**Suppl. App. 190**



<span style="color:gray">Legislature · Mar 13, 2025 · 2 min read</span>

## Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

Bryan Schott



House Chamber inside the Utah State Capitol (Photo by Scott Catron from Sandy, Utah, USA is licensed under CC BY-SA 2.0.)

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night of the 2025 legislative session, they quietly dismantled Utah's open records law—eliminating language that for years has protected citizens' right to access information about their government.

Buried at the bottom of HB394 is a provision that repeals "intent language" that lawmakers included with Utah's Government Access and Records Management Act, known as GRAMA. Intent language is sometimes added to legislation to give courts guidance on how to interpret laws.

The section currently on the chopping block contains statements that have long affirmed the public's right to access information about how the government conducts its business, and that the government should favor public disclosure whenever possible. It also recognizes the public's right to privacy in relation to personal data collected by government agencies.

Become a paid subscriber

Buy me a coffee

EXHIBIT
8
Suppl. App. 191

3/21/25, 1:07 PM    Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

If Gov. Spencer Cox signs the bill into law, these critical transparency guarantees will vanish entirely.

Sen. Daniel Thatcher warned that deleting this section from the law was too much of a change.

"I believe this is a very significant policy decision, and I'm not comfortable voting to strike that language recognizing the right of the public to know what we're doing and for their data to be private," Thatcher declared. "I think this is a serious policy call and I think we should reject this."

The assault on the public's right to know didn't stop there. SB277 would dismantle the seven-member State Records Committee — replacing the oversight body with a single attorney appointed by the governor who would have unilateral power to decide whether records can be released to the public. HB69 makes it more difficult for the public to recoup legal costs if they have to fight to access public records in court.

## Got a news tip to share?
## Scan this QR code and connect with me securely on Signal.



You can also reach me via secure email
tips@utahpoliticalwatch.news



Suppl. App. 192

Share    𝕏 Share    Share    Share    in Share    ✉ Email    🔗 Copy

## Comments

0 comments

 Start the conversation

**Read next**



Legislature · Mar 12, 2025    ⭐

### Report: Pride flag ban threatens Utah's Sundance Film Festival future

Utah's hopes for keeping the Sundance Film Festival — a cultural and economic powerhouse — from leaving the state could

 Bryan Schott



Legislature · Mar 11, 2025    ⭐

### No such thing as a free lunch? Utah lawmakers were treated to dozens of free meals and events

Utah's 104 lawmakers received 27 catered meals, 33 refreshment breaks, 9 receptions, and 10 complimentary social events during

 Bryan Schott



**Suppl. App. 193**

Legislature · Mar 7, 2025

## Sen. Daniel Thatcher leaves GOP, joins Utah Forward Party

Republican Sen. Daniel Thatcher announced Friday he's abandoning the Republican Party to join the fledgling Utah Forward Party

 Bryan Schott



Independent news and commentary about politics in Utah

ᵮ   X   ℝ   ꙮ   ©   in   ◎   ♪   ▷

**Utah Political Watch**

Home

Subscribe

About

Support My Work

Buy me a coffee

Staff

**Categories**

2024 election

Congress

Environment

Legislature

**Legal**

Archive

Tags

©2025 Utah Political Watch. Published with Ghost & Flair.   ☀   🌙

**Suppl. App. 194**



Legislature · Mar 11, 2025 · 2 min read

## No such thing as a free lunch? Utah lawmakers were treated to dozens of free meals and events

 Bryan Schott



"Flags over Utah State Capitol" by Jodanoo is marked with CC0 1.0.

Utah's 104 lawmakers received 27 catered meals, 33 refreshment breaks, 9 receptions, and 10 complimentary social events during the state's just-completed 45-day legislative session — all provided by government agencies, industry organizations, special interest groups and lobbyists. The freebies are exempt from Utah's public disclosure laws.

The meals, snacks and events were coordinated as part of the Legislature's "Third House" events for lawmakers. Under current rules, sponsoring organizations aren't required to disclose their spending as long as all lawmakers receive invitations.

Several of the sponsored dinners were held in exclusive locations like the Alta Club, Memorial House in Memory Grove or at This is the Place Park. Holding an event at those venues can cost several thousand dollars.

Become a paid subscriber

Buy me a coffee

In addition to meals and snacks, some groups treated lawmakers to free outings at museums or live theater performances. One lobbying firm treated legislators to an evening of dinner and a movie.

According to a schedule obtained by Utah Political Watch, many of the sponsoring organizations either had business before the Legislature or were special interest groups advocating for specific legislation. For instance, the Utah State Board of Education, Snow College and Southern Utah University depend on the Legislature to set their annual budgets.

Utah Parents United, which hosted an afternoon break, actively pushed for lawmakers to pass the bill banning fluoride in drinking water systems. UPU has also pushed to expand funding for Utah's school vouchers program and testified in favor of a bill to ban transgender students living in dormitories at public colleges and universities that align with their gender identity.



EXHIBIT

Suppl. App. 195

Case 2:25-cv-00050-RJS-CMR    Document 57-6    Filed 04/25/25    PageID.1183    Page
Appellate Case: 25-4124    Document: 35-5    Date Filed: 12/18/2025    Page: 198

3/21/25, 1:14 PM    Utah lawmakers fed by special interests with no disclosure required

## 2025 "Third House" activities for Utah Lawmakers

| Date | Breakfast | Morning break | Lunch | Afternoon break | Reception | Dinner | Social event |
|------|-----------|---------------|-------|-----------------|-----------|--------|--------------|
| 01/21 | | | | | | UMA/ Utah Beverage Association | |
| 01/22 | | Utah Food Industry Association | Utah League of Cities and Towns | | | | Open House at Governor's Mansion |
| 01/23 | | Utah anti-bullying coalition | | | | National Association of Benefits and Insurance Professionals | |
| 01/24 | Utah State Board of Education | Libertas Institute | Braver Angels | | | | North American Museum of Ancient Life (Thanksgiving Point) |
| 01/25 | | | | | | | Discovery Gateway (all-day) |
| 01/27 | | 1-800 Contacts | Utah Police Chiefs | | | | SL City Council - Gallivan Center |
| 01/28 | Envision Utah | Holland and Hart | | | | | Clark Planetarium |
| 01/29 | Utah Tech University | Utah High School Activities Association | Utah Health Forum | | Utah Housing Coalition | Artworks for Kids (Grand America) | |
| 01/30 | | Utah Optometric Association | | | | | Loveland Aquarium |
| 01/31 | | Utah Beer Wholesalers | Utah Tourism | | Utah Nurse Practicioners | | |
| 02/03 | Utah Academy of Family Physicians | Utah Petroleum Association | Utah Fire Caucus | | Utah Legislative Coalition for People with Disabilities | Huntsman Mental Health Foundation | |
| 02/04 | | | AES | | Utah Hospital Association (Little America) | | |
| 02/05 | Utah Association of Counties | Intermountain and Select Health | Snow College | Single Family Home Owners | | | |
| 02/06 | | Clark Planetarium Board | | | | | Dinner/Show @ Centerpoint Legacy Theater |
| 02/07 | Utah Defense Alliance | Holcim | Alzehimer's Association of Utah | Utah Mining | | | The Leonardo |
| 02/10 | | Utah Chiropractic Physicians Association | Utah Association of Realtors | Utah State Board of Education | NAIFA | | Natural History Museum |

**Suppl. App. 196**



Utah lawmakers fed by special interests with no disclosure required

| 02/11 | United Way of Utah | | Utah Business Coalition | Utah Restaurant Association (The Garden Place at Heritage Park) |

1 / 2

✳ *A Flourish table*

## Got a news tip to share?
## Scan this QR code and connect with me securely on Signal.



SchottHappens.01

## You can also reach me via secure email
## tips@utahpoliticalwatch.news





Share     ✗ Share     ᪲ Share     ⓯ Share     ᦲ Share     ✉ Email     ⧉ Copy

**Read next**

**Suppl. App. 197**

3/21/25, 1:14 PM    Utah lawmakers fed by special interests with no disclosure required



Legislature · Mar 21, 2025

**Poll: Only 20% of Utah voters support fluoride ban, but**



Legislature · Mar 13, 2025

**Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature**

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night

 Bryan Schott



Legislature · Mar 12, 2025

**Report: Pride flag ban threatens Utah's Sundance Film Festival future**

Utah's hopes for keeping the Sundance Film Festival — a cultural and economic powerhouse — from leaving the state could

 Bryan Schott

Independent news and commentary about politics in Utah

ⓕ  𝕏  ⤵  ⌨  ⓐ  in  ⓘ  ♪  ▶

**Utah Political Watch**

Home
Subscribe
About
Support My Work
Buy me a coffee
Staff

**Legal**

Archive
Tags

**Categories**

2024 election
Congress
Environment
Legislature

©2025 Utah Political Watch. Published with Ghost & Flair.  ☀  ☾

**Suppl. App. 198**

Case 2:25-cv-00050-RJS-CMR    Document 57-7    Filed 04/25/25    PageID.1187    Page
Appellate Case: 25-4124    Document 2 of 6    Date Filed: 12/18/2025    Page: 201

3/24/25, 10:56 AM                                     Day 28: Don't believe the hype



# Day 28: Don't believe the hype

 Bryan Schott



Utah legislative leaders are expected to tout in the coming days that they're boosting public education funding for the 2025-26 school year by nearly a quarter billion dollars or more. However, it's important to understand how much of that increase is mandatory, and how much is discretionary.

Last December, legislative leaders approved a 4% increase in the weighted pupil unit (WPU), the formula determining how much the state spends per student in the public education system. Currently, Utah spends just under $4,500 per student.



EXHIBIT

Suppl. App. 199

The 4% increase, amounting to approximately $180 million, is required under state law to cover inflationary costs to public schools, calculated on a five-year rolling average. Lawmakers are also required to cover the cost of enrollment growth, which adds about $21 million.

Anything above the $200 million approved in December is discretionary.

The Public Education Appropriations subcommittee is recommending a discretionary increase to the WPU of just 1%, which amounts to $43 million.

In contrast, that same subcommittee has recommended increasing funding to Utah's private school voucher program by $40 million.

## New Bills that caught my attention

- HB521 from Rep. Nicholeen Peck prohibits the use of public funds for "transgender medical treatments and procedures."

## Afternoon headlines

Senate committee OKs bill aimed at immigrants thought to be involved in organized crime. [KSL]

Utah lawmaker moves to restrict transgender adults access to gender-affirming care. [Tribune]

Bill expanding Utah's free school lunch program advances past committee. [Fox 13]

Utah bill would require cops to disclose AI-authored police reports. [Popular Science]

Utah lawmakers work to ensure modesty, privacy for children in schools. [Deseret News]

A new Utah bill would protect religious clubs at universities. [Deseret News]

What state oversight is there for Utah's next Olympics? [Deseret News]

**Suppl. App. 200**

Case 2:25-cv-00050-RJS-CMR    Document 57-7    Filed 04/25/25    PageID.1189    Page
Appellate Case: 25-4124    Document 4 of 6    Date Filed: 12/18/2025    Page: 203

3/24/25, 10:56 AM    Day 28: Don't believe the hype

## What's on Wednesday's agenda?

**Morning committee meetings**

- [HB120](#), which keeps Utah on mountain standard time year-round until Congress allows Utah to switch to mountain daylight time permanently, is up in the Senate Business and Labor Committee.

- [HB84](#) from Rep. Trevor Lee mandates that any food that is used as a method for delivering a vaccine be labeled as a drug. The bill is set for debate in the Senate Health and Human Services Committee.

**Afternoon committee meetings**

- The House Education Committee will debate [HB402](#) from Rep. Kristen Chevrier that bans schools from serving food with certain food dyes in them.

- The House Education Committee will also consider [HB169](#) from Rep. Doug Welton that requires the State Board of Education to establish a code of conduct and ethical rules for members.

- [HB331](#) which establishes rules for the sale or transfer of one of Utah's Olympic facilities is scheduled for the House Economic Development and Workforce Services Committee.

- [SB142](#) which requires age verification for app store purchases from Sen. Todd Weiler is also on the House Economic Development committee.

Share       X Share       Share       Share       Share       Email       Copy

**Suppl. App. 201**

## Read next



Legislature  ·  Mar 21, 2025  ⭐

### Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway

Utah is about to become the first state in America to completely ban adding fluoride to drinking water, even though

 Bryan Schott



Legislature  ·  Mar 13, 2025  ⭐

### Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night

 Bryan Schott



**Suppl. App. 202**

Legislature · Mar 12, 2025

## Report: Pride flag ban threatens Utah's Sundance Film Festival future

Utah's hopes for keeping the Sundance Film Festival — a cultural and economic powerhouse — from leaving the state could

 Bryan Schott



Independent news and commentary about politics in Utah

**Utah Political Watch**

Home

Subscribe

About

Support My Work

Buy me a coffee

Staff

**Categories**

2024 election

Congress

Environment

Legislature

**Legal**

Archive

Tags

©2025 Utah Political Watch. Published with Ghost & Flair.

**Suppl. App. 203**



Legislature · Dec 26, 2024 · 2 min read

## Rep. Kera Birkeland resigns from Utah Legislature

This summer, Birkeland took a job with a Montana trade association. Prosecutors recently filed stalking charges against a woman who was harassing her family.

 Bryan Schott



"Kera Birkeland (52520620345)" by Gage Skidmore from Surprise, AZ, United States of America is licensed under CC BY-SA 2.0.

Despite winning re-election to another term in the Utah Legislature, Rep. Kera Birkeland announced Thursday she was resigning from her seat in January.

In a post on X/Twitter, Birkeland said she was stepping down from her seat to give more attention to her family.



EXHIBIT

Suppl. App 204

Case 2:25-cv-00050-RJS-CMR    Document 57-8    Filed 04/25/25    PageID.1194    Page
Appellate Case: 25-4124    Document 3-6    Date Filed: 12/18/2025    Page: 207

3/24/25, 11:09 PM    Rep. Kera Birkeland resigns from the Legislature



"My family and professional commitments have increasingly required my attention away from home, a trend I anticipate will persist for the next year or two," Birkeland wrote in a letter she posted to social media.

Birkeland's replacement will be chosen by Republican delegates in a special election. That's the same process used to appoint Birkeland to the Legislature in 2020 when former Rep. Logan Wilde resigned after he was appointed as Utah Commissioner of Agriculture and Food.

During her tenure, Birkeland sponsored legislation to ban female transgender athletes from participating in women's sports. In 2024, she sponsored legislation restricting which bathrooms and locker rooms transgender people can use in state buildings.

Birkeland was hired as the director of policy for the Montana Grain Growers Association (MGGA) in July. That new position appears to present a direct conflict with her responsibilities

Suppl. App. 205

as an elected official as the 2025 Montana Legislature commences on Jan. 6 while the Utah Legislature begins on Jan. 21.

For her part, Birkeland denies she would be unable to juggle the two positions.

"I'm not the lobbyist for MGGA. I mostly work on federal policy for them. The farm bill has been my priority with MGGA," Birkeland said in a text message.

Additionally, Birkeland's husband, Lars, moved to Montana to take a job on her father's ranch in 2023.

"We've been going back and forth between both our homes, for over a year. I work remotely (for all my work) but my parent's needs are escalating— it's not right to remain a representative when my priorities are pulling me so far away, so often," Birkeland said in a text message to Utah Political Watch.

In October, the state filed misdemeanor stalking charges against a woman who was harassing Birkeland and her family. Court documents allege the woman sent harassing messages to Birkeland and her children on social media. In one case, after Birkeland made a post on social media, the woman replied with a photo of Birkeland's home with the caption, "Is this you?"

Despite the alleged stalking incident, Birkeland says she intends to remain in Utah.

"I'll keep Utah as my residence, my kids all live and attend school here. But for the next year or two, I'll be between both locations. Several laws passed have greatly impacted development in rural Utah. That has created many needs for those I represent—they need someone who has the time to work through and advocate for them better," Birkeland said via text.

Birkeland's resignation is effective on Jan. 10, which is less than two weeks before the 2025 Utah Legislature begins. However, according to the Utah Constitution, her term officially ends on Jan. 1, 2025.

Share        X Share     ✗ Share     ♪ Share     in Share     ✉ Email     ⚭ Copy

**Suppl. App. 206**

Case 2:25-cv-00050-RJS-CMR    Document 57-8    Filed 04/25/25    PageID.1196    Page
Appellate Case: 25-4124    Document 5 of 6    Date Filed: 12/18/2025    Page: 209

3/24/25, 11:09 PM    Rep. Kera Birkeland resigns from the Legislature

## Read next



Legislature · Mar 24, 2025    ⭐

### Utah GOP Senator: Media rule change meant to show journalist 'Who's the boss'

The Republican-controlled Utah Legislature revised their media credential policy late last year to exclude "independent" journalists. One GOP senator says

Utah Political Watch



Legislature · Mar 21, 2025    ⭐

### Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway

Utah is about to become the first state in America to completely ban adding fluoride to drinking water, even though

 Bryan Schott



Legislature · Mar 13, 2025    ⭐

### Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night

 Bryan Schott

**Suppl. App. 207**

Case 2:25-cv-00050-RJS-CMR    Document 57-8    Filed 04/25/25    PageID.1197    Page
Appellate Case: 25-4124    Document: 46-6    Date Filed: 12/18/2025    Page: 210

3/24/25, 11:09 PM                                    Rep Kera Birkeland resigns from the Legislature



Independent news and commentary about politics in Utah

**Utah Political Watch**

Home

Subscribe

About

Support My Work

Buy me a coffee

Staff

**Categories**

2024 election

Congress

Environment

Legislature

**Legal**

Archive

Tags

©2025 Utah Political Watch. Published with Ghost & Flair.

**Suppl. App. 208**



🔍  👤  ≡

Legislature · Jan 9, 2025 · 5 min read

## Political payback? Utah teachers' union locked out of discussions on bill to limit their power

 Bryan Schott



"Jordan Teuscher (52520696193)" by Gage Skidmore from Surprise, AZ, United States of America is licensed under CC BY-SA 2.0.

Utah lawmakers are preparing fresh legislation to restrict public employee unions, reviving a battle that could dramatically reshape how the state's largest teachers' union operates. While Republican leaders insist the upcoming bill isn't aimed at the Utah Education Association (UEA), it comes amid escalating tensions over education funding and two high-profile lawsuits that have put the teachers' union at odds with the GOP-controlled Legislature.

The state's largest teacher's union angered legislative Republicans by opposing Amendment A, which sought to expand the state's constitutional framework for public education funding.

Currently, income and corporate tax revenues can only fund public and higher education and certain social service programs. Amendment A sought to expand that earmark, allowing the legislature to use those funds for other budget areas.

After the UEA went to court alleging the ballot language for the proposed amendment was misleading and lawmakers didn't follow the correct process to notify the public, they abandoned that effort.




EXHIBIT

Suppl. App. 209

The Republican majority was further irked by another lawsuit filed by the UEA challenging Utah's $82 million private school voucher program, dubbed the Utah Fits All Scholarship. A judge is expected to rule on whether the program is unconstitutional later this month.

Rep. Jordan Teuscher, R-South Jordan, is working on legislation for the upcoming session to "establish appropriate guardrails" on public sector unions.

Teuscher declined to provide details about his legislation, but said it would be similar to HB285 from the 2024 session. That bill sought to require public sector unions to hold a recertification vote every five years and required members wanting dues deducted from their paychecks to opt in.

Teuscher couldn't garner enough support for the legislation last year due to massive opposition from Utah labor unions, and it died without a vote in the Utah House.

Teuscher says his bill isn't meant as retaliation against the UEA.

"To be clear, this is not targeted at the UEA or any specific organization," Teuscher said in a text message.

If approved, Teuscher's bill would significantly impact the UEA. However, he says he hasn't discussed the legislation with the organization, nor does he intend to.

"In the past, I engaged extensively with them, listening to their concerns, discussing issues, and even incorporating their suggestions. However, their continued use of bullying tactics, misleading their members, and spreading misinformation has been deeply troubling. These actions suggest they are more focused on advancing their own agenda than on genuinely supporting Utah's teachers, students, or the broader education community. Until I see a meaningful change in their approach, I have no intention of meeting with them."

"I am meeting with other unions and individual public employee union members (including teachers) to ensure a broad and constructive dialogue. My focus remains on creating solutions that protect Utah's taxpayers, eliminate perverse incentives/needless conflicts, and best serve Utah."

Utah Education Association President Renée Pinkney doesn't believe Teuscher's claim that he's not exacting revenge on her organization.

"Anti-public education lawmakers claim proposed legislation isn't targeting the Utah Education Association, but their actions—like excluding UEA leadership from discussions—say otherwise. Trying to sideline public educators' strongest advocate is a legislative power grab designed to weaken public education," Pinkney said in a statement to Utah Political Watch.

Pinkney adds excluding her organization from discussions about legislation that would significantly impact members is unacceptable.

Suppl. App. 210

Case 2:25-cv-00050-RJS-CMR     Document 57-9     Filed 04/25/25     PageID.1201     Page
Appellate Case: 25-4124     Document 4-47     Date Filed: 12/18/2025     Page: 213

3/24/25, 11:17 PM
Utah GOP plans union crackdown after teacher legal battles

"UEA proudly and truthfully advocates for Utah's 18,000 public educators and the students we serve. Excluding the most established voice for public school educators isn't about fostering dialogue—it's about consolidating power at the expense of Utah's public education system."

"Utah's students, public educators, and taxpayers deserve better than political retaliation masquerading as policy."

Teuscher is meeting with other individuals and organizations to fine-tune his proposal.

Teuscher's proposal will get a signal boost from the right-wing group Utah Parents United. A non-scientific survey sent to their membership included an entire section on the UEA. Questions included, "Do you believe the UEA represents your values?" and "Do you believe the UEA has a negative influence on education in the state?"



Questions from the Utah Parents United 2025 Legislative Survey

It's easy to understand the animosity toward the UEA from Utah Parents United. UPU was a driving force behind the passage of Utah's private school voucher program, which UEA is challenging in court. UPU also advocates for home schooling as an alternative to public education.

The UPU survey included questions about legislation to hamstring the UEA. The proposals, reminiscent of Teuscher's failed 2024 legislation, include:

- "Would you support legislation that limits special privileges for public labor unions like the UEA, such as automatic payroll deductions for union dues?"

- "Do you believe the UEA should be required to certify and prove their membership?"

- "Do you believe the UEA is transparent enough about their membership and operations?"

- "Would you be more or less likely to vote for a legislator who supported reforms to UEA privileges?"

Corrine Johnson, the UPU founder, says her group plans to present the non-scientific survey results to lawmakers as definitive "proof" of broad public support for their agenda.

"It gives us that data so that when we go to the Legislature, it really helps us to show how important this legislation is to parents in the state of Utah and helps us get those bills passed," Johnson said during a December meeting with the far-right Utah Citizens for the Constitution.

During the meeting, Johnson made the far-fetched claim that there's unanimous support for at least one idea from the UPU survey.

"100 percent of parents really want the UEA to not collect union dues through paychecks."

Thank you for being a valued reader of Utah Political Watch.

Your support is crucial for delivering the high-quality, independent journalism that informs and empowers our community.

Join our growing community of supporters today by becoming a paid subscriber or making a one-time donation.

Every contribution, big or small, makes a difference.

Thank you for standing with us as we work to strengthen democracy and elevate the issues that matter to Utahns like you.



**Read next**



Legislature · Mar 24, 2025                                    ⭐

### Utah GOP Senator: Media rule change meant to show journalist 'Who's the boss'

The Republican-controlled Utah Legislature revised their media credential policy late last year to exclude "independent" journalists. One GOP senator says

Utah Political Watch



Legislature · Mar 21, 2025                                    ⭐

### Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway

Utah is about to become the first state in America to completely ban adding fluoride to drinking water, even though

 Bryan Schott



Legislature · Mar 13, 2025                                    ⭐

### Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night

 Bryan Schott

**Suppl. App. 213**



Independent news and commentary about politics in Utah

ℱ    𝕏    ᯥ    ⤬    ⑨    in    ⌾    ♪    ▶

**Utah Political Watch**                    **Legal**

Home                                        Archive

Subscribe                                   Tags

About

Support My Work

Buy me a coffee

Staff

**Categories**

2024 election

Congress

Environment

Legislature

©2025 Utah Political Watch. Published with Ghost & Flair.    ☀    🌙

**Suppl. App. 214**

**Re: Speak with Rep. Gricius?**



 ⊙ **Alexa Musselman <amusselman@le.utah.gov>**

Today at 10:54 AM

**To:** ○ schott@utahpoliticalwatch.news;  **Cc:** ⊙ Stephanie Gricius  ⌄

Hi Bryan,

Rep. Gricius asked me to pass along the following message:

While the idea was brought to me by a constituent, Utah Parents United was immensely helpful in getting the bill across the finish line. I appreciate their partnership and collaboration in moving forward an important piece of legislation.

Thanks,

Alexa Musselman
Director of Communications
Utah House of Representatives
801-865-5882

**From:** schott@utahpoliticalwatch.news <schott@utahpoliticalwatch.news>
**Date:** Wednesday, March 19, 2025 at 7:44 AM
**To:** Alexa Musselman <amusselman@le.utah.gov>
**Subject:** Speak with Rep. Gricius?

Yesterday at the UVU event, Rep. Gricius said that the idea for the bill to ban fluoride in the water came from one of her constituents.

I have tape of Corrine Johnson from Utah Parents United claiming credit for that bill.

I'd like to speak with Rep. Gricius today to try and understand why Johnson and UPU are claiming credit for this bill.

Thanks.

**BRYAN SCHOTT**
_____

**Publisher/Managing Editor**
**Utah Political Watch**
**"Journalists should be watchdogs, not lapdogs"**
**Cell: 801.205.8387**
**schott@utahpoliticalwatch.news**
**UTAHPOLITICALWATCH.NEWS**

Image removed by sender.




EXHIBIT
13

3/26/25, 2:00 PM
Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway

Case 2:25-cv-00050-RJS-CMR    Document 57-11    Filed 04/25/25    PageID.1208    Page
                    2 of 7
Appellate Case: 25-4124    Document: 7    Date Filed: 12/18/2025    Page: 218



  

Legislature · Mar 21, 2025 · 3 min read

# Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway

 Bryan Schott



Utah State Capitol (Photo: makelessnoise is licensed under CC BY 2.0)

Utah is about to become the first state in America to completely ban adding fluoride to drinking water, even though a new poll suggests only one in five Utah voters actually supports the decision.

Over the objections of dental health experts, lawmakers passed HB81, which overturns a voter-approved 1976 ballot initiative that allows fluoride to be added to water systems if voters approve it at the ballot box.

The survey from Noble Predictive Insights asked registered voters which of these statements came closest to their position on fluoridated water.

**EXHIBIT**

**Suppl. App. 216**

3/26/25, 2:04 PM Case 2:25-cv-00050-RJS-CMR Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway Filed 04/25/25 PageID.1209 Page

Appellate Case: 25-4124 Document 3 of 7 Date Filed: 12/18/2025 Page: 219

- "Fluoride is added to tap water in almost every state. It has dental health benefits and no negative effects. It should be in the water."

- "Fluoride is good for dental health, but local governments should be able to choose whether it's in the water."

- "Fluoride has negative effects and should not be added to drinking water."

The two statements supporting fluoridation were chosen by 32% and 34% of voters respectively. Just 20% felt fluoride was harmful, while 14% were not sure.



The poll suggests there is not a groundswell of public support for removing fluoride from water systems. In fact, just two years ago, voters in Brigham City **overwhelmingly rejected a ballot initiative** to end fluoridation in that city.

So, why would Utah lawmakers push through legislation that 66% of voters either oppose or believe should remain a local choice? The legislation got a big boost by right-wing special interest groups, showing the influence these organizations exert on legislative outcomes.

As a reader of Utah Political Watch, you know how vital independent journalism is to our state, but I can only continue this essential work with your support.

**Suppl. App. 217**

Case 2:25-cv-00050-RJS-CMR    Document 57-11    Filed 04/25/25    PageID.1210    Page
                              4 of 7
Appellate Case: 25-4124    Document: 447    Date Filed: 12/18/2025    Page: 220

Will you join other Utahns who've already stepped up to support this effort? Choose between a monthly subscription starting at just $5 or a one-time contribution that fits your budget.

Your investment helps maintain our independence, and dig deeper into the stories that matter to you.

Together, we can ensure Utah has the strong, independent journalism it deserves. Join us today in building a more informed, transparent, and democratic Utah.

**Become a paid subscriber**

**Buy me a coffee**

Just two counties — Salt Lake and Davis — currently have fluoridated water. The bill's sponsor, Rep. Stephanie Gricius, represents an area in Utah County that is not impacted by fluoridation. This week, she claimed that the issue was brought to her by a constituent, who also does not have fluoride added to their water.

A review of committee hearings and floor debates by Utah Political Watch found that at no point during the 2025 legislative session did Gricius mention the issue being prompted by constituent concerns.

However, late last year, Corrine Johnson, President of the right-wing parents' rights group Utah Parents United, **boasted during a recorded online meeting** that her organization had already secured a sponsor for the bill—who turned out to be Gricius.

"There's going to be a piece of legislation that is going to be removing fluoride from the water in Utah," Johnson said. "We've been pushing for this legislation since we fought masks and vaccines."

Johnson spoke in favor of the bill twice during committee hearings.

Gricius declined an interview request but acknowledged in a statement that Utah Parents United played a pivotal role in the legislation.

**Suppl. App. 218**

3/26/25, 2:02 PM Case 2:25-cv-00050-RJS-CMR Document 57-11 Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway Filed 04/25/25 PageID.1211 Page

Appellate Case: 25-4124    Document: 5 of 7    Date Filed: 12/18/2025    Page: 221

"While the idea was brought to me by a constituent, Utah Parents United was immensely helpful in getting the bill across the finish line. I appreciate their partnership and collaboration in moving forward an important piece of legislation," Gricius said.

Despite the clear disconnect between public opinion and legislative action, Gov. Spencer Cox confirmed <u>he intends to sign the legislation</u> into law — cementing a victory for special interest groups over the majority of Utah voters.

# Got a news tip to share?
# Scan this QR code and connect with me securely on Signal.



# You can also reach me via secure email
# tips@utahpoliticalwatch.news



Case 2:25-cv-00050-RJS-CMR    Document 57-11    Filed 04/25/25    PageID.1212    Page
              Appellate Case: 25-4124    Document: 44-7    Date Filed: 12/18/2025    Page: 222
                                                     6 of 7

Share        𝕏 Share      ᯤ Share      𝑓 Share      in Share      ✉ Email      ⧉ Copy

## Read next



Legislature · Mar 24, 2025                    ⭐

### Utah GOP Senator: Media rule change meant to show journalist 'Who's the boss'

The Republican-controlled Utah Legislature revised their media credential policy late last year to exclude "independent" journalists. One GOP senator says

Utah Political Watch



Legislature · Mar 13, 2025                    ⭐

### Lawmakers quietly gutted Utah's open records law in final hours of 2025 Legislature

In a little noticed last-minute move, Utah Republicans dealt a potentially devastating blow to government transparency. On the final night

 Bryan Schott

**Suppl. App. 220**

3/26/25, 2:08 AM Case 2:25-cv-00050-RJS-CMR Poll: Only 20% of Utah voters support fluoride ban, but lawmakers passed it anyway Document 57-11 Filed 04/25/25 PageID.1213 Page

Appellate Case: 25-4124 Document 7 of 7 Date Filed: 12/18/2025 Page: 223



Legislature · Mar 12, 2025 ⭐

## Report: Pride flag ban threatens Utah's Sundance Film Festival future

Utah's hopes for keeping the Sundance Film Festival — a cultural and economic powerhouse — from leaving the state could

 Bryan Schott



Independent news and commentary about politics in Utah

       

**Utah Political Watch**

Home

Subscribe

About

Support My Work

Buy me a coffee

Staff

**Categories**

2024 election

Congress

Environment

Legislature

**Legal**

Archive

Tags

©2025 Utah Political Watch. Published with Ghost & Flair.  

**Suppl. App. 221**

## CERTIFICATE OF SERVICE

I filed this supplemental appendix with the Court via ECF, which will email everyone requiring service.

Dated: December 18, 2025                                    */s/ Tyler R. Green*